*Solicitation Version*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § § § | **Chapter 11** |
| **WHITE ROCK MEDICAL CENTER, LLC,** *et al.* [1] | § § § § | **Case No. 26-90115 (ARP)** |
| | § § | **(Jointly Administered)** |
| Debtors. | § § | |

## DISCLOSURE STATEMENT FOR SECOND PLAN OF REORGANIZATION OF WHITE ROCK MEDICAL CENTER, LLC AND ITS AFFILIATED DEBTORS AS MODIFIED ON JULY 17, 2026

**REED SMITH LLP**

Omar J. Alaniz (SBN 24040402)
2850 N. Harwood Street, Suite 1500
Dallas, TX 75201
Telephone: (469) 680-4200
Facsimile: (469) 680-4299
E-mail: oalaniz@reedsmith.com

Scott M. Esterbrook (admitted *pro hac vice*)
Derek M. Osei-Bonsu (admitted *pro hac vice*)
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, PA 19103
Telephone: (215) 851-8100
Facsimile: (215) 851-1420
E-mail: sesterbrook@reedsmith.com
          dosei-bonsu@reedsmith.com

*Counsel for the*
*Debtors and Debtors-in-Possession*

Dated: July 24, 2026
Houston, Texas

---

[1] The Debtors in these chapter 11 cases and the last four digits of each of their federal identification numbers are White Rock Medical Center, LLC (6083); NCP Management, LLC (8327); North Houston Surgical Hospital, LLC (2161); National Payroll Services, LLC (3573); Heights Healthcare of Texas, LLC (0118); Heights Healthcare of Houston, LLC (3093); and Ashland Healthcare, LLC (0023). The location of the Debtors' corporate headquarters and the Debtors' service address is 9440 Poppy Drive Dallas, Texas 75218.

## TABLE OF CONTENTS

ARTICLE I INTRODUCTION...................................................................................... 1

   1.1    The Filing of the Debtors' Chapter 11 Cases........................................... 1

   1.2    Purpose of the Disclosure Statement ..................................................... 2

   1.3    Plan Balloting and Confirmation Procedures ........................................ 3

   1.4    Projected Recoveries and Treatment of Claims Under the Plan............. 9

   1.5    Releases, Exculpation and Injunctions ................................................ 15

   1.6    Recommendation of Plan Supporting Parties ....................................... 16

ARTICLE II DEBTORS' BACKGROUND AND FINANCIAL PICTURE ........................ 16

   2.1    History of the Debtors.......................................................................... 16

   2.2    The Debtors' Prepetition Capital Structure and Outstanding Obligations............ 19

ARTICLE III MATERIAL DEVELOPMENTS IN THE CHAPTER 11 CASES................ 23

   3.1    Commencement and Administration of the Chapter 11 Cases ............... 23

   3.2    Other Developments During the Chapter 11 Cases .............................. 27

ARTICLE IV SUMMARY OF THE DEBTORS' PLAN ................................................. 34

   4.1    Overview of the Debtors' Plan ............................................................ 34

   4.2    Terms of the Plan Control.................................................................... 34

   4.3    Unclassified Claims ............................................................................ 34

   4.4    Classification and Treatment of Claims................................................ 37

   4.5    Special Provisions Regarding Unimpaired Claims................................ 41

   4.6    Subordination of Claims ...................................................................... 41

   4.7    Appointment of Plan Administrator...................................................... 41

   4.8    Powers and Duties of the Plan Administrator........................................ 42

   4.9    Plan Administrator's Compensation and Retention of Professionals ................... 43

   4.10   Exculpation; Indemnification; Insurance; Liability Limitation ............. 44

   4.11   Reorganized Debtor ............................................................................ 44

   4.12   Indemnification of Resigning Employees............................................. 45

   4.13   Restructuring Transactions .................................................................. 45

   4.14   Sources of Cash for Distributions and Operations................................. 46

   4.15   Cancellation of Existing Securities and Agreements............................. 47

   4.16   Authorization of Issuance of New Securities Pursuant to the Restructuring
Transaction........................................................................................ 47

   4.17   Execution, Delivery, and Enforcement of Plan Documents Upon
Restructuring Transaction.................................................................... 48

| 4.18 | Intercompany Interests and Intercompany Claims | 48 |
| 4.19 | Deemed Consolidation | 48 |
| 4.20 | Corporate Action | 49 |
| 4.21 | Effectuating Documents; Further Transactions | 49 |
| 4.22 | Release of Liens | 49 |
| 4.23 | Tax Obligations of Liquidating Debtors | 49 |
| 4.24 | Exemption from Certain Transfer Taxes and Recording Fees | 49 |
| 4.25 | Further Authorization | 50 |
| 4.26 | Waiver and Release of Supporting Creditor Unsecured Claims | 50 |
| 4.27 | Replacement of Equipment Guaranties | 50 |
| 4.28 | Debtors' Releases | 50 |
| 4.29 | Releases by Releasing Parties | 51 |
| 4.30 | Consensual Releases; Reservation and Severability | 52 |
| 4.31 | Exculpation | 53 |
| 4.32 | Injunction | 53 |
| 4.33 | Allowance of Claims | 54 |
| 4.34 | Objection to Claims | 54 |
| 4.35 | Estimation of Claims | 54 |
| 4.36 | No Distributions Pending Allowance | 55 |
| 4.37 | Distributions Generally | 55 |
| 4.38 | No Postpetition or Default Interest on Claims | 55 |
| 4.39 | Timing of Distributions | 55 |
| 4.40 | Distribution Record Date | 55 |
| 4.41 | Distributions by Plan Administrator | 56 |
| 4.42 | Delivery of Distributions | 56 |
| 4.43 | Resolution of Claims | 56 |
| 4.44 | Disallowed Claims | 56 |
| 4.45 | Undeliverable Distributions and Unclaimed Property | 57 |
| 4.46 | Minimum Distributions | 57 |
| 4.47 | Setoff and Recoupment | 57 |
| 4.48 | No Distribution in Excess of Amount of Allowed Claims | 57 |
| 4.49 | Assumption or Rejection of Executory Contracts and Unexpired Leases | 57 |
| 4.50 | Assumption of the Hospital Lease | 59 |
| 4.51 | Assumption or Rejection of Government Agreements | 59 |

| | | |
|---|---|---|
| 4.52 | Cure of Defaults Under Assumed Contracts | 59 |
| 4.53 | Claims Based on Rejection of Executory Contracts and Unexpired Leases | 60 |
| 4.54 | Contracts and Leases Entered Into After the Petition Date | 60 |
| 4.55 | Reservation of Rights | 61 |

**ARTICLE V CONFIRMATION OF THE PLAN AND BINDING EFFECT** ... **61**

| | | |
|---|---|---|
| 5.1 | Conditions Precedent to the Effective Date | 61 |
| 5.2 | Waiver of Conditions Precedent | 62 |
| 5.3 | Notice of Effective Date | 62 |
| 5.4 | Discharge | 62 |
| 5.5 | Binding Effect | 63 |

**ARTICLE VI JURISDICTION OF THE BANKRUPTCY COURT** ... **63**

| | | |
|---|---|---|
| 6.1 | General Retention of Jurisdiction | 63 |
| 6.2 | Jurisdiction for Certain Other Agreements | 65 |
| 6.3 | Courts of Competent Jurisdiction | 65 |

**ARTICLE VII MISCELLANEOUS** ... **66**

| | | |
|---|---|---|
| 7.1 | Payment of Statutory Fees | 66 |
| 7.2 | Substantial Consummation and Case Closing | 66 |
| 7.3 | Amendment or Modification of the Plan | 66 |
| 7.4 | Successor and Assigns | 66 |
| 7.5 | Revocation, Withdrawal, or Non-Consummation | 67 |
| 7.6 | Immediate Binding Effect | 67 |
| 7.7 | Entire Agreement | 67 |
| 7.8 | Notice | 67 |
| 7.9 | Votes Solicited in Good Faith | 68 |
| 7.10 | Closing of Chapter 11 Cases | 68 |
| 7.11 | Waiver or Estoppel | 69 |

**ARTICLE VIII CONFIRMATION AND ALTERNATIVES TO THE PLAN** ... **69**

| | | |
|---|---|---|
| 8.1 | Requirements for Confirmation of the Plan | 69 |
| 8.2 | Feasibility | 69 |
| 8.3 | Best Interests Test/Liquidation Analysis | 70 |
| 8.4 | Acceptance by Impaired Classes. | 70 |
| 8.5 | Acceptance of the Plan without Acceptance from All Impaired Classes | 71 |

**ARTICLE IX RISK FACTORS** ... **72**

| | | |
|---|---|---|
| 9.1 | Bankruptcy Risks | 72 |

9.2     Plan Risks.................................................................................................. 75

**ARTICLE X CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE
PLAN.................................................................................................................... 76**

10.1     Certain U.S. Federal Income Tax Consequences to the Debtor ........................... 78

10.2     Certain U.S. Federal Income Tax Consequences for Holders of Class 2,
         Class 4, or Class 5 Claims.................................................................................... 79

10.3     Information Reporting and Withholding ............................................................. 83

IMPORTANT NOTICE

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE SECOND PLAN OF REORGANIZATION OF WHITE ROCK MEDICAL CENTER, LLC AND ITS AFFILIATED DEBTORS. EACH HOLDER OF A CLAIM AGAINST THE DEBTORS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ THE PLAN AND DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING. NO SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN MAY BE MADE EXCEPT PURSUANT TO THE TERMS HEREOF, THE DISCLOSURE STATEMENT ORDER AND SECTIONS 1121 AND 1125 OF THE BANKRUPTCY CODE. IF YOU ARE ENTITLED TO VOTE TO ACCEPT THE PLAN, YOU ARE RECEIVING A BALLOT WITH YOUR COMBINED NOTICE AND THIS DISCLOSURE STATEMENT. THE DEBTORS AND THE PLAN SUPPORTING PARTIES URGE YOU TO VOTE TO ACCEPT THE PLAN.

THE PLAN AND DISCLOSURE STATEMENT HAVE BEEN PREPARED IN ACCORDANCE WITH SECTIONS 1121 AND 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 3016 AND 3017, AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NON-BANKRUPTCY LAW. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING CLAIMS AGAINST OR INTERESTS IN THE DEBTORS SHOULD EVALUATE THE PLAN AND DISCLOSURE STATEMENT IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED. THE PLAN AND DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN OR DISCLOSURE STATEMENT AS TO HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS. YOU SHOULD CONSULT YOUR PERSONAL COUNSEL OR TAX ADVISOR ON ANY QUESTIONS OR CONCERNS REGARDING THE TAX, SECURITIES, OR OTHER LEGAL CONSEQUENCES OF THE PLAN AND DISCLOSURE STATEMENT.

THE DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN STATUTORY PROVISIONS, DOCUMENTS RELATED TO THE PLAN AND DISCLOSURE STATEMENT, EVENTS IN THE CHAPTER 11 CASES, AND FINANCIAL INFORMATION. ALTHOUGH THE DEBTORS BELIEVE THAT THE STATEMENTS AND DESCRIPTIONS CONTAINED IN THE DISCLOSURE STATEMENT ARE TRUE AND ACCURATE, THEY ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF THE DOCUMENTS RELATED TO THE PLAN AND DISCLOSURE STATEMENT AND APPLICABLE STATUTORY PROVISIONS. CREDITORS AND OTHER INTERESTED PARTIES SHOULD READ THE PLAN AND DISCLOSURE STATEMENT, THE DOCUMENTS RELATED TO THE PLAN AND DISCLOSURE STATEMENT, AND THE APPLICABLE STATUTES THEMSELVES FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE FACTUAL STATEMENTS AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE BY THE DEBTORS AS OF THE DATE

- v -

HEREOF UNLESS OTHERWISE SPECIFIED, AND THE DEBTORS DISCLAIM ANY OBLIGATION TO UPDATE ANY SUCH STATEMENTS AFTER THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN. THE DELIVERY OF THE DISCLOSURE STATEMENT SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF. THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT NECESSARILY BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

ALL FORWARD-LOOKING STATEMENTS CONTAINED HEREIN OR OTHERWISE MADE BY THE DEBTORS INVOLVE MATERIAL RISKS AND UNCERTAINTIES AND ARE SUBJECT TO CHANGE BASED ON NUMEROUS FACTORS, INCLUDING FACTORS THAT ARE BEYOND THE DEBTORS' CONTROL. ACCORDINGLY, THE DEBTORS' FUTURE PERFORMANCE AND FINANCIAL RESULTS MAY DIFFER MATERIALLY FROM THOSE EXPRESSED OR IMPLIED IN ANY SUCH FORWARD-LOOKING STATEMENTS. SUCH FACTORS INCLUDE, BUT ARE NOT LIMITED TO, THOSE DESCRIBED IN THE DISCLOSURE STATEMENT. THE DEBTORS DO NOT INTEND TO UPDATE OR REVISE THEIR FORWARD-LOOKING STATEMENTS EVEN IF EXPERIENCE OR FUTURE CHANGES MAKE IT CLEAR THAT ANY PROJECTED RESULTS EXPRESSED OR IMPLIED THEREIN WILL NOT BE REALIZED.

ANY PROJECTED RECOVERIES TO CREDITORS SET FORTH IN THIS DISCLOSURE STATEMENT ARE BASED UPON THE ANALYSES PERFORMED BY THE DEBTORS AND THEIR ADVISORS. ALTHOUGH THE DEBTORS AND THEIR ADVISORS HAVE MADE EVERY EFFORT TO VERIFY THE ACCURACY OF THE INFORMATION PRESENTED HEREIN, THE DEBTORS AND THEIR ADVISORS CANNOT MAKE ANY REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THIS INFORMATION.

IN CONNECTION WITH THE DEBTORS' SOLICITATION OF ACCEPTANCES OF THE PLAN PURSUANT TO SECTION 1126(b) OF THE BANKRUPTCY CODE, THE DEBTORS ARE FURNISHING A SOLICITATION PACKAGE, CONSISTING OF THE DISCLOSURE STATEMENT, THE EXHIBITS HERETO, CONFIRMATION NOTICE, AND A BALLOT, AS APPLICABLE, TO EACH RECORD HOLDER OF CLAIMS ELIGIBLE TO VOTE OR ITS COUNSEL. THE DISCLOSURE STATEMENT AND EXHIBITS ARE TO BE USED BY EACH SUCH ELIGIBLE HOLDER SOLELY IN CONNECTION WITH AN EVALUATION OF THE PLAN; USE OF THE DISCLOSURE STATEMENT FOR ANY OTHER PURPOSE IS NOT AUTHORIZED. NOTHING

**STATED IN THIS DISCLOSURE STATEMENT SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY. THE DISCLOSURE STATEMENT MAY NOT BE REPRODUCED OR PROVIDED TO ANYONE OTHER THAN ADVISORS TO THE RECIPIENT WITHOUT THE PRIOR WRITTEN CONSENT OF THE DEBTORS.**

**IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY. THE BANKRUPTCY COURT'S CONDITIONAL APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.**

# ARTICLE I
# INTRODUCTION

White Rock Medical Center, LLC ("**White Rock**") and its affiliated debtor entities, except for NCP Management LLC, as debtors and debtors in possession (collectively, the "**Debtors**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), hereby propose and file this disclosure statement (this "**Disclosure Statement**") pursuant to section 1125 of the Bankruptcy Code, to Holders of Claims against the Debtors and Interests in the Debtors in support of the solicitation of votes for acceptance and rejection of the *Second Plan of Reorganization of White Rock Medical Center, LLC and its Affiliated Debtors, as Modified on July 17, 2026* (the "**Plan**") filed on July 24, 2026.[2] A copy of the Plan is attached hereto as **Exhibit A**. This Disclosure Statement, among other things, summarizes and describes: (i) how creditors may vote their claims pursuant to the Plan, (ii) the applicable deadlines for approval of the Disclosure Statement and Confirmation of the Plan, (iii) the Debtors' history and operations, (iv) the events of the Debtors' chapter 11 cases (the "**Chapter 11 Cases**"), (v) an overview of the Plan, which provides for the issuance of the equity of Reorganized Debtor White Rock Medical Center, LLC to the Plan Sponsor, (vi) the treatment of all Allowed Claims against and Interests in the Debtors, (vii) the requirements for Confirmation of the Plan and the procedures for objecting to the Plan, and (viii) certain risk factors applicable to the Plan and Confirmation of the Plan.  The Debtors' Chapter 11 Cases are currently pending in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "**Bankruptcy Court**").

Article I of the Disclosure Statement contains a brief overview of certain material provisions of the Plan as well as the Plan and this Disclosure Statement's purpose. This overview is qualified by reference to the provisions of the Plan, as amended from time to time, which is provided with this Disclosure Statement. In the event that any inconsistency or conflict exists between this Disclosure Statement and the Plan, the terms of the Plan control. Statements on the rationale underlying the treatment of Claims and Interests under the Plan are not intended to, and shall not, waive, compromise or limit any rights, Claims, or Causes of Action in the event the Plan is not confirmed.

## 1.1     **The Filing of the Debtors' Chapter 11 Cases**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for similarly situated creditors and applicable equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The

---

[2] Capitalized terms used but not defined herein have the meaning provided for in the Plan. The Plan proposed excludes NCP Management LLC and all of its assets, liabilities, and creditors from the treatment proposed therein. A resolution of NCP Management LLC's assets and liabilities will be addressed in subsequent filings in the Chapter 11 Cases.

Bankruptcy Code provides that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

On January 20, 2026, and January 21, 2026, (collectively, the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code before the Bankruptcy Court. The Debtors continue to manage their affairs as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. This Disclosure Statement and the accompanying Plan are filed on behalf of the Debtors.

### 1.2    **Purpose of the Disclosure Statement**

The purpose of this Disclosure Statement is to provide you, as the holder of a Claim against, or Interest in, the Debtors, with information to enable you to make a reasonably informed decision on the Plan before exercising your right to vote to accept or reject the Plan. The statements contained in this Disclosure Statement are made as of the date hereof, unless another time is specified in this Disclosure Statement. Neither the delivery of this Disclosure Statement nor any action taken in connection with the Plan implies that the information contained in this Disclosure Statement is correct as of any time after that date.

Unless the context requires otherwise: (a) the gender (or lack of gender) of all words used in this Disclosure Statement includes the masculine, feminine and neuter; (b) references to articles and sections (other than in connection with the Bankruptcy Code, the Bankruptcy Rules, another specified law or regulation or another specified document) refer to the articles and sections of this Disclosure Statement; and (c) "including" means "including, without limitation."

Certain of the information contained in this Disclosure Statement is forward-looking. This Disclosure Statement contains estimates and assumptions that may prove not to have been accurate and financial projections that may be materially different from actual future experiences.

On July 10, 2026, the Debtors filed a motion seeking conditional approval of this Disclosure Statement and approval of certain procedures and deadlines related to the voting of Claims against the Debtors. On July 18, 2026, after notice and a hearing, the Bankruptcy Court entered an order conditionally approving this Disclosure Statement [Dkt No. 370] (the "**Disclosure Statement Order**"). A copy of the Disclosure Statement Order is attached as **Exhibit B**.

**THE BANKRUPTCY COURT'S CONDITIONAL APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THIS INFORMATION CONTAINED HEREIN OR THE BANKRUPTCY COURT'S ENDORSEMENT OF THE PLAN. YOU SHOULD READ ALL OF THIS DISCLOSURE STATEMENT BEFORE VOTING ON THE PLAN.**

**THE DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE A CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN ITSELF BY EACH HOLDER OF A CLAIM OR INTEREST. THE DISCLOSURE STATEMENT IS INTENDED TO AID AND SUPPLEMENT THAT REVIEW. THE DESCRIPTION OF THE PLAN CONTAINED HEREIN IS A SUMMARY ONLY. HOLDERS OF CLAIMS AND INTERESTS AND OTHER PARTIES IN INTEREST ARE CAUTIONED TO REVIEW THE PLAN AND ANY RELATED ATTACHMENTS IN THEIR ENTIRETY FOR A FULL UNDERSTANDING OF THE PLAN'S PROVISIONS. THE DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN.**

You are urged to consult with your own financial and other advisors to decide whether to vote to approve or reject the Plan. No solicitation of votes may be made except pursuant to this Disclosure Statement, and no person has been authorized to use any information concerning the Debtors or their businesses other than the information contained in this Disclosure Statement.

Acceptance or rejection of the Plan is subject to a number of risks. *See* "Risk Factors" at Article IX of this Disclosure Statement.

### 1.3  **Plan Balloting and Confirmation Procedures**

**THE DISCUSSION OF THE SOLICITATION AND VOTING PROCEDURES SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY. PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER ATTACHED FOR A COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.**

*Holder of Claims and Interests Entitled to Vote*

Under the provisions of the Bankruptcy Code, not all holders of claims against or interests in a debtor are entitled to vote on a chapter 11 plan. Only classes of claims and interests that are (i) "impaired" by a plan of reorganization or liquidation and (ii) entitled to receive a distribution under such a plan are entitled to vote to accept or reject a plan under the Bankruptcy Code. In these Chapter 11 Cases, only the holders of Claims in Classes 2, 4, and 5 are entitled to vote to accept or reject the Plan (the "**Voting Classes**"). The Debtors **are not** soliciting votes for acceptance or rejection of the Plan from holders of Claims and Interests in Classes 1, 3 and 6.

| Class | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| Class 1 | Other Priority Claims | Unimpaired | No (Presumed to Accept) |
| Class 2 | Secured Lender Claims | Impaired | Yes |
| Class 3 | Reinstated Equipment Loan Claims | Unimpaired | No (Presumed to Accept) |

| Class | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| Class 4 | Restructured Equipment Loan Claims | Impaired | Yes |
| Class 5 | General Unsecured Claims | Impaired | Yes |
| Class 6 | Existing Equity Interests | Impaired | No (Deemed to Reject) |

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expenses, DIP Claims, Professional Fee Claims and Priority Tax Claims have not been classified.

***Voting Procedures and Confirmation Schedule***

The following table provides the key deadlines related to Confirmation of the Plan as approved by the Bankruptcy Court in the Disclosure Statement Order:

| Event | Date | Description |
|---|---|---|
| **Voting Record Date** | July 13, 2026 | Date to determine which Holders of Claims and Interests are entitled to vote to accept or reject the Plan. |
| **Hearing on Conditional Approval of the Disclosure Statement** | July 17, 2026, at 1:00 p.m. CT | Date and time of the hearing on conditional approval of the Disclosure Statement. |
| **Solicitation Commencement Date** | July 20, 2026 | Date by which the Debtors will begin soliciting votes to accept or reject the Plan. |
| **Solicitation Deadline** | July 27, 2026, at 11:59 p.m. CT | Date by which the Debtors will finish (i) mailing Solicitation Packages and Non-Voting Status Package (the "**Solicitation Deadline**"), (ii) mailing the Combined Notice to the U.S. Trustee and all parties entitled to receive notice under Bankruptcy Rule 2002; (iii) mailing the Cure Schedule to counterparties to Executory Contracts and Unexpired Leases; and (iv) filing the Cure Schedule. |
| **Cure Schedule Filing Deadline** | July 30, 2026, at 11:59 p.m. CT | Date by which the Debtors will file the Cure Schedule and anticipated Cure Costs for |

| Event | Date | Description |
|---|---|---|
| | | Executory Contracts and Unexpired Leases to be assumed by the Reorganized Debtor, *provided, however* that the Debtors may file a supplemental Cure Schedule any time prior to the date that is fifteen (15) days before the Combined Hearing, and any Executory Contract or Unexpired Lease counterparty whose Executory Contract or Unexpired Lease is included on such supplemental Cure Schedule shall have fourteen (14) days from the date of such Supplemental Cure Schedule to file an appropriate objection to the assumption of the Executory Contract or Unexpired Lease. |
| **Claim Objection Voting Deadline** | August 3, 2026, at 4:00 p.m. CT | Date by which the Debtors or other party in interest must file an objection to a proof of claim filed by a Holder of Claim for voting purposes. |
| **Plan Supplement Filing Deadline** | August 10, 2026 (14 days before Voting Deadline) | Date by which the Debtors will file the Plan Supplement. |
| **Executory Contract and Unexpired Lease Objection Deadline** | August 13, 2026, at 4:00 p.m. CT | Deadline by which counterparties to Executory Contracts or Unexpired Leases may object to the proposed Cure Costs, assumption, or assumption and assignment of their Executory Contract or Unexpired Lease. |
| **Disputed Claim or Interest Resolution Deadline** | August 17, 2026, at 4:00 p.m. CT | Date by which creditors seeking to have a claim temporarily allowed for purposes of voting to accept or reject the Plan pursuant to Bankruptcy Rule 3018(a) are required to file a motion. |
| **Confirmation Objection Deadline** | August 24, 2026, at 4:00 p.m. CT | Deadline by which parties in interest may object to confirmation of the Plan. |

| Event | Date | Description |
|---|---|---|
| **Voting Deadline** | August 24, 2026, at 4:00 p.m. CT | Deadline by which Holders of Claims and Interests entitled to vote on the Plan must vote to accept or reject the Plan. |
| **Voting Report Deadline** | August 31, 2026, at 4:00 p.m. CT | Deadline by which the Debtors must file report tabulating the voting to the Plan (the "**Voting Report**"). |
| **Confirmation Brief and Objection Response Deadline** | August 31, 2026, at 4:00 p.m. CT | Deadline by which the Debtors must file a Confirmation Brief or respond to any objections to confirmation of the Plan if the Debtors choose to do so. |
| **Combined Hearing Date** | September 1, 2026, at 9:00 a.m. CT | Date and time for the hearing at which the Court will consider final approval and confirmation of the Plan and Disclosure Statement. |

The Voting Record Date is the date on which it will be determined which holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the holder of a Claim.

**IF YOU ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN, A BALLOT (THE "BALLOT") FOR ACCEPTANCE OR REJECTION OF THE PLAN IS ENCLOSED WITH THIS DISCLOSURE STATEMENT. BALLOTS FOR ACCEPTANCE OR REJECTION OF THE PLAN ARE BEING PROVIDED TO THE HOLDERS OF CLAIMS IN CLASSES 2, 4, AND 5 BECAUSE THEY ARE HOLDERS OF CLAIMS IN THE VOTING CLASS. HOLDERS OF CLAIMS ENTITLED TO VOTE MUST SUBMIT THEIR BALLOT TO THE DEBTORS' VOTING AGENT AT THE ADDRESS BELOW BY THE VOTING DEADLINE.**

| By first class mail to: | Via overnight courier or hand delivery to: |
|---|---|
| White Rock Medical Center LLC c/o Epiq Ballot Processing P.O. Box 4422 Beaverton, OR 97076-4422 | White Rock Medical Center LLC c/o Epiq Ballot Processing 10300 SW Allen Boulevard Beaverton, OR 97005 |

**BALLOTS MAY ALSO BE SUBMITTED TO THE DEBTORS' VOTING AGENT ELECTRONICALLY VIA THE E-BALLOTING PORTAL BY FOLLOWING THE**

**INSTRUCTIONS INCLUDED ON THE BALLOT. ELECTRONIC SUBMISSION INSTRUCTIONS ARE ON THE DEBTORS' CHAPTER 11 CASES WEBSITE: HTTPS://DM.EPIQ11.COM/CASE/WHITEROCKMEDICALCENTER/INFO. TO SUBMIT YOUR BALLOT VIA THE E-BALLOTING PORTAL, VISIT THE DEBTORS' CASE WEBSITE, CLICK ON THE "E-BALLOT" LINK UNDER THE CASE ACTIONS SECTION OF THE WEBSITE AND FOLLOW THE INSTRUCTIONS TO SUBMIT YOUR BALLOT.**

After carefully reviewing this Disclosure Statement and the Plan, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan, then return the Ballot to the Voting Agent, at the address set forth on the Ballot or electronically via the E-Balloting Portal, **so as to be actually received by 4:00 p.m. (Prevailing Central Time) on August 24, 2026 (the "Voting Deadline")**. **ANY BALLOTS RECEIVED BY THE VOTING AGENT AFTER THE VOTING DEADLINE WILL NOT BE COUNTED UNLESS EXPRESSLY CONSENTED TO IN WRITING BY THE DEBTORS.**

**IF YOU ARE THE HOLDER OF A CLAIM IN A VOTING CLASS AND DID NOT RECEIVE A BALLOT, RECEIVED A DAMAGED OR ILLEGIBLE BALLOT, LOST YOUR BALLOT, OR IF YOU ARE A PARTY IN INTEREST AND HAVE ANY QUESTIONS CONCERNING THIS DISCLOSURE STATEMENT AND THE EXHIBITS HERETO, INCLUDING THE PLAN OR THE VOTING PROCEDURES IN RESPECT THEREOF, PLEASE CONTACT THE VOTING AGENT AT (646) 362-6336 OR WHITEROCKMEDICAL@EPIQGLOBAL.COM.**

*Voting Requirements for Class Acceptance of the Plan*

YOUR ACCEPTANCE OF THE PLAN IS IMPORTANT. For the Plan to be "accepted" by a Class of Creditors, at least sixty-six and two-thirds percent (66.66%) in amount of Allowed Claims and more than fifty percent (50%) in number of Allowed Claims voting in each Class must accept the Plan. By not voting, a Creditor favoring acceptance of the Plan jeopardizes the ultimate confirmation of the Plan.

No Ballot will be counted toward Confirmation if, among other things: (1) it is illegible or contains insufficient information to permit the identification of the Holder; (2) it is submitted by a Person or Entity that does not hold a Claim; (3) it is unsigned; and/or (4) it is submitted by a party not entitled to cast a vote with respect to the Plan. Any Ballot received that does not indicate whether the Holder votes to accept or reject the Plan or marked both to accept and reject the Plan will be deemed to vote in favor of the Plan. Please refer to the Disclosure Statement Order and Solicitation Procedures attached thereto for additional requirements with respect to voting.

**ANY BALLOT RECEIVED BY THE VOTING AGENT THAT DOES NOT COMPLY WITH THE SOLICITATION PROCEDURES SET FORTH IN THE DISCLOSURE STATEMENT ORDER WILL NOT BE COUNTED TOWARDS CONFIRMATION EVEN IF RECEIVED PRIOR TO THE VOTING DEADLINE.**

*Confirmation Hearing*

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan. The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

The Bankruptcy Court set **September 1, 2026 at 9:00 a.m.** (Prevailing Central Time), as the date for the Combined Hearing on Confirmation of the Plan and approval of the Disclosure Statement. **The Confirmation Hearing will be a hybrid hearing.** Audio communication for the Confirmation Hearing will be by use of the Bankruptcy Court's dial-in facility. You may access the facility at 1-832-917-1510. Once connected, you will be asked to enter the conference room number. Judge Perez's conference room number is 282694. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or by using the following web address: https://www.gotomeet.me/JudgePerez. The meeting code is "judgeperez." Attendees must click the settings icon in the upper right corner and enter their name under the personal information setting. The Combined Hearing may be adjourned from time to time without further notice except for the announcement of the adjourned time and date at the confirmation hearing or any adjournment thereof.

Section 1128(a) of the Bankruptcy Code also provides that any party in interest may object to confirmation of a plan. Any confirmation objection must be in writing, conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, set forth the name of the objecting party, the nature and amount of the Claim or Interest held or asserted by the objecting party against the Debtors' Estates, the basis for the objection and the specific grounds thereof. The objection, together with proof of service thereof, must then be filed with the Bankruptcy Court, with copies served upon counsel to the Debtors at the following addresses and upon the Service List in these cases:

Omar J. Alaniz
REED SMITH LLP
2850 N. Harwood Street, Suite 1500
Dallas, TX  75201
(469) 680-4200
E-mail: oalaniz@reedsmith.com

– and –

Scott M. Esterbrook
Derek M. Osei-Bonsu
REED SMITH LLP
1717 Arch Street, Suite 3100
Philadelphia, PA 19103
(215) 851-8100
E-mail: sesterbrook@reedsmith.com
dosei-bonsu@reedsmith.com

**UNLESS AN OBJECTION IS TIMELY AND PROPERLY SERVED AND FILED BY AUGUST 24, 2026 AT 4:00 P.M. (PREVAILING CENTRAL TIME), IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

### 1.4    Projected Recoveries and Treatment of Claims Under the Plan

The following chart provides a summary of the anticipated recovery to holders of Claims or Interests under the Plan. Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts Allowed by the Bankruptcy Court. Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE. FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.**

| Class | Claim or Interest | Summary of Treatment | Estimated Claim Amount | Estimated Recovery Under Plan |
|---|---|---|---|---|
| Class 1 | Other Priority Claim | Unless the Holder of an Allowed Other Priority Claim agrees to less favorable treatment of such Claim, each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for such Allowed Other Priority Claim Cash in an amount equal to the Allowed amount of such Allowed Other Priority Claim as soon as reasonably practicable after the latest of (A) the Effective Date, (B) the date that such Claim becomes an Allowed Other Priority Claim, and (C) a date agreed to by the Plan Sponsor and the Holder of such Allowed Other Priority Claim. | $0 - $269,535.55 | 100% |

| Class | Claim or Interest | Summary of Treatment | Estimated Claim Amount | Estimated Recovery Under Plan |
|---|---|---|---|---|
| Class 2 | Secured Lender Claims | Unless the Holder of an Allowed Secured Lender Claim and the Debtors agree to other treatment of such Secured Lender Claim, each Holder of an Allowed Secured Lender Claim shall receive, the following in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for such Allowed Secured Lender Claim.<br><br>(a) On the Effective Date all liens provided for in the Cash Collateral Orders shall remain in full force, and effect and priority until such claim is paid in full;<br><br>(b) Dismissal, with prejudice, of the Pipeline Adversary Proceeding; and<br><br>(c) The Secured Lender shall be provided with five percent (5%) of all gross revenues of the Reorganized Debtor which will be applied to repayment of the Secured Lender Claim until such Claim has been paid in full. For purposes of this Plan "gross revenues" means all revenues, receipts, income, accounts, accounts receivable, and other sums generated or received by the Reorganized Debtor from the ownership or operation of the hospital and the Reorganized Debtor's business, including (t) patient service revenue, inpatient and outpatient services, emergency, surgery, imaging, laboratory, pharmacy, therapy, and other ancillary services, physician and clinic services billed and collected by the Reorganized Debtor; (u) all private or government payments including, without limitation, Medicare payments and reimbursements, Medicaid payments and reimbursements, commercial insurance payments and reimbursements, and managed care payments and reimbursements; (v) other third-party payor reimbursements; (w) self-pay collections, co-payments, and deductibles, grants, supplemental payments, settlements, refunds, and credits; (x) rental and other ancillary operating income; (y) insurance proceeds relating to lost revenue and proceeds of loans against the Secured Lender's collateral (other than the Secured | $7,442,001.20 | 100% |

| Class | Claim or Interest | Summary of Treatment | Estimated Claim Amount | Estimated Recovery Under Plan |
|---|---|---|---|---|
| | | Lender's loan); and (z) all proceeds of the foregoing, in each case before deduction of operating expenses, debt service, taxes, or other costs. | | |
| Class 3 | Reinstated Equipment Loan Claims | On the Effective Date, each Reinstated Equipment Lender's Equipment Loan Claim shall be reinstated and rendered unimpaired in accordance with section 1124 of the Bankruptcy Code. In furtherance thereof: (a) any and all defaults under the Reinstated Equipment Loan Documents, other than defaults of a kind specified in section 365(b)(2) of the Bankruptcy Code, shall be cured on or as soon as reasonably practicable after the Effective Date; (b) the maturity of the Equipment Loan Claim of each Reinstated Equipment Lender shall be reinstated as such maturity existed before any default under the applicable Reinstated Equipment Loan Documents; (c) the legal, equitable, and contractual rights of each Reinstated Equipment Lender under the Reinstated Equipment Loan Documents shall not otherwise be altered by the Plan; (d) all liens and security interests held by each Reinstated Equipment Lender under the Reinstated Equipment Loan Documents shall remain in full force and effect, unaltered by the Plan or the Confirmation Order; and (e) the Reorganized Debtor shall continue to perform all obligations under the Reinstated Equipment Loan Documents in accordance with their terms from and after the Effective Date. For the avoidance of doubt, the Restructured Equipment Note Terms shall not apply to the Equipment Loan Claims of Reinstated Equipment Lenders, and the Reinstated Equipment Loan Documents shall continue in full force and effect in accordance with their original terms (as cured pursuant to this Section). | $2,935,266.61 | 100% |
| Class 4 | Restructured Equipment Loan Claims | On the Effective Date, Holders of an Allowed Restructured Equipment Loan Claims shall receive the following treatment:<br><br>(1) if such Holder accepts the Plan, such Holder shall receive, in full and final satisfaction, settlement, release, and discharge of its Equipment Loan Claim, treatment on substantially the same terms and conditions as set forth in such Holder's Equipment Lender Loan Documents, except that the Restructured Equipment Note Terms shall apply to such Equipment Lender Loan Documents. On the Effective Date, the Equipment Lender Loan Documents of each accepting Equipment Lender shall be deemed modified and amended to incorporate the Restructured Equipment Note Terms without the need for the execution of any | $829,528.24 | TBD |

| Class | Claim or Interest | Summary of Treatment | Estimated Claim Amount | Estimated Recovery Under Plan |
|---|---|---|---|---|
| | | amendment or modification agreement, and the Reorganized Debtor and such Holder shall be bound by the Equipment Lender Loan Documents as so modified. For the avoidance of doubt, all liens and security interests granted to an accepting Equipment Lender under its Equipment Lender Loan Documents shall remain in full force and effect following the Effective Date, subject to the terms of such Equipment Lender Loan Documents as modified by the Restructured Equipment Note Terms.<br><br>(2) if such Holder rejects the Plan, the Reorganized Debtor shall execute and deliver to each rejecting Equipment Lender an Equipment Lender Cramdown Note in a principal amount equal to the Allowed amount of such rejecting Equipment Lender's Secured Claim as determined under section 506(a) of the Bankruptcy Code. To the extent that a rejecting Equipment Lender holds an Allowed unsecured deficiency Claim under section 506(a) of the Bankruptcy Code, such deficiency Claim shall be treated as a General Unsecured Claim under Class 5 of the Plan. The Equipment Lender Cramdown Note shall be on substantially the same terms and conditions as such rejecting Equipment Lender's Equipment Lender Loan Documents, except that (i) the principal amount of the Equipment Lender Cramdown Note shall be as set forth in this Section 3.3(d)(ii)(2), and (ii) the Restructured Equipment Note Terms shall apply to the Equipment Lender Cramdown Note. Each Rejecting Equipment Lender shall retain its liens and security interests on the collateral securing its Equipment Loan Claim to the extent of the Allowed Secured Claim as determined under section 506(a) of the Bankruptcy Code. | | |
| Class 5 | General Unsecured Claims | On the Effective Date or as soon as reasonably practicable thereafter, except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment of such Claim, each Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction, compromise, settlement, release and discharge of and in exchange for such Allowed General | $29,874,960 - $97,682,348.33 | 1.4% - 3.3% |

| Class | Claim or Interest | Summary of Treatment | Estimated Claim Amount | Estimated Recovery Under Plan |
|---|---|---|---|---|
| | | Unsecured Claim, its Pro Rata Share of the GUC Distribution Pool. Notwithstanding the foregoing, the treatment of the Class 5 General Unsecured Claims held by REILS SPV Finance Inc. and Strategic Management and Capital, LLC shall be subject to Section 5.21 (Waiver and Release of Supporting Creditor Unsecured Claims) of the Plan. | | |
| Class 6 | Existing Equity Interests | On the Effective Date, each Allowed Existing Equity Interest shall be discharged, cancelled, released, and extinguished, without any distributions to Holders. | N/A | 0% |

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, DIP Claims and Priority Tax Claims have not been classified and thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

Administrative Claims will be satisfied as set forth in section 2.1 of the Plan. Except with respect to Professional Fee Claims, unless the Holder of an Allowed Administrative Claim agrees to less favorable treatment of such Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date on which an Administrative Claim becomes an Allowed Administrative Claim, or (iii) the date on which an Allowed Administrative Claim becomes payable under any agreement relating thereto, each Holder of an Allowed Administrative Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for such Allowed Administrative Claim, Cash equal to the unpaid portion of such Allowed Administrative Claim.

DIP Claims will be satisfied as set forth in section 2.2 of the Plan. All DIP Claims shall be deemed Allowed as of the Effective Date in an amount equal to the aggregate amount of the DIP Facility obligations approved by the Bankruptcy Court, including, (i) the principal amount outstanding under the DIP Facility on such date, (ii) all interest accrued and unpaid thereon through and including the date of payment, and (iii) all accrued fees, expenses, and indemnification obligations payable under the DIP Documents.

On the Effective Date or as soon as reasonably practicable thereafter, except to the extent a Holder of an Allowed DIP Claim agrees to a less favorable treatment of such Claim, each Holder of an Allowed DIP Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for such Allowed DIP Claim, at the election of the Holder of said Allowed DIP Claim, either (a) Cash equal to the unpaid portion of such Allowed DIP Claim or (b) a portion of the New Securities as agreed to by the Plan Sponsor and the DIP Lender.

Priority Tax Claims will be satisfied as set forth in section 2.3 of the Plan. Unless the Holder of an Allowed Priority Tax Claim agrees to less favorable treatment of such Claim, each Holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for such Allowed Priority Tax Claims, either

(a) payment in full in Cash, on or as soon as reasonably practicable after the latest of (i) the Effective Date, or (ii) the date on which a Priority Tax Claim becomes an Allowed Priority Tax Claim, (b) payment upon such other terms as agreed between the Debtor and each Holder of such Allowed Priority Tax Claim, or (c) to the extent permitted by section 1129(a)(9)(C) of the Bankruptcy Code, deferred Cash payments made in regular installments over a period ending not later than five (5) years after the Petition Date, together with interest at the applicable statutory rate, of a total value, as of the Effective Date, equal to the Allowed amount of such Priority Tax Claim. Consistent with the Resignation Settlement Agreement, the Reorganized Debtor shall assume liability for all Allowed Priority Tax Claims against the Debtors and all related payment plan agreements.

Professional Fee Claims will be satisfied as set forth in section 2.4 of the Plan. All applications for allowance and payment of Professional Fee Claims by Professionals for services rendered and reimbursement of expenses incurred prior to the Effective Date must be filed on or before the Professional Fee Claims Bar Date. If an application for a Professional Fee Claim is not filed by the Professional Fee Claims Bar Date, such Professional Fee Claim shall be deemed waived, and the Holder of such Claim shall be forever barred from receiving payment on account thereof. The notice of the occurrence of the Effective Date shall set forth the Professional Fee Claims Bar Date and shall constitute notice thereof. Objections to any Professional Fee Claims must be filed and served on the Plan Administrator and the requesting Professional, no later than twenty-one (21) days after service of the applicable final application for allowance and payment of Professional Fee Claims. Unless otherwise agreed to (i) by the Debtors and the Professional prior to the Effective Date or (ii) by the Plan Administrator and the Professional after the Effective Date, the amount of Professional Fee Claims owing to such Professional that are Allowed by Final Order shall be paid in full in Cash by the Plan Administrator as soon as reasonably practicable after its Professional Fee Claims are Allowed by Final Order, (x) *first*, by application of any retainer monies held by such Professional, and (y) *second*, once such retainer balance is exhausted, the Plan Administrator shall pay such Professional the remaining balance of its Allowed Professional Fee Claim in Cash. Professionals shall reasonably estimate their unpaid Professional Fee Claims incurred prior to the Confirmation Hearing and for fees and expenses estimated to be incurred at and after the Confirmation Hearing and through the Effective Date and shall deliver such estimate to the Plan Sponsor no later than the date of the Confirmation Hearing; provided, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Professional Fee Claims.

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court, and Confirmation alone does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective. Initial distributions to Holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Plan. See Article IX of the Plan for a discussion of the conditions precedent to the effectiveness of the Plan.

In the event that the Plan is not confirmed or the Effective Date does not occur, there is no assurance that the Debtors will be able to reorganize their businesses and that any creditor will be entitled to any recovery. It is possible that any alternative may provide holders of Claims with less

than they would have received pursuant to the Plan.  For a description of the consequences of an extended chapter 11 case, or of a chapter 7 liquidation scenario, see Section 9.1 of this Disclosure Statement.

Parties in interest may object to the approval of this Disclosure Statement and/or Confirmation of the Plan; such objections could give rise to litigation.  In the event that it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such rejecting Classes.  The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code.  See Section 8.5 of this Disclosure Statement for a discussion of the requirements to cramdown the Plan for confirmation.

All Cash necessary for the payments required by the Plan shall be obtained from (a) existing Cash held by the Debtors on the Effective Date, (b) Cash generated from operations after the Effective Date in the ordinary course of business, and (c) the Plan Funding. Within two (2) business days after entry of the Confirmation Order, the Plan Sponsor will transfer the Plan Funding (other than any Supplemental PA Contribution) to the Debtors for use in accordance with the terms of the Plan; any Supplemental PA Contribution shall be funded in accordance with the terms of the Plan.

## 1.5     **Releases, Exculpation and Injunctions**

The Plan proposes the release of all "Released Parties" by the Debtors and the Releasing Parties and the exculpation of the "Exculpated Parties."  The Releasing Parties are each of the following, solely in its capacity as such: (a) the Debtors, (b) Plan Sponsor, (c) the DIP Lender, (d) each of the Supporting Creditors, and (e) Holders of Claims that accept the Plan.  The Released Parties are each of the following, solely in its capacity as such: (a) the Debtors, (b) Plan Sponsor, (c) the DIP Lender, (d) each of the Supporting Creditors, (e) solely as and to the extent provided in the Resignation Settlement Agreement, the Resigning Employees, (f) solely as and to the extent provided in the Resignation Settlement Agreement, Dr. Mirza N. Baig and (g) with respect to each of the foregoing in clauses (a)–(f), each of their Related Parties.  The Debtors and the Chief Restructuring Officer are the only Exculpated Parties.  The releases, injunction and exculpation provisions in the Plan are an integral part of the Plan and the Debtors' restructuring efforts, and were an integral part of securing the support of the Plan Sponsor.  The Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Fifth Circuit.  The Debtors will present evidence at the Combined Hearing to demonstrate the basis for and propriety of the releases and exculpation provisions.

See Sections 4.31 and 4.32 of this Disclosure Statement for a discussion of the Release and Exculpation provisions of the Plan.

1.6     **Recommendation of Plan Supporting Parties**

The Plan is supported by the Debtors and the Supporting Creditor Group (defined below, and collectively, the "**Plan Supporting Parties**").  The Plan Supporting Parties believe that the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result from any other available alternative.  The Plan Supporting Parties believe that the Plan, and the recoveries thereunder, are in the best interest of all holders of Claims or Interests and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan. Given the foregoing the Plan Supporting Parties strongly recommend voting in favor of the Plan.

## ARTICLE II

## DEBTORS' BACKGROUND AND FINANCIAL PICTURE

2.1     **History of the Debtors**

(a)        **The Debtors' Hospital Operations**

The Debtors are the current owners and operators of White Rock Medical Center ("**WRMC**") operating in Dallas, Texas and the former owners and operators of the former Heights Hospital ("**Heights Hospital**") in Houston, Texas.  WRMC has been a vital healthcare institution in eastern Dallas for over six decades. Originally founded as the "Doctors Hospital" and later affiliated with major regional health systems, the facility has evolved alongside the community it serves. WRMC's physical location, proximity to major arterial roadways, and long-standing presence make it a critical access point for both residents and regional emergency medical services.

WRMC was purchased by Debtor Heights Healthcare of Texas, LLC ("**HHT**") in 2023. WRMC is a 211-bed community-based "safety-net" hospital that provides critical healthcare services to the residents of east Dallas and its patients are primarily minority, elderly and indigent persons. In 2025 alone, WRMC supported approximately 30,000–35,000 unique patient visits and associated claims across emergency, inpatient, outpatient, and ancillary services, underscoring both the scale of community reliance and the hospital's ongoing operational relevancy.

Safety net hospitals such as WRMC serve low-income communities, regardless of a patient's insurance coverage, ability to pay or immigration status. In practice, that means they do not turn away patients who cannot pay. Thus, these hospitals usually have high numbers of uninsured and Medicare and Medicaid patients whose treatment costs are not fully covered. This means that safety-net hospitals typically depend on public funding and operate on thin profit margins. WRMC is a safety net hospital and nearly 80% of its patient population is either on some form of government insurance plan (e.g. Medicare or Medicaid), is self-pay, or is uninsured.

WRMC operates as a full-service acute care hospital that serves a particularly vulnerable community in several ways. WRMC provides its community with significant and critical health care services such as: (i) a 24/7 emergency department with on-site emergency physicians and advanced practice providers; (ii) a Level IV Trauma designation supporting regional EMS and emergency response; (iii) an intensive care unit (ICU) providing critical care services to patients;

(iv) hospitalist-led inpatient medicine services with dedicated coverage; (v) cardiac and chest pain treatment provision; (vi) comprehensive diagnostic services, including radiology and laboratory services available around the clock; and (vii) on-site emergency physicians and employed ER physician coverage aligned with hospital operations. WRMC also provides bariatrics, cardiology, orthopedics, and wellness services to the vulnerable population it serves.

The Debtors are affiliates that operate in conjunction with each other to manage and operate WRMC. The primary operating entity is lead Debtor White Rock. White Rock is the owner of WRMC and is also the Debtor entity licensed to operate hospitals in the various jurisdictions in which the Debtors reside. NCP Management, LLC ("**NCP Management**") owns 100% of the interests of Debtor North Houston Surgical Hospital LLC ("**North Houston**"). Neither NCP Management nor North Houston have any ongoing business operations, and their day to day operations were assumed by White Rock.[3] Debtor National Payroll Services LLC ("**Payroll**") previously performed payroll and benefit services for the Debtors and their affiliates and no longer performs any benefit or payroll related services for the Debtors or their Estates. Payroll is owned entirely by NCP Management. Debtor HHT is a special purpose entity created for the purchase of White Rock and WRMC as discussed herein. HHT is a holding company with no ongoing operations.  Debtor Heights Healthcare of Houston, LLC ("**HHH**") is a special purpose entity created to create joint venture Ashland. HHH has no ongoing operations. Ashland was an operating entity that leased space in Heights Hospital and made rental payments to PH (defined below) but has ceased operations.

Certain Debtors were critical to the operation of the Heights Hospital, a second hospital in Houston Texas previously owned and operated by the Debtors. Heights Hospital and the real estate upon which it is situated were owned by debtor-affiliate Platinum Heights, LP ("**PH**").  PH's post-confirmation estate is currently being administered by a plan administrator pursuant to a confirmation order entered by this Court under case number 25-90012.  PH did not provide hospital or medical services and instead was a landlord renting out hospital space in the Heights Hospital to healthcare service providing tenants.  White Rock managed the day-to-day operations at Heights Hospital and interfaced with the tenants of Heights Hospital.  Pursuant to an order confirming the chapter 11 plan of PH, the Heights Hospital was sold to a buyer and PH's operations and the operations of the tenants at Heights Hospital are winding down in accordance with the terms of PH's plan of reorganization.

### (b)    Government Payments to the Debtors

As a safety-net hospital, the Debtors' operations are dependent on funding provided from a variety of state and local government Medicaid supplemental programs which provide the Debtors with payments, refunds and reimbursement rights (collectively the "**Government Payments**"). These Government Payments allow the Debtors to provide services to indigent, uninsured and underinsured members of their community. In a calendar year, the Debtors receive approximately $20-22 million in Government Payments from the following programs:

---

[3] North Houston was the primary tenant of PH during its operational tenure. North Houston's cessation of operations was a primary driver of PH's chapter 11 filing.

| Program | Description |
|---|---|
| Disproportionate Share Hospital Program (DSH) | The Disproportionate Share Hospital Program provides federal funds to hospitals serving a high volume of Medicaid and uninsured patients |
| Uncompensated Care (UC) | The Uncompensated Care program provides reimbursement to hospitals for medical services provided to patients who cannot pay for such services |
| Comprehensive Hospital Incentive Reimbursement Program (CHIRP) | CHIRP is a Texas supplemental Medicaid directed payment program designed to boost funding for hospitals meeting certain quality standard criteria providing care to applicable patients |
| Hospital Augmented Reimbursement Program (HARP) | HARP is a Texas supplemental Medicaid program providing Medicaid payments to hospitals for inpatient and outpatient services that serve qualifying Texas Medicaid fee-for-service patients |
| Aligned Technology by Linking Interoperable Systems (ATLIS) | ATLIS is a Texas supplemental Medicaid program providing funding to qualifying hospitals engaging in coordinated data sharing practices. |

The Government Payments are received by the Debtors over the course of the year, with the schedule of the applicable Government Payments being determined by the applicable program mandates. The Government Payments may be utilized by the Debtors for their operations in accordance with various federal, state and local statutes and regulations including the number of applicable patients served within requisite timeframes. Accordingly, the Debtors use the Government Payments generally in the operation of their businesses to ensure continued quality service provision to patients. Absent the provision of these Government Payments, the Debtors would not be able to bear the financial cost of providing services to patients with insufficient health insurance.

Historically, the demographic makeup of the Debtors' patient population remains relatively stable year after year. The Debtors' current management team does not anticipate a significant shift in their patient population over the course of the Plan and the distributions to be provided therein. As the Debtors' patient make up remains relatively stable, the Debtors believe they will continue to receive the Government Payments after the Effective Date of the Plan in an amount comparable to the Government Payments received prior to the Petition Date. Notwithstanding the

foregoing, if the Debtors were no longer eligible for the Government Payments, the loss of eligibility would be the result of the Debtors' providing services to a greater number of patients with private insurance. As private insurance companies generally pay higher rates than government reimbursements and grants, the Debtors believe that providing services to more patients with private insurance could theoretically increase the Debtors' revenue notwithstanding the lack of eligibility for receipt of the Government Payments.

### 2.2   **The Debtors' Prepetition Capital Structure and Outstanding Obligations**

### (a)   **Pipeline Obligations**

The Debtors maintain a secured credit obligation with SRC Hospital Investments I, LLC ("**SRC**") and Pipeline Health System Holdings, LLC (collectively, "**Pipeline**") related to the purchase of WRMC and the entities sold along with it.

HHT and Pipeline executed the MIPA on September 20, 2023, pursuant to which HHT acquired all of the outstanding membership interests of White Rock, which was then named Pipeline East Dallas, LLC for the purchase price of $9,000,000.00. HHT paid $3,600,000.00 of the purchase price at the closing of the MIPA in October 2023. The remaining balance was to be paid via an installment payment of $2,400,000 and in accordance with the terms of a $3,000,000.00 promissory note (the "**Note**"). On July 5, 2024, HHT, NCP Management issued a new promissory note in the amount of $7,064,860.27 in favor of Pipeline. As part of the initial 2023 transaction, Pipeline and HHT also entered into the TSA pursuant to which HHT was to pay Pipeline for certain IT and management services (collectively, with the obligations arising under the MIPA and Note the "**Pipeline Obligations**").

The Pipeline Obligations are secured in favor of Pipeline by all assets of HHT and NCP Management. As of the Petition Date, the Debtors estimate that the outstanding Pipeline Obligations are approximately $5,370,000.00.  Pursuant to filed proofs of claim, the Pipeline Entities assert that the outstanding Pipeline Obligations are $9,811,894.40 in the aggregate, of which $7,442,001.20 is purported to be secured by a lien against the Debtors' assets.

### (b)   **Other Secured Obligations**

The Debtors maintain secured equipment lease obligations (the "**Equipment Leases**") with several equipment vendors (collectively the "**Equipment Lenders**"), all of which are secured by related medical equipment or building equipment such as elevators. The Equipment Leases are leases of various pieces of equipment critical to the Debtors' operations and are properly designated as loan obligations rather than executory contracts. The Debtors estimate that these secured obligations total approximately $7,600,000.00 in the aggregate.

The Debtors' Equipment Lenders will fall into two general categories for treatment under the Plan based on the anticipated outstanding obligations of the Debtors owed to the Equipment Lenders as of the date immediately before the Effective Date. The Debtors are current, or will be current prior to the Effective Date, on all obligations owed to the following Equipment Lenders: Siemens CIOS, Stryker Flex Financial, Medone, JB&B, Bancorp and Olympus America Inc., and

each of their related affiliate entities serving as Equipment Lenders to the Debtors. These Equipment Lenders, and any other Equipment Lenders with no outstanding obligations owed as of the anticipated Effective Date will be placed into Class 3 (Reinstated Equipment Loan Claims) and shall have the treatment set forth herein and in the Plan. Those Equipment Lenders who have valid claims against the Debtors outstanding prior to the Effective Date and which the Debtors are not current upon will be placed in to Class 4 (Restructured Equipment Loan Claims) and shall have the treatment set forth herein and in the Plan.

(c)     **REILS Obligations**

The Debtors' remaining obligations are all unsecured claims from various vendors and creditors. The largest of these claims is the unsecured claim of REILS SPV Finance Inc. ("**REILS**"). REILS entered into a $15,000,000.00 credit facility with non-Debtor PH SPE LLC. Each of the Debtors are jointly and severally liable for the obligations owed to REILS. As of the Petition Date, the Debtors estimate REILS' unsecured claim is approximately $17,000,000.00. Pursuant to a filed proof of claim, REILS asserts that the outstanding amount owed to REILS as of the Petition Date is no less than $20,473,914.95.

(d)     **Government Agreements**

The Debtors are subject to oversight and regulation by a number of local, municipal, state and federal regulatory, taxing bodies and authorities including specialized oversight authorities directly related to the provision and evaluation of Medicare and Medicaid funding. Over the course of the Debtors' operations, certain of the Debtors were subject to various investigations by certain authority or regulatory bodies. The Debtors have settled numerous claims asserted against them without any admission or acknowledgment of any wrongdoing. Certain of these settlement agreements (the "**Government Agreements**") remain outstanding and as set forth in section 8.3 of the Plan, it is the Debtors' intention to continue to negotiate the terms of these agreements with the relevant counterparties. To the extent an agreement regarding these Government Agreements is reached, the applicable modified Government Agreement will be disclosed in the Plan Supplement.

*Pipeline HHSC Settlement*

On November 1, 2024, White Rock (as White Rock Medical Center, LLC d/b/a Pipeline East) and Texas Health and Human Services ("**HHSC**"), an agency of the State of Texas acting through HHSC's Office of Inspector General ("**HHSC-OIG**") entered into a settlement agreement regarding alleged Medicaid misbilling (the "**Pipeline HHSC Settlement Agreement**"). The Pipeline HHSC Settlement Agreement represented a settlement of allegations made by HHSC and HHSC-OIG alleging submission of claims that were out of compliance with Medicaid Policy. Pursuant to the Pipeline HHSC Settlement Agreement, White Rock agreed to make payments to HHSC and HHSC-OIG in the amount of $350,448.29 in principal and $73,229.15 in deferred interest payments in monthly installments. Pursuant to the Pipeline HHSC Settlement Agreement, White Rock, HHSC and HHSC-OIG provided each other with releases for all conduct related to the allegations of HHSC and HHSC-OIG. As of the date hereof, the Debtors believe $330,255.44 remains outstanding under the Pipeline HHSC Settlement Agreement.

*DY10 and DY12 Overpayment Settlement*

On August 5, 2025, White Rock (as the City Hospital at White Rock) entered into another agreement with HHSC for the repayment of alleged overpayment of certain Medicare and Medicaid funds (the "**Overpayment HHSC Settlement**") in the amount of $1,439,956.79 for alleged overpayment of UC DY10 funds and $2,039,732.15 for alleged overpayment of UC DY12 Funds.  Pursuant to section 8.3 of the Plan, the Reorganized Debtor will assume the Overpayment HHSC Settlement. As of the date hereof, the Debtors believe $608,786.61 remains outstanding under the Overpayment HHSC Settlement.

*Parkland Payment and Forbearance Agreement*

As an Institutional Healthcare Provider (as defined in Chapter 298A of the Texas Health & Safety Code) system operating in Dallas, White Rock and the Debtors were obligated to make certain payments to LPPF. Between 2023 and 2025 the Debtors allegedly failed to make certain required payments to LPPF.  As a result of these allegedly delinquent payments, Dallas County Hospital District d/b/a Parkland Health acting in its role as the administrator of the Dallas County Hospital District Provider Participation Program ("**Parkland**") filed suit against White Rock in Dallas County asserting delinquent payments in the amount of approximately $13,132,032.00 (the "**Delinquent Payments**").  On November 3, 2025, White Rock and Parkland entered into a Payment and Forbearance Agreement (the "**Parkland Payment and Forbearance Agreement**"). Pursuant to the Parkland Payment and Forbearance Agreement, White Rock and Parkland executed an agreed judgment in the amount of the Delinquent Payments.  Further, after an initial payment of $38,334.00, White Rock would make monthly payments to Parkland in the amount of $16,667.00 until Parkland had been paid an amount equal to the Delinquent Payments and an additional $5,000.00 in attorneys' fees incurred by Parkland. In addition to these monthly payments, White Rock was also obligated to turn over to Parkland five percent (5%) of any payments made to White Rock by the following Medicaid Supplemental Programs (or any subsequent program replacing any of the following): DSH – Medicaid Disproportionate Share Hospital, UC – Uncompensated Care, HARP – Hospital Augmented Reimbursement Program, and APHRIQA – Alternate Participating.  As of the date hereof, the Debtors believe $12,614,212.25 remains outstanding under the Parkland Payment and Forbearance Agreement.

*OAG Settlement Agreement*

HHT and the State of Texas (the "**State**"), acting on behalf of the Texas Comptroller of Public Accounts by and through the Office of the Attorney General of Texas entered into a settlement agreement (the "**OAG Settlement Agreement**") for the resolution of this delinquent tax liability.  Pursuant to the OAG Settlement Agreement, HHT agreed that the outstanding tax liability, inclusive of a credit attributable to White Rock, was $778,909.95.  This amount was to be paid down in thirty-nine (39) monthly payments of $18,133.59. So long as HHT continued to make its obligated monthly payments, the State would not pursue HHT for collection of the delinquent franchise taxes.  The Debtors intend to treat any Claims arising from the OAG Settlement Agreement as General Unsecured Claims in Class 5.  As of the date hereof, the Debtors believe $362,614.72 remains outstanding under the OAG Settlement Agreement.

(e)      **Strategic Management Claims**

Prior to the Petition Date, Strategic Management and Capital, LLC ("**Strategic Management**") and certain of its affiliates entered into certain agreements and debt instruments with the Debtors.  Strategic Management and its affiliates provided the Debtors with management services in exchange for monthly payments, as well as capital for the Debtors' various operations.

Strategic Solutions LLC ("**Solutions LLC**"), an affiliate of Strategic Management, and White Rock are parties to that certain Wound Care Management and Support Services Agreement ("**Wound Care Agreement**") dated February 27, 2025. Pursuant to the terms of the Wound Care Agreement, Solutions LLC provides White Rock with administrative and business management services related to White Rock's operations.  White Rock was obligated to make monthly payments for these services.  Pursuant to a filed proof of claim, Solutions LLC is asserting a claim against the Debtors in the amount of $842,793.38.

Additionally, Strategic Management and HHT are parties to a certain Promissory Note dated as of February 27, 2025, in the amount of $5,000,000.00 at an annual interest rate of ten percent (10%) on the outstanding principal balance during the life of the loan, with an additional default interest rate of three percent (3%) and a late charge equal to five percent (5%) of the amount of each late payment. Pursuant to a filed proof of claim, Strategic Management is asserting a claim against the Debtors in the amount of $5,000,000.00.

(f)      **Bank of America Claims**

Certain Debtors are party to the Bank of America Financing Agreements, which govern the terms of the Debtors' use of the Bank of America Equipment.  Certain of the Bank of America Equipment is located in a former hospital facility operated by the Debtors known as the "Spring Hospital" while the remaining Bank of America Equipment remains in WRMC segregated from the rest of the Debtors' equipment.  The Spring Hospital was sold by its owner before the Bank of America Equipment was removed.   The Debtors intend to abandon the Bank of America Equipment and are in discussions with Bank of America for the repossession of the Bank of America Equipment.

(g)      **Other General Unsecured Claims**

The remainder of outstanding Claims against the Debtors are general unsecured claims, the majority of which are asserted against North Houston, White Rock and NCP Management.  These claims generally relate to the routine provision of goods and services incurred by the Debtors in the ordinary course of their business for the maintenance and operation of their healthcare facilities.

# ARTICLE III

# MATERIAL DEVELOPMENTS IN THE CHAPTER 11 CASES

### 3.1 **Commencement and Administration of the Chapter 11 Cases**

The Debtors' Chapter 11 Cases commenced on the Petition Date.  The following is a description of the more significant matters to have come before the Bankruptcy Court since then.

### (a) **First Day Relief and Financing**

The Debtors sought typical "First Day" relief on January 22, 2026, through the filing of various motions before the Bankruptcy Court.  The relief sought in these first day motions was critical to ensure the Debtors were able to make an orderly transition into chapter 11.  In addition to filing for various forms of first day relief, the Debtors also filed the *Declaration of Rashid Syed In Support of Debtors' First Day Motions* [Dkt No. 18] (the "**First Day Declaration**").  A brief description of the first day motions and evidence in support thereof is set forth in the First Day Declaration.

### *Joint Administration Motion*

On January 22, 2026, the Debtors filed the *Debtors' Emergency Motion for an Order Directing Joint Administration of Chapter 11 Cases* [Dkt. No. 5] (the "**Joint Admin Motion**"). Pursuant to the Joint Admin Motion the Debtors sought to have their seven (7) Chapter 11 Cases administered jointly under Case Number 26-90115 for lead debtor White Rock.  The relief sought in the Joint Admin Motion was procedural in nature and would provide for a more efficient administration of the Debtors' estates.  On January 23, 2026, the Bankruptcy Court entered an order [Dkt. No. 14] approving the relief sought in the Joint Admin Motion.

### *SOFA and Schedule Motion*

On January 22, 2026, the Debtors filed the *Debtors' Emergency Motion for an Order (I) Extending Time to File (A) Schedule of Assets and Liabilities, (B) Schedule of Current Income and Expenditures, (C) Schedule of Executory Contracts and Unexpired Leases, and (D) Statement of Financial Affairs and (II) Granting Related Relief* [Dkt. No. 6] (the "**Schedules Motion**").  The Schedules Motion requested authority to extend the deadline by which the Debtors were required to file their schedules of assets and liabilities and statements of financial affairs (collectively, the "**Schedules and SOFAs**").  On January 26, 2026, the Bankruptcy Court entered an order [Dkt. No. 39] extending the Debtors' deadline to file the Schedules and SOFAs to February 25, 2026. On February 25, 2026, the Debtors filed the Schedules and SOFAs.

### *Employee Wage Motion*

On January 22, 2026, the Debtors filed the *Debtors' Emergency Motion for Entry of an Order Authorizing the Debtors to (I) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses, (II) Continue Employee Benefits Programs, and (III) Granting Related Relief* [Dkt. No. 7] (the "**Employee Wage Motion**").  Pursuant to the Employee Wage Motion,

the Debtors sought permission to pay certain prepetition obligations of their employees and to continue to pay their employees in the ordinary course of business. The Debtors' employees are the backbone of their operations and are critical to ensuring continued patient care and safety. On January 23, 2026, the Bankruptcy Court entered an order [Dkt. No. 10] approving the relief sought in the Employee Wage Motion.

### Creditor Matrix Motion

On January 22, 2026, the Debtors filed the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) File a Consolidated List of Creditors, and (B) File a Consolidated List of the 30 Largest Creditors of the Commencement of These Chapter 11 Cases; and (III) Granting Related Relief* [Dkt. No. 8] (the "**Creditor Matrix Motion**"). The Creditor Matrix Motion sought procedural relief permitting the Debtors to consolidate certain statutory creditor lists and mailing matrixes for the administrative benefit of the Debtors' estates and all parties in interest. On January 27, 2026, the Bankruptcy Court entered an order [Dkt. No. 50] approving the relief sought in the Creditor Matrix Motion.

### Insurance Motion

On January 23, 2026, the Debtors filed the *Debtors' Emergency Motion for Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Insurance Policies and (B) Satisfy Obligations Related thereto; and (II) Granting Related Relief* [Dkt. No. 9] (the "**Insurance Motion**"). As hospital operators, the Debtors are required by various local, state, and federal regulators and statutes to maintain certain levels of insurance coverage. On January 26, 2026, the Bankruptcy Court entered an order [Dkt. No. 41] approving the relief in the Insurance Motion on an interim basis. On February 17, 2026, the Bankruptcy Court entered an order [Dkt. No. 98] approving the relief in the Insurance Motion on a final basis.

### Patient Protection Motion

On January 22, 2026, the Debtors filed the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Implementation of Procedures to Protect Confidential Patient Information and (II) Granting Related Relief* [Dkt. No. 10] (the "**Patient Protection Motion**"). As hospital operators, the Debtors are required by various statutes and regulations, including HIPAA to safeguard the personal information of their patients. The Debtors required the relief in the Patient Protection Motion to ensure HIPAA compliance notwithstanding the requirements of the Bankruptcy Code. On January 26, 2026, the Bankruptcy Court entered an order [Dkt. No. 42] approving the relief in the Patient Protection Motion.

### Taxes Motion

On January 22, 2026, the Debtors filed the *Debtors' Emergency Motion for an Order (I) Authorizing Debtors to Pay Certain Prepetition Taxes and Fees; and (II) Granting Related Relief* [Dkt. No. 11] (the "**Taxes Motion**"). The Debtors are required to pay various local, state and federal taxes in the ordinary course of their business operations. Pursuant to the Taxes Motion the Debtors sought authorization to pay their tax liabilities in the ordinary course and prevent the

attendant harm of outstanding tax liability.  On January 26, 2026, the Bankruptcy Court entered an order [Dkt. No. 43] approving the relief sought in the Taxes Motion.

### Utilities Motion

On January 22, 2026, the Debtors filed the *Debtors' Emergency Motion for an Order (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Companies; (II) Establishing Procedures for Resolving Objections by Utility Companies; (III) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service; and (IV) Granting Related Relief* [Dkt. No. 12] (the "**Utilities Motion**").  As hospital operators, ensuring continued access to utilities such as electricity, heating and cooling services, sewage removal, sanitation and the like is paramount to ensuring patient safety and operational efficiency.  The Utilities Motion sought to establish procedures to ensure continued utility services and provide utility service providers with a means to ensure they were adequately protected throughout the Chapter 11 Cases.  On January 26, 2026, the Bankruptcy Court entered an order [Dkt. No. 44] approving the relief sought in the Utilities Motion.

### Critical Vendor Motion

On January 23, 2026, the Debtors filed the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Critical Vendor Claims and (II) Granting Related Relief* [Dkt. No. 16] (the "**Critical Vendor Motion**"). Pursuant to the Critical Vendor Motion the Debtors sought interim and final relief to pay the prepetition claims of certain vendors whose goods and services were absolutely critical to the operation of the Debtors' businesses. The Debtors sought authority to pay these critical vendors approximately $535,000 on an interim basis and approximately $1,456,000 on a final aggregate basis. Pursuant to the Critical Vendor Motion a critical vendor who accepted payment from the Debtors on behalf of prepetition receivables would also need to enter into an agreement with the Debtors ensuring continued service on terms equal to or better than the prepetition terms provided to the Debtors.  On January 26, 2026, the Bankruptcy Court entered an order [Dkt. No. 45] approving the relief sought in the Critical Vendor Motion on an interim basis and on February 17, 2026, entered an order [Dkt. No. 96] approving the relief sought in the Critical Vendor Motion on a final basis.

### Cash Management Motion

On January 23, 2026, the Debtors filed the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Continue their Existing Cash Management System, (B) Maintain Existing Business Forms and Intercompany Arrangements, (C) Continue Intercompany Transactions, (D) Continue the Debtors' Credit Card Program; (II) Extending Time to Comply with Requirements of 11 U.S.C. § 345(b); and (III) Granting Related Relief* [Dkt. No. 17] (the "**Cash Management Motion**"). Pursuant to the Cash Management Motion, the Debtors sought permission to continue using their internal cash management system throughout the Chapter 11 Cases. The Debtors maintain a complex cash management system that is integrated into their operations. Shifting that system to comply with the terms of the Bankruptcy Code would have caused significant harm to the Debtors and their estates at a critical time in the Chapter 11 Cases.  On January 26, 2026, the Bankruptcy Court entered an order [Dkt. No. 46] approving the

relief sought in the Cash Management Motion on an interim basis.  On February 10, 2026, Pipeline filed an objection to the relief sought in the Cash Management Motion asserting that certain relief could harm their secured position.  The Debtors and Pipeline were able to reach an agreement that addressed Pipeline's concerns and on February 17, 2026, the Bankruptcy Court entered an order [Dkt. No. 95] approving the relief sought in the Cash Management Motion on a final basis.

### Authorization to Use Cash Collateral

On January 23, 2026, the Debtors filed the *Debtors' Emergency Motion for Interim and Final Orders (I) Authorizing the Debtors to (A) Use Cash Collateral and (B) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to SRC Hospital Investments I, LLC; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief* [Dkt. No. 19] (the "**Cash Collateral Motion**"), seeking authority to use Cash Collateral (as defined in the Cash Collateral Motion).  As a result of the agreements with Pipeline, all of the Debtors' Cash in Accounts and Deposit Accounts (as defined in the Cash Collateral Motion) was encumbered by liens in favor of SRC.  On January 27, 2026, the Bankruptcy Court entered an order [Dkt. No. 51] approving the use of Cash Collateral on an interim basis.  On February 10, 2026, Pipeline filed an objection to the Cash Collateral Motion.  After negotiations between the Debtors and Pipeline, the Bankruptcy Court entered a second interim order [Dkt. No. 99] permitting the Debtors to continue to use Cash Collateral.  On March 31, 2026, the Bankruptcy Court entered a third interim order [Dkt. No. 199] further permitting the use of Cash Collateral. On May 7, 2026, the Bankruptcy Court entered a fourth interim order [Dkt. No. 252] permitting the use of Cash Collateral until the date of a final hearing on the Cash Collateral Motion, June 24, 2026 at 4:00 p.m. CT.

As discussed in greater detail below, the Debtors and Pipeline, among others, reached an agreement regarding the consensual use of cash collateral, postpetition financing for the Debtors' Estates and the Plan.  In accordance with this agreement, on June 24, 2026, the Bankruptcy Court entered an order (the "**DIP Order**") permitting the use of Cash Collateral on a final basis.

(b)     **Retention of Estate Professionals**

### Approval of Employment of Attorneys and Financial Advisor

On March 16, 2026, the Bankruptcy Court approved the retention and appointment (as applicable) of: (i) Reed Smith, LLP ("**Reed Smith**"), as counsel to the Debtors; (ii) HMP Advisory Holdings, LLC dba Harney Partners ("**Harney Partners**") as the Debtors' financial advisor; and (iii) Erik White as the Debtors' Chief Restructuring Officer.  Pursuant to the order of the Bankruptcy Court appointing the Chief Restructuring Officer, the Chief Restructuring Officer has the sole decision-making authority over all of the Debtors' operations while the Debtors remain in chapter 11.  This authority was further expanded upon the Bankruptcy Court's entry of the Resignation Settlement Order (defined below) to provide the Chief Restructuring Officer with sole authority to propose a chapter 11 plan on behalf of the Debtors.

On February 18, 2026, Susan N. Goodman was appointed as the Healthcare Ombudsman (the "**Ombudsman**").  On March 23, 2026, the Ombudsman filed its application to employ Kane,

Russell, Coleman, Logan PC as counsel. On April 17, 2026, the Bankruptcy Court approved the Ombudsman's retention of counsel [Dkt. No. 223]. On April 20, 2026, the Ombudsman filed their report with the Bankruptcy Court [Dkt. No. 225].

### *No Unsecured Creditors' Committee*

The United States Trustee has not appointed a committee of unsecured creditors in these Chapter 11 Cases.

### 3.2   **Other Developments During the Chapter 11 Cases**

### *Establishing Bar Date for Claims Against the Debtors*

On February 23, 2026, the Debtors filed the *Emergency Motion of Debtors for Entry of an Order (I) Establishing Deadlines and Procedures for Filing Proofs of Claim; (II) Approving Form and Manner of Notice Thereof; and (III) Granting Related Relief* [Dkt No. 119] (the "**Bar Date Motion**"), seeking entry of an order (the "**Bar Date Order**") establishing the deadline for non-governmental and governmental creditors to file claims against the Debtors' estates.  The relief in the Bar Date Motion and Bar Date Order was necessary for the Debtors to establish a concrete universe of claims to be addressed in a proposed plan of reorganization.  On February 27, 2026, the Bankruptcy Court entered the Bar Date Order [Dkt. No. 144] establishing April 2, 2026, as the General Bar Date (as defined in the Bar Date Order) and July 20, 2026, as the Governmental Bar Date (as defined in the Bar Date Order) setting forth the descriptions of creditors required to file claims against the Debtors' estates and procedures for filing such claims.

### *Bidding Procedures for Potential Sale of Assets*

As part of its restructuring, PH undertook a sale of all or substantially all of its assets.  The pool of bidders for Heights Hospital is incredibly diverse and represents parties with varying interests.  Certain assets of the Debtors were in use at Heights Hospital to assist in the provision of services to the patients located there. On February 13, 2026, the Debtors filed the *Debtors' Emergency Motion for Entry of an Order (I)(A) Approving Bidding Procedures, (B) Scheduling Certain Dates and Deadlines, and (C) Approving the Form and Manner of Notice Thereof; (II) Authorizing the Sale of the Assets Free and Clear of All Encumbrances; and (III) Granting Related Relief* [Dkt. No. 83] (the "**Bidding Procedures Motion**").  Pursuant to the Bidding Procedures Motion the Debtors sought the Bankruptcy Court's authority to engage in bidding process for the PH sale process, including the receipt of good faith deposits and allocations of sale proceeds. Ultimately the PH sale process resolved itself without the sale of any assets of the Debtors.

### *Ordinary Course Professional Motion*

On February 23, 2026, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business and (II) Granting Related Relief* [Dkt. No. 120] (the "**OCP Motion**").  The Debtors employ a number of professionals necessary in the ordinary course of their operations. These professionals provide a variety of non-bankruptcy related services. Pursuant to the OCP Motion the Debtors sought the Bankruptcy Court's authority to retain these non-bankruptcy

professionals in the ordinary course without the need for court approval and without requiring these professionals to file fee statements and related compensation related filings with the Bankruptcy Court.  On March 20, 2026, the Bankruptcy Court entered an order [Dkt. No. 168] approving the relief sought in the OCP Motion.

### *Interim Compensation Procedures*

On February 16, 2026, the Debtors filed the *Motion of Debtors to Establish Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* [Dkt. No. 89] (the "**Interim Compensation Motion**") seeking to establish procedures governing the compensation of estate professionals. The relief in the Interim Compensation Motion was beneficial to the Debtors' estates by establishing a procedure to address the universe of claims for the Debtors' professionals and their costs to the Debtors' estate.  On March 13, 2026, the Bankruptcy Court entered an order [Dkt. No. 158] approving the relief sought in the Interim Compensation Motion.

### *Athelas Service Agreement Litigation*

The Debtors' team rebuilt the hospital's technology infrastructure over the course of their ownership of WRMC; however, the Debtors' infrastructure remained fragmented. As a result of this fragmentation the Debtors are running multiple clinical EHR systems: one for inpatient and one for the emergency department, with a third wrapper system layered on top for patient access, registration, and revenue cycle functions.

To address this fragmentation, the Debtors moved to CliniComp as their new EHR system, which the Debtors believed could be a single unified platform to consolidate inpatient data, patient access, and clinical documentation. Moving to CliniComp was intended to eliminate fragmentation and give coders and billers a complete view of each patient encounter—enabling proper charge capture at the point of care. However, this was not the case and CliniComp's services were not provided in the way they were represented to the Debtors.  Ultimately the Debtors found that they would need to engage yet another party to fully migrate to the CliniComp system.  In furtherance of the Debtors' critical need to migrate to the CliniComp system, Athelas Inc. ("**Athelas**") was engaged specifically to provide the revenue cycle management layer services that integrate with CliniComp. On November 30, 2025, certain Debtors and Athelas executed a services agreement for revenue cycle management services (the "**Service Agreement**"). Under the Service Agreement, Athelas would become the Debtors' revenue cycle platform replacing a former contract counterparty. Athelas' services under the Service Agreement were critical support functions necessary for the Debtors' operation of their new EHR with CliniComp to permit the Debtors to more efficiently bill and reduce the estimated revenue loss resulting from the fragmented system.

Prior to the Debtors' chapter 11 filing, the parties anticipated that the transition of services to Athelas (and implementation of the CliniComp system) would be available for live use by April 1, 2026. The Service Agreement required the Debtors to pay a $19,000 "Site Onboarding" fee upon execution of the Service Agreement. The Debtors paid the $19,000 Site Onboarding fee on December 3, 2025. Athelas then began the implementation process prior to the Petition Date.

Less than a week after the Petition Date, Athelas informed the Debtors that it would cease its ongoing implementation services under the Service Agreement until the Debtors emerged from chapter 11 protection. The Debtors were blindsided by this unilateral decision, in part because the Debtors paid the $19,000 onboarding fee, and the Debtors were not in breach of the Service Agreement—nor have they ever been in breach of the Service Agreement.

After discussing with the Debtors, Athelas assured the Debtors that Athelas would continue the implementation under the Service Agreement. With this assurance, the Debtors did not seek further any remedies before this Court.

Several weeks later Athelas filed a *Motion of Athelas Inc. for Relief from the Automatic Stay to Exercise Termination* [Dkt. No. 159] and *Motion of Athelas Inc. to Shorten Time and Fix Dates and Conditions by Which Debtor Must Assume, Assume and Assign, or Reject Executory Contract* [Dkt. No. 160] (together the "**Athelas Motions**").  Athelas asserted no missed payments, breaches or defaults under the Service Agreement; rather, Athelas took unilateral actions impermissible under the Bankruptcy Code.  These actions caused significant harm to the Debtors and their estates, and caused significant losses in revenue through continued revenue leakage. This revenue leakage further exacerbated the Debtors' tight liquidity and accelerated the Debtors' need for postpetition financing.

On March 31, 2026, the Debtors filed the *Debtors' Emergency Motion Pursuant to Section 105(a), 362 and 365 of the Bankruptcy Code to Enforce the Automatic Stay and Compel Performance of Obligations under Executory Contract* [Dkt. No. 195] (the "**Motion to Compel**").  Pursuant to the Motion to Compel, the Debtors requested the Bankruptcy Court to enforce the automatic stay and compel Athelas to continue to provide the services under the Service Agreement, which had already been fully paid for.  On May 6, 2026, the Debtors and Athelas filed a joint stipulation [Dkt. No. 246] (the "**Athelas Stipulation**") seeking withdrawal of the Motion to Compel, and deeming the Service Agreement rejected as of the date of entry of the Athelas Stipulation, mooting the relief sought in the Athelas Motions.

The Debtors reserve the right to seek relief against Athelas for breach of the Service Agreement, damages related to its willful and intentional violation of the automatic stay, and related relief.

### Motion for Rejection of Executory Contracts

In response to the Athelas Motions, on March 23, 2026, the Debtors also filed the *Debtors' Motion for Entry of an Order (I) Approving Procedures for the Rejection of Executory Contracts and (II) Granting Related Relief* [Dkt. No. 177] (the "**Rejection Motion**") seeking to establish procedures to streamline the rejection process of executory contracts that are burdensome to the Debtors' reorganization efforts.  The Rejection Motion benefits the Debtors' estates and their creditors by establishing clear and uniform practices for the rejection of executory contracts and unexpired leases, while ensuring that impacted executory contract counterparties have sufficient time to establish their related rejection claims.  On April 17, 2026, the Bankruptcy Court entered an Order [Dkt. No. 222] approving the relief sought in the Rejection Motion and establishing

procedures for the rejection of executory contracts and unexpired leases, as well as the deadlines for filing claims arising from said rejection.

### *Motion to Impose the Automatic Stay*

On March 23, 2026, the Debtors filed the *Debtors' Motion for Entry of Order to Enforce the Automatic Stay and Impose the Automatic Stay* [Dkt. No. 176] (the "**Automatic Stay Motion**"). As set forth in the Automatic Stay Motion, extension of the automatic stay to the Debtors' principal, Dr. Mirza N. Baig ("**Dr. Baig**") is necessary to stay a litigation initiated against Dr. Baig by Friedman & Feiger, L.L.P. ("**Friedman**") alleging liability for Dr. Baig based on the alleged non-payment by the Debtors. The Debtors believe that the suit against Dr. Baig is improper and a costly distraction from their reorganization efforts. Further, if the alleged payment obligation giving rise to liability against Dr. Baig was an obligation of the Debtors, Friedman has a recourse: filing a claim against the Debtors prior to the Bar Date.

On March 31, 2026, the Bankruptcy Court held a hearing on the Automatic Stay Motion and entered an order [Dkt. No. 201] extending the automatic stay to Dr. Baig until the earlier of (i) the effective date of the Debtors' chapter 11 plan, (ii) a further Order of this Court, or (iii) 60 days (without prejudice to seeking further extension). On June 30, 2026, the Bankruptcy Court entered another order [Dkt. No. 345] extending the automatic stay to Dr. Baig until the earlier of (i) August 29, 2026 or (ii) the effective date of the Debtors' chapter 11 plan.

### *The Adversary Proceeding*

On April 28, 2026 certain of the Debtors (the "**Plaintiffs**") initiated an adversary proceeding against SRC and Pipeline styled *White Rock Medical Center, LLC; NCP Management, LLC; North Houston Surgical Hospital, LLC; and Heights Healthcare of Texas, LLC v. SRC Hospital Investments I, LLC and Pipeline Health System Holdings, LLC* Adv. Case No. 26-03140 (the "Adversary Proceeding") through the filing of an adversary complaint (the "Complaint"). The Adversary Proceeding seeks to redress the status of SRC and Pipelines' liens on the Debtors' assets and prepetition actions taken by SRC and Pipeline against the Debtors. On June 15, 2026, the Pipeline Entities filed a motion to dismiss seeking dismissal of the Adversary Proceeding. On July 7, 2026, the Bankruptcy Court entered an order holding all filing and response deadlines in the Adversary in abeyance until the earlier of the Effective Date of the Plan or the termination of the Restructuring Term Sheet (defined below).

### *Filing of the First Plan and First Disclosure Statement*

On May 8, 2026, the Debtors filed the *Plan of Reorganization of White Rock Medical Center, LLC and its Affiliated Debtors* [Dkt. No. 254] (as amended from time to time the "**First Plan**") and the *Disclosure Statement for the Plan of Reorganization of White Rock Medical Center, LLC and its Affiliated Debtors* [Dkt. No. 255] (as amended from time to time the "**First Disclosure Statement**"). The First Plan was to be funded by a non-profit plan sponsor who, in exchange for providing plan funding, would receive all of the equity of the reorganized debtor upon the effective date of the First Plan. The Debtors' management believed that emerging from chapter 11 as a

subsidiary of a non-profit would be beneficial to the reorganized debtor as well as the patients being cared for at WRMC.

On May 8, 2026, Debtors also filed the *Debtors' Emergency Motion for Entry of an Order (I) Scheduling a Combined Hearing on the Disclosure Statement and Plan of Reorganization; (II) Conditionally Approving the Disclosure Statement; (III) Establishing a Plan and Disclosure Statement Objection Deadline and Related Procedures; (IV) Approving the Solicitation Procedures; (V) Approving the Combined Notice; (VI) Establishing Procedures for the Assumption and Rejection of Executory Contracts and Unexpired Leases; and (VII) Granting Related Relief* [Dkt. No. 256] (the "**First Solicitation Motion**"). The First Solicitation Motion sought to establish a timeline for the solicitation and confirmation of the First Plan and First Disclosure Statement.

On May 17, 2026, the Debtors filed an amended version of the First Plan [Dkt. No. 277] and the First Disclosure Statement [Dkt. No. 278]. The same day, a joint objection to the First Disclosure Statement and First Solicitation Motion by was filed by Pipeline, REILS, Strategic Management and Strategic Solutions. These parties collectively made up a majority of the Debtors' creditor body and their objection challenged the Debtors' ability to fund the solicitation and confirmation process of the First Plan and the Chapter 11 Cases. The Debtors adjourned the hearing on approval of the First Solicitation Motion and engaged in negotiations for the possibility of a consensual path forward to resolving the Chapter 11 Cases.

### *Restructuring Term Sheet, DIP Facility, Consensual Use of Cash Collateral and Second Plan*

Following the adjournment of the hearing on the First Solicitation Motion, the Debtors and the parties who objected to the First Solicitation Motion engaged in holistic negotiations regarding the viability of the Debtors' Chapter 11 Cases and potential paths forward for a consensual and successful reorganization. Each of the parties, including the Debtors' management, were represented by separate and sophisticated counsel during these negotiations. Over the course of several weeks, the parties were able to reach an agreement for a framework for a consensual plan of resolution embodied in a restructuring term sheet (the "Restructuring Term Sheet") executed by the Debtors on the one hand, Pipeline, REILS, Strategic Management and Strategic Solutions (collectively, the "**Supporting Creditors**") on the other hand, that among other things: (a) governs the terms of the provision of a postpetition financing facility of up to $3,000,000.00 (the "**DIP Facility**") to the Debtors, (b) provides for the consensual use of Cash Collateral by the Debtors on a final basis, (c) calls for the abeyance of the Adversary Proceeding and (d) calls for the resignation of Dr. Baig and the Resigning Employees (defined below).

### *The Restructuring Term Sheet*

The Restructuring Term Sheet governs the terms of the consensual restructuring efforts between the Debtors and the Supporting Creditors and is embodied in the terms of the Plan. The Restructuring Term Sheet provides that in exchange for the equity interests of the Reorganized Debtor, the Plan Sponsor will provide Plan Funding in the form of a $3,300,000.00 Exit Facility that will be used to fund the distributions provided for in the Plan and the Reorganized Debtors'

operational expenses after confirmation of the Plan. The Restructuring Term Sheet also provides for the terms governing the DIP Facility and consensual use of Cash Collateral, as well as the milestones that will govern the Debtors' reorganization efforts. The Restructuring Term Sheet represents a tremendous success for the Debtors' Estates. Prior to entering the Restructuring Term Sheet, the Debtors were running out of Cash to fund their operations and were reliant on the consent of Pipeline for the continued use of Cash Collateral. Absent funding it was unclear if the Debtors would be able to remain administratively solvent. Further, it was unclear whether the Debtors would have sufficient liquidity to fund a contested confirmation hearing over the objections of a majority of their creditor group. The Restructuring Term Sheet and the transactions set forth therein provided the framework for the Debtors to access critical liquidity, fund a chapter 11 plan, and resolve the objections of a majority of the Debtors' creditors. This will benefit the Debtors', their Estates, and all parties in interest. The Plan Sponsor under the Restructuring Term Sheet is an affiliate of REILS.

### The DIP Facility

As set forth in the Restructuring Term Sheet, the Debtors were provided with a secured DIP Facility of up to $3,000,000.00 consisting of (i) $2,000,000.00 in committed postpetition financing and (ii) an additional amount of up to $1,000,000.00 funded at the DIP Lender's discretion. The DIP Facility is governed by the terms of that certain DIP Agreement executed by White Rock and the DIP Lender. The DIP Facility is secured by liens on all of the Debtors' unencumbered assets (including the proceeds of Avoidance Actions but not the Avoidance Actions themselves) and junior liens on all of the Debtors' encumbered assets.

On June 8, 2026, the Debtors filed the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Incur Postpetition Credit, (II) Scheduling a Final Hearing, and (III) Granting Related Relief* [Dkt. No. 307] (the "**DIP Motion**"). Notwithstanding the negotiations with the Supporting Creditor Group, the Debtors through the Chief Restructuring Officer, engaged in a fulsome marketing process to procure necessary postpetition financing on the most favorable terms possible. Despite other parties seeking additional information, only the DIP Lender provided terms for a postpetition financing facility. As set forth in the DIP Motion, the Debtors needed postpetition financing to ensure continued operations and avoid any detrimental impacts to continued patient care.

On June 9, 2026, a hearing was held on the DIP Motion and an order was entered [Dkt. No. 313] approving the DIP Facility on an interim basis. On June 24, 2026, after notice and hearing, the Bankruptcy Court entered the DIP Order approving the DIP Facility on a final basis.

The outstanding obligations under the DIP Facility will be addressed under the Plan. On the Effective Date, the DIP Lender will be provided either (a) Cash in an amount equal to the DIP Claims outstanding as of the date thereof, or (b) with the agreement of the Plan Sponsor, 100% of the membership interests in the Reorganized Debtor.

### *Final Use of Cash Collateral*

The Restructuring Term Sheet provides that the SRC and Pipeline will consent to the Debtors' use of Cash Collateral through the Effective Date of the Plan.  On June 24, 2026, the Bankruptcy Court entered the DIP Order which approved the Debtors' use of Cash Collateral on a final basis.

### *Resignation of Dr. Baig and the Resigning Employees*

As a condition of funding the DIP Facility the Supporting Creditors required Dr. Baig and his family members employed by the Debtors (the "**Resigning Employees**") to resign. Dr. Baig, the Debtors' former CEO and ultimate equity holder, spent years trying to turn WRMC around and was the Debtors' fiduciary with respect to plan matters. He initially believed that the First Plan represented the best path for maximizing creditor outcomes and stabilizing WRMC for the benefit of the community. As discussions with the Supporting Creditor Group developed, however, including over the Restructuring Term Sheet, he recognized that the Plan may represent a better and more certain path forward, especially because it is coupled with the DIP Facility. He was generally willing to step aside to facilitate the Plan and DIP Facility but needed certainty regarding (a) Restructuring Term Sheet and (b) reasonable protections for the Resigning Employees (who were being asked to step aside on an immediate basis).

The resignation of Dr. Baig and the Resigning Employees was governed by the terms of a settlement agreement (the "**Resignation Settlement Agreement**").  The Resignation Settlement Agreement provides, among other things, that the Debtors would provide certain severance and healthcare benefits to the Resigning Employees for a period of three (3) months following the resignations, that the Plan Sponsor and Reorganized Debtor will make reasonable efforts to replace certain guarantee obligations to the Debtors' creditors owed by Dr. Baig, and provided for the mutual release of claims by and against the Debtors, Dr. Baig and the Resigning Employees.  The Debtors believed that the Resignation Settlement Agreement and the satisfaction of claims and releases contained therein, as well as the access to the DIP Facility, were in the best interest of the Debtors and their Estates.

On June 12, 2026, the Debtors filed the *Debtors' Emergency Motion for Entry of an Order (I) Approving Settlement Agreement Regarding Resignation of Current Management and (II) Granting Related Relief* (the "**Resignation Motion**") seeking the Bankruptcy Court's authority to enter into the Resignation Settlement Agreement.  On June 24, 2026, the Bankruptcy Court entered an order [Dkt. No. 337] permitting the Debtors to enter into the Resignation Settlement Agreement.

### *Waiver of Claims of the Waiving Supporting Creditors*

As part of the restructuring transactions set forth in the Restructuring Term Sheet, REILS, Strategic Management and Strategic Solutions will waive their claims against the Debtors and the Debtors' estates.  These claims are General Unsecured Claims and would have otherwise received a majority of the distribution provided for General Unsecured Creditors.  Each of the Waiving Supporting Creditors will retain their right to vote in favor of the Plan.

## ARTICLE IV

## SUMMARY OF THE DEBTORS' PLAN

### 4.1     Overview of the Debtors' Plan

The Plan is the culmination of months of effort by the Debtors and their professionals and advisors to present a plan of reorganization that maximizes value for the Debtors' creditors while ensuring that WRMC remains open and able to continue providing care to the vulnerable community that has come to depend on its operations. The Plan calls for the reorganization of the Debtors outstanding obligations and liabilities. Lead Debtor White Rock will be the Reorganized Debtor after the Effective Date, while all of the other Debtor entities shall be wound down and liquidated according to the terms of the Plan.  The membership interests of the Reorganized Debtor will be distributed to the Plan Sponsor in exchange for the $3,300,000.00 Plan Funding which will be used to make the distributions called for under the Plan and fund the Reorganized Debtor's operations. The Plan Sponsor, or with the Plan Sponsor's agreement the DIP Lender, would receive all membership interests in the Reorganized Debtor.

### 4.2     Terms of the Plan Control

The following represents the Debtors' best efforts to describe the treatment afforded to the Claims of the Creditors in various Classes.  Creditors should be aware that the terms of the Plan control the treatment of all Claims.  In the event of any inconsistencies between the Plan and this Disclosure Statement, the terms of the Plan shall be, in all events, determinative.  The Debtors urge all Creditors to read the Plan for a complete understanding of the treatment of their Claims.

### 4.3     Unclassified Claims

As provided in section 1123(a)(1) of the Bankruptcy Code, Administrative Claims (including Professional Fee Claims and U.S. Trustee Fees), DIP Claims and Priority Tax Claims are not classified for purposes of voting on the Plan.  Holders of Administrative Claims and Priority Tax Claims are not entitled to vote on the Plan but, rather, are treated separately in accordance with Article II of the Plan and under section 1129(a)(9)(A) of the Bankruptcy Code.

**Administrative Claims**.  Except with respect to Professional Fee Claims, unless the Holder of an Allowed Administrative Claim agrees to less favorable treatment of such Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date on which an Administrative Claim becomes an Allowed Administrative Claim, or (iii) the date on which an Allowed Administrative Claim becomes payable under any agreement relating thereto, each Holder of an Allowed Administrative Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for such Allowed Administrative Claim, Cash equal to the unpaid portion of such Allowed Administrative Claim.

To the extent not already asserted in the Chapter 11 Cases pursuant to a timely filed Proof of Claim in accordance with the Bar Date Order, all requests for allowance and payment of Administrative Claims (other than (i) Professional Fee Claims (such claims are

subject to the Professional Fee Claims Bar Date), (ii) Claims asserted under section 503(b)(9) of the Bankruptcy Code (such Claims are subject to the General Bar Date), (iii) U.S. Trustee Fees, (iv) Administrative Claims that have been Allowed on or before the Effective Date, and (v) Administrative Claims that were already asserted in the Chapter 11 Cases pursuant to a timely Proof of Claim in accordance with the Bar Date Order), must be filed and served on the Debtors and the Plan Sponsor, or, after the Effective Date, the Plan Administrator, and its counsel, so as to actually be received on or before the Administrative Claims Bar Date.  The notice of the occurrence of the Effective Date shall set forth the Administrative Claims Bar Date and shall constitute notice thereof.  For the avoidance of doubt, Holders of Administrative Claims based on liabilities incurred by the Debtors in the ordinary course of business after the Petition Date must file and serve a request for payment of such Administrative Claim by the applicable Administrative Claims Bar Date.

After notice and a hearing, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with, a Final Order.

Holders of Administrative Claims (other than (i) Professional Fee Claims, (ii) Claims asserted under section 503(b)(9) of the Bankruptcy Code, (iii) U.S. Trustee Fees, (iv) Administrative Claims that have been Allowed on or before the Effective Date, and (v) Administrative Claims that were already asserted in the Chapter 11 Cases pursuant to a timely filed Proof of Claim in accordance with the Bar Date Order), that do not file and serve a request for allowance and payment of an Administrative Claim by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting Administrative Claims against the Debtors, Plan Administrator, the Debtors' Estates, or their assets and properties, and any Administrative Claims shall be deemed Disallowed as of the Effective Date without the need for any notices, objection, or other action from the Debtors or the Plan Administrator, as applicable, or any action or approval of the Bankruptcy Court.

**DIP Claims**. All DIP Claims shall be deemed Allowed as of the Effective Date in an amount equal to the aggregate amount of the DIP Facility obligations approved by the Bankruptcy Court, including, (i) the principal amount outstanding under the DIP Facility on such date, (ii) all interest accrued and unpaid thereon through and including the date of payment, and (iii) all accrued fees, expenses, and indemnification obligations payable under the DIP Documents.

On the Effective Date or as soon as reasonably practicable thereafter, except to the extent a Holder of an Allowed DIP Claim agrees to a less favorable treatment of such Claim, each Holder of an Allowed DIP Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for such Allowed DIP Claim, at the election of the Holder of said Allowed DIP Claim, either (a) Cash equal to the unpaid portion of such Allowed DIP Claim or (b) a portion of the New Securities as agreed to by the Plan Sponsor and the DIP Lender.

Page 35

Contemporaneously with the receipt by the Holder of the Allowed DIP Claim of the foregoing treatment, the DIP Facility and DIP Documents shall be deemed terminated without further action by the DIP Lender.  The DIP Lender shall take all actions to effectuate and confirm such termination as reasonably requested by the Debtors, Plan Sponsor or Plan Administrator as applicable.

**Priority Tax Claims**.  Unless the Holder of an Allowed Priority Tax Claim agrees to less favorable treatment of such Claim, each Holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for such Allowed Priority Tax Claims, either (a) payment in full in Cash, on or as soon as reasonably practicable after the latest of (i) the Effective Date, or (ii) the date on which a Priority Tax Claim becomes an Allowed Priority Tax Claim, (b) payment upon such other terms as agreed between the Debtor and each Holder of such Allowed Priority Tax Claim, or (c) to the extent permitted by section 1129(a)(9)(C) of the Bankruptcy Code, deferred Cash payments made in regular installments over a period ending not later than five (5) years after the Petition Date, together with interest at the applicable statutory rate, of a total value, as of the Effective Date, equal to the Allowed amount of such Priority Tax Claim. Consistent with the Resignation Settlement Agreement, the Reorganized Debtor shall assume liability for all Allowed Priority Tax Claims against the Debtors and all related payment plan agreements.

**Professional Fee Claims**.   All applications for allowance and payment of Professional Fee Claims by Professionals for services rendered and reimbursement of expenses incurred prior to the Effective Date must be filed on or before the Professional Fee Claims Bar Date.  If an application for a Professional Fee Claim is not filed by the Professional Fee Claims Bar Date, such Professional Fee Claim shall be deemed waived, and the Holder of such Claim shall be forever barred from receiving payment on account thereof.  The notice of the occurrence of the Effective Date shall set forth the Professional Fee Claims Bar Date and shall constitute notice thereof. Objections to any Professional Fee Claims must be filed and served on the Plan Administrator and the requesting Professional, no later than twenty-one (21) days after service of the applicable final application for allowance and payment of Professional Fee Claims.

Unless otherwise agreed to (i) by the Debtors and the Professional prior to the Effective Date or (ii) by the Plan Administrator and the Professional after the Effective Date, the amount of Professional Fee Claims owing to such Professional that are Allowed by Final Order shall be paid in full in Cash by the Plan Administrator as soon as reasonably practicable after its Professional Fee Claims are Allowed by Final Order, (x) *first*, by application of any retainer monies held by such Professional, and (y) *second*, once such retainer balance is exhausted, the Plan Administrator shall pay such Professional the remaining balance of its Allowed Professional Fee Claim in Cash.

Professionals shall reasonably estimate their unpaid Professional Fee Claims incurred prior to the Confirmation Hearing and for fees and expenses estimated to be incurred at and after the Confirmation Hearing and through the Effective Date and shall deliver such estimate to the Plan Sponsor no later than the date of the Confirmation

Hearing; provided, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Professional Fee Claims.

### 4.4    **Classification and Treatment of Claims**

In accordance with section 1123(a)(1) of the Bankruptcy Code, all Claims and Equity Interests are placed in the Classes described below for all purposes, including voting on, confirmation of, and distributions under, the Plan as follows:

| Class | Claim or Interest | Summary of Treatment | Voting Status | Estimated Claim Amount |
|---|---|---|---|---|
| Class 1 | Other Priority Claim | Unless the Holder of an Allowed Other Priority Claim agrees to less favorable treatment of such Claim, each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for such Allowed Other Priority Claim Cash in an amount equal to the Allowed amount of such Allowed Other Priority Claim as soon as reasonably practicable after the latest of (A) the Effective Date, (B) the date that such Claim becomes an Allowed Other Priority Claim, and (C) a date agreed to by the Plan Sponsor and the Holder of such Allowed Other Priority Claim. | Unimpaired (not entitled to vote) | $0 - $269,535.55 |
| Class 2 | Secured Lender Claims | Unless the Holder of an Allowed Secured Lender Claim and the Debtors agree to other treatment of such Secured Lender Claim, each Holder of an Allowed Secured Lender Claim shall receive, the following in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for such Allowed Secured Lender Claim.<br><br>(a)    On the Effective Date all liens provided for in the Cash Collateral Orders shall remain in full force, and effect and priority until such claim is paid in full;<br><br>(b)    Dismissal, with prejudice, of the Pipeline Adversary Proceeding; and<br><br>(c)    the Secured Lender shall be provided with five percent (5%) of all gross | Impaired (entitled to vote) | $7,442,001.20 |

| Class | Claim or Interest | Summary of Treatment | Voting Status | Estimated Claim Amount |
|---|---|---|---|---|
| | | revenues of the Reorganized Debtor which will be applied to repayment of the Secured Lender Claim until such Claim has been paid in full. For purposes of this Plan "gross revenues" means all revenues, receipts, income, accounts, accounts receivable, and other sums generated or received by the Reorganized Debtor from the ownership or operation of the hospital and the Reorganized Debtor's business, including (t) patient service revenue, inpatient and outpatient services, emergency, surgery, imaging, laboratory, pharmacy, therapy, and other ancillary services, physician and clinic services billed and collected by the Reorganized Debtor; (u) all private or government payments including, without limitation, Medicare payments and reimbursements, Medicaid payments and reimbursements, commercial insurance payments and reimbursements, and managed care payments and reimbursements; (v) other third-party payor reimbursements; (w) self-pay collections, co-payments, and deductibles, grants, supplemental payments, settlements, refunds, and credits; (x) rental and other ancillary operating income; (y) insurance proceeds relating to lost revenue and proceeds of loans against the Secured Lender's collateral (other than the Secured Lender's loan); and (z) all proceeds of the foregoing, in each case before deduction of operating expenses, debt service, taxes, or other costs. | | |
| Class 3 | Reinstated Equipment Loan Claims | On the Effective Date, each Reinstated Equipment Lender's Equipment Loan Claim shall be reinstated and rendered unimpaired in accordance with section 1124 of the Bankruptcy Code. In furtherance thereof: (a) any and all defaults under the Reinstated Equipment Loan Documents, other than defaults of a kind specified in section 365(b)(2) of the | Unimpaired (not entitled to vote) | $2,935,266.61 |

| Class | Claim or Interest | Summary of Treatment | Voting Status | Estimated Claim Amount |
|---|---|---|---|---|
| | | Bankruptcy Code, shall be cured on or as soon as reasonably practicable after the Effective Date; (b) the maturity of the Equipment Loan Claim of each Reinstated Equipment Lender shall be reinstated as such maturity existed before any default under the applicable Reinstated Equipment Loan Documents; (c) the legal, equitable, and contractual rights of each Reinstated Equipment Lender under the Reinstated Equipment Loan Documents shall not otherwise be altered by the Plan; (d) all liens and security interests held by each Reinstated Equipment Lender under the Reinstated Equipment Loan Documents shall remain in full force and effect, unaltered by the Plan or the Confirmation Order; and (e) the Reorganized Debtor shall continue to perform all obligations under the Reinstated Equipment Loan Documents in accordance with their terms from and after the Effective Date. For the avoidance of doubt, the Restructured Equipment Note Terms shall not apply to the Equipment Loan Claims of Reinstated Equipment Lenders, and the Reinstated Equipment Loan Documents shall continue in full force and effect in accordance with their original terms (as cured pursuant to this Section). | | |
| Class 4 | Restructured Equipment Loan Claims | On the Effective Date, Holders of an Allowed Restructured Equipment Loan Claims shall receive the following treatment:<br><br>if such Holder _accepts_ the Plan, such Holder shall receive, in full and final satisfaction, settlement, release, and discharge of its Equipment Loan Claim, treatment on substantially the same terms and conditions as set forth in such Holder's Equipment Lender Loan Documents, except that the Restructured Equipment Note Terms shall apply to such Equipment Lender Loan Documents. On the Effective Date, the Equipment Lender Loan Documents of each accepting Equipment Lender shall be deemed modified and | Impaired<br><br>(entitled to vote) | $829,528.24 |

| Class | Claim or Interest | Summary of Treatment | Voting Status | Estimated Claim Amount |
|---|---|---|---|---|
| | | amended to incorporate the Restructured Equipment Note Terms without the need for the execution of any amendment or modification agreement, and the Reorganized Debtor and such Holder shall be bound by the Equipment Lender Loan Documents as so modified. For the avoidance of doubt, all liens and security interests granted to an accepting Equipment Lender under its Equipment Lender Loan Documents shall remain in full force and effect following the Effective Date, subject to the terms of such Equipment Lender Loan Documents as modified by the Restructured Equipment Note Terms.<br><br>if such Holder rejects the Plan, the Reorganized Debtor shall execute and deliver to each rejecting Equipment Lender an Equipment Lender Cramdown Note in a principal amount equal to the Allowed amount of such rejecting Equipment Lender's Secured Claim as determined under section 506(a) of the Bankruptcy Code. To the extent that a rejecting Equipment Lender holds an Allowed unsecured deficiency Claim under section 506(a) of the Bankruptcy Code, such deficiency Claim shall be treated as a General Unsecured Claim under Class 5 of the Plan. The Equipment Lender Cramdown Note shall be on substantially the same terms and conditions as such rejecting Equipment Lender's Equipment Lender Loan Documents, except that (i) the principal amount of the Equipment Lender Cramdown Note shall be as set forth in this Section 3.3(d)(ii)(2), and (ii) the Restructured Equipment Note Terms shall apply to the Equipment Lender Cramdown Note. Each Rejecting Equipment Lender shall retain its liens and security interests on the collateral securing its Equipment Loan Claim to the extent of the Allowed Secured Claim as determined under section 506(a) of the Bankruptcy Code. | | |

| Class | Claim or Interest | Summary of Treatment | Voting Status | Estimated Claim Amount |
|---|---|---|---|---|
| Class 5 | General Unsecured Claims | On the Effective Date or as soon as reasonably practicable thereafter, except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment of such Claim, each Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction, compromise, settlement, release and discharge of and in exchange for such Allowed General Unsecured Claim, its Pro Rata Share of the GUC Distribution Pool. Claims held by REILS SPV Finance Inc. and Strategic Management and Capital, LLC shall be subject to Section 5.21 (Waiver and Release of Supporting Creditor Unsecured Claims) of the Plan. | Impaired (entitled to vote) | $29,874,960 - $97,682,348.33 |
| Class 6 | Existing Equity Interests | On the Effective Date, each Allowed Existing Equity Interest shall be discharged, cancelled, released, and extinguished, without any distributions to Holders. | Impaired (not entitled to vote) | N/A |

4.5     **Special Provisions Regarding Unimpaired Claims**. Except as otherwise provided in the Plan, nothing shall affect the Debtors', the Plan Sponsor's, or the Plan Administrator's rights and defenses, legal and equitable, with respect to any Unimpaired Claims, including but not limited to all rights with respect to legal and equitable defenses to setoffs against or recoupments of Unimpaired Claims.

4.6     **Subordination of Claims**. Except as expressly provided herein, the Allowance, classification, and treatment of all Allowed Claims and Interests take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code or otherwise. To the extent any Section 510(b) Claim or other Subordinated Claim exists against any Debtor, such Claim shall be subordinated pursuant to section 510(b) of the Bankruptcy Code to all Claims other than Existing Equity Interests, and, unless otherwise ordered by the Bankruptcy Court, the Holder of such Subordinated Claim shall not receive or retain any property under the Plan on account of such Subordinated Claim.

4.7     **Appointment of Plan Administrator**

(a)     On the Effective Date, the Plan Administrator shall be deemed the Estate's representative in accordance with section 1123 of the Bankruptcy Code and shall have all powers, authority, and responsibilities specified in the Plan, including, without limitation, the powers of a trustee under sections 704 and 1106 of the Bankruptcy Code.

(b)     On the Effective Date, the authority, power, and incumbency of the persons acting as directors and officers of the Debtors shall be deemed to have resigned, solely in their capacities as such.  From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Debtors in the same fiduciary capacity as applicable to a board of managers and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same) solely as to the implementation of the Plan, and for the avoidance of doubt shall have no operational control or authority over the Reorganized Debtor.

### 4.8     **Powers and Duties of the Plan Administrator**

The powers of the Plan Administrator shall include any and all powers and authority to implement the Plan and wind down the Liquidating Debtors' affairs, including:

(a)     liquidating, receiving, holding, and investing, supervising, and protecting any remaining assets of the Liquidating Debtors after the Effective Date;

(b)     executing and delivering all documents and taking all actions necessary to consummate the Plan and wind up the Liquidating Debtors' affairs;

(c)     making distributions to holders of Allowed Claims as contemplated by the Plan;

(d)     establishing and maintaining bank accounts in the name of the Liquidating Debtors for the winding up of the Liquidating Debtors' affairs;

(e)     subject to the terms of the Plan, employing, retaining, terminating or replacing professionals to represent it with respect to its responsibilities or otherwise winding up the Liquidating Debtors' affairs;

(f)     preparing and filing tax returns and related forms and filings on behalf of the Liquidating Debtors, protesting or appealing any tax assessment, applying for or otherwise pursuing any Claim for any tax refund, rebate, or reduction, seeking a determination of tax liability under section 505 of the Bankruptcy Code or otherwise, and paying, or causing to be paid any taxes incurred by the Debtors before or after the Effective Date that are validly Allowed Claims;

(g)     compromising or settling any Claims or Interests or transferring, relinquishing, assigning, or otherwise disposing of any asset of the Liquidating Debtors without further approval of the Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules;

(h)     prosecuting, settling, compromising, abandoning, selling, assigning, transferring, or otherwise resolving or disposing of any and all Avoidance and Other Actions and any other Causes of Action belonging to the Debtors or their Estates, including, without limitation, actions arising under sections 542, 543, 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code and applicable non-bankruptcy law, in each case without further notice to or approval of the Bankruptcy Court;

(i)     coordinating the storage and maintenance of the Liquidating Debtors' books and records;

(j)     seeking entry of one or more final decrees closing the Chapter 11 Cases of White Rock Medical Center, LLC and any other Debtor whose Chapter 11 Case need not remain open for claims administration purposes, without prejudice to the Bankruptcy Court's retained jurisdiction under the Plan and the Confirmation Order or to the administration, objection, resolution, or payment of Claims against any Debtor through the Claims Administration Case, as soon as reasonably practicable after the Effective Date and substantial consummation of the Plan;

(k)     paying fees owed to the Office of the U.S. Trustee in accordance with applicable law for each Chapter 11 Case that remains open after the Effective Date and filing reports to show the calculation of such fees for such open Chapter 11 Cases until such Chapter 11 Case is converted, dismissed, or closed under section 350 of the Bankruptcy Code; provided, that after the Chapter 11 Case of White Rock Medical Center, LLC is closed, ordinary course operating receipts and disbursements of the Reorganized Debtor shall not be reported as disbursements in the Claims Administration Case except to the extent otherwise required by Final Order;

(l)     paying fees owed to the Office of the U.S. Trustee in accordance with applicable law and file reports to show the calculation of such fees for the Estates until the Chapter 11 Cases or Claims Administration Cases, as applicable, are closed under section 350 of the Bankruptcy Code; and

(m)     exercising such other powers as may be vested in it pursuant to an order of the Court or the Plan, or as it reasonably deems to be necessary and proper to carry out the provisions of the Plan.

4.9     **Plan Administrator's Compensation and Retention of Professionals**

The Plan Administrator's compensation will be set forth in the Plan Administrator Agreement. The fees and expenses incurred by the Plan Administrator on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including attorney fees and expenses) made by the Plan Administrator in connection with such Plan Administrator's duties shall be paid without any further notice to or action, order, or approval of the Court in Cash from the Plan Administrator Reserve.

The Plan Administrator shall have sole right to retain the services of attorneys, accountants, and other professionals that, in the discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of his or her duties under the Plan and to otherwise to represent and wind down the affairs of the Liquidating Debtors after the Effective Date. The reasonable fees and expenses of such professionals shall be paid without any further notice to or action, order, or approval of the Court in Cash from the Plan Administrator Reserve or the Reorganized Debtor.

On or before the Effective Date, the Debtors shall establish the Plan Administrator Reserve and fund it with the Plan Administrator Funding (an amount up to $528,092, or such other amount

as may be agreed to by the Plan Sponsor and the Plan Administrator) from the Plan Funding, in priority to any distributions on account of General Unsecured Claims in Class 5. To the extent the Plan Funding is insufficient to fund the Plan Administrator Funding in full, or if the Plan Administrator determines after the Effective Date that the funds remaining in the Plan Administrator Reserve are insufficient to satisfy the Plan Administrator's remaining duties and obligations under the Plan, the Plan Sponsor shall fund any such shortfall by making a supplemental contribution to the Plan Administrator Reserve (a "Supplemental PA Contribution") within ten (10) business days of written request from the Plan Administrator. Any excess funds remaining in the Plan Administrator Reserve after payment of all fees and costs shall revert to the Plan Sponsor, including any amounts funded by a Supplemental PA Contribution.

4.10   **Exculpation; Indemnification; Insurance; Liability Limitation**

The Plan Administrator and all professionals retained by the Plan Administrator, each in their capacities as such, shall be deemed exculpated and indemnified, except for fraud, willful misconduct, or gross negligence, in all respects by the Debtors and their Estates.  The Plan Administrator may rely upon written information generated by the Debtors or the Reorganized Debtor as applicable.  For the avoidance of doubt, notwithstanding anything to the contrary contained herein, the Plan Administrator in its capacity as such, shall have no liability whatsoever to any party for the liabilities and/or obligations, however created, whether direct or indirect, in tort, contract, or otherwise, of the Debtors or their Estates or the Reorganized Debtor as applicable.

4.11   **Reorganized Debtor**

On the Effective Date, except as otherwise set forth herein, pursuant to sections 1141(b)–(c) of the Bankruptcy Code, the Debtors' Assets will vest in the Reorganized Debtor free and clear of all liens, Claims, and encumbrances.

On the Effective Date, the authority, power, and incumbency of the persons acting as directors and officers of the Debtors shall be deemed to have resigned, solely in their capacities as such. From and after the Effective Date, the Plan Sponsor shall be the sole member of the Reorganized Debtor and shall appoint officers consistent with the Reorganized Debtor's corporate documents and the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same), including the Reorganized Debtor Operating Agreement.

Immediately following the Effective Date, the Reorganized Debtor shall purchase and maintain a runoff or "tail" directors and officers insurance policy for a period of no less than five (5) years following the Effective Date, which policy shall be comparable in all material respects to the directors and officers insurance policy maintained by the Debtors immediately prior to the Effective Date and shall name Dr. Mirza N. Baig and each other Resigning Employee as insureds for acts or omissions occurring during their respective tenures with the Debtors, consistent with the Resignation Settlement Agreement.

On the Effective Date, except as otherwise determined by the Plan Sponsor, the Reorganized Debtor will continue the employment of the Debtors' employees in the ordinary

course of business, subject to the terms of applicable employment arrangements and personnel policies maintained by the Debtors immediately prior to the Effective Date. Wages, salaries, other compensation and benefits of obligations of the Debtors' retained employees that are assumed or otherwise payable will be paid by the Reorganized Debtor in the ordinary course of the Reorganized Debtor's business. Notwithstanding the foregoing, after the Effective Date the Reorganized Debtor may maintain, modify, or terminate employee compensation, benefit, incentive, retention, and severance arrangements in a manner consistent with applicable law and the applicable organizational and operational requirements of the Reorganized Debtor's business.

### 4.12   Indemnification of Resigning Employees

Consistent with, and to implement, the Resignation Settlement Agreement, (a) on and after the Effective Date, the Reorganized Debtor shall indemnify, defend, and hold harmless Dr. Mirza N. Baig and each other Resigning Employee on the terms, and subject to the conditions and the $700,000 aggregate Indemnity Cap, set forth in Section 6.1 of the Resignation Settlement Agreement; and (b) notwithstanding the foregoing Indemnity Cap, the Reorganized Debtor shall indemnify Dr. Mirza N. Baig with respect to any costs or liability relating to the equipment leases identified in the Resignation Settlement Agreement and the associated guaranties, without regard to the Indemnity Cap, so long as the Plan is confirmed and becomes effective. The releases provided in favor of the Resigning Employees under Article X of the Plan, and the directors and officers insurance required by Section 5.6(c) of the Plan, are intended to implement the corresponding provisions of the Resignation Settlement Agreement.

### 4.13   Restructuring Transactions

(a)   On the Effective Date, existing membership interests in White Rock Medical Center, LLC will be cancelled and the New Securities shall be issued to the Plan Sponsor who shall become and be deemed the sole member of the Reorganized Debtor, *provided, however*, that at the direction of the Plan Sponsor, a portion of the New Securities may be issued to the Holders of Allowed DIP Claims in accordance with section 2.2(b) of the Plan. The Reorganized Debtor shall elect disregarded entity status for tax purposes under IRC §301.7701-3. The transactions contemplated in the Plan and the consideration received in connection therewith, shall be structured in a manner that (i) minimizes any current taxes payable as a result of the consummation of such transactions and (ii) optimizes the tax efficiency (including, but not limited to, by way of the preservation or enhancement of favorable tax attributes) of such transactions to the Debtors and the Plan Sponsor.

(b)   The Debtors, Reorganized Debtor or Plan Sponsor, as applicable, may, in their discretion, take such action as permitted by applicable law, including those the Debtors, Reorganized Debtor or Plan Sponsor determine are reasonable, necessary or appropriate to effectuate the Plan, including: (i) the execution and delivery of any appropriate agreements or other documents of formation, merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or

obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; (iv) such other transactions that are required to effectuate the Plan; (v) all transactions necessary to provide for the purchase of some or all of the assets of, or Interests in the Debtors which purchase may be structured as a taxable transaction for United States federal income tax purposes; (vi) all actions that the applicable Entities determine to be necessary to obtain the requisite regulatory approvals to effectuate the Plan; (vii) rejection or assumption, as applicable, of Executory Contracts and Unexpired Leases; and (viii) all other actions that the applicable Entities determine to be necessary, including making filings or recordings that may be required by applicable law in connection with the Plan, and such action and documents are deemed to require no further action or approval (other than any requisite filings required under the applicable state, provincial and federal or foreign law or such consent or consultation rights as set forth in the Plan).

(c)       Except as otherwise provided in the Plan, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all the Debtors' Assets shall transfer to the Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances, except for the Liens and Claims established under the Plan and subject to the assumed liabilities. On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtor may operate its business and may use, acquire, or dispose of property and maintain, prosecute, abandon, compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, subject only to those restrictions expressly imposed by the Plan or the Confirmation Order, as well as the documents and instruments executed and delivered in connection therewith, including the documents, exhibits, instruments, and other materials comprising the Plan Supplement. For the avoidance of doubt, after the Effective Date, Cash generated from operation of the hospital shall be property of the Reorganized Debtor.

(d)       Notwithstanding the foregoing, on the Effective Date the Reorganized Debtor shall abandon the Bank of America Equipment pursuant to applicable nonbankruptcy law.

### 4.14   **Sources of Cash for Distributions and Operations**

All Cash necessary for the Reorganized Debtor to make payments required by the Plan and for post-Confirmation operations shall be obtained from (a) existing Cash held by the Debtors on the Effective Date, (b) Cash generated from the Reorganized Debtor's operations after the Effective Date in the ordinary course of business, and (c) the Plan Funding. Within two (2) business days after entry of the Confirmation Order, the Plan Sponsor will transfer the Plan Funding (other than any Supplemental PA Contribution) to the Debtors for use in accordance with the terms of the Plan; any Supplemental PA Contribution shall be funded in accordance with the terms of the Plan.

4.15    **Cancellation of Existing Securities and Agreements**

Except as provided in the Plan or in the Confirmation Order, on the Effective Date, all notes, stock (where permitted by applicable law), instruments, certificates, agreements, side letters, fee letters, and other documents evidencing or giving rise to Claims against and Interests in the Debtors, shall be cancelled and the obligations of the Debtors thereunder or in any way related thereto shall be fully released, terminated, extinguished, and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or any requirement of further action, vote, or other approval or authorization by any Person. The Holders of or parties to such notes, stock, instruments, certificates, agreements, side letters, fee letters, and other documents shall retain their rights vis-à-vis each other but shall have no rights against the Debtors, Reorganized Debtor or the Plan Sponsor, as applicable, arising from or relating to such notes, stock, instruments, certificates, agreements, side letters, fee letters, and other documents or the cancellation thereof, except the rights provided pursuant to the Plan and the Confirmation Order.

4.16    **Authorization of Issuance of New Securities Pursuant to the Restructuring Transaction**

(a)     On the Effective Date, the Reorganized Debtor is authorized to issue or cause to be issued the New Securities to the Plan Sponsor in accordance with the terms and conditions set forth in the Plan or the Plan Supplement, without the need for any further action. The issuance of the New Securities shall be authorized under section 1123(a)(5)(J) of the Bankruptcy Code and shall be exempt from registration under the Securities Act of 1933 and any applicable state or local law requiring registration of securities pursuant to section 1145 of the Bankruptcy Code, to the extent applicable, or, to the extent section 1145 of the Bankruptcy Code is not applicable, shall be issued pursuant to section 4(a)(2) of the Securities Act of 1933 and Regulation D promulgated thereunder or another available exemption from registration.

(b)     The New Securities shall be issued in accordance with the terms of the Reorganized Debtor Operating Agreement. The New Securities shall have the rights, preferences, privileges, and restrictions set forth under applicable non-bankruptcy law or in the Reorganized Debtor Operating Agreement. The sole member of the Reorganized Debtor shall be the Plan Sponsor, which shall have the rights, duties, and obligations set forth in applicable non-bankruptcy law, its governing documents, or the Reorganized Debtor Operating Agreement.

(c)     Pursuant to section 1145(a)(1) of the Bankruptcy Code, the offering, issuance, and distribution of the New Securities under the Plan shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act of 1933 and any other applicable non-bankruptcy law requiring registration prior to the offering, issuance, distribution, or sale of securities, to the extent such exemption is available. To the extent section 1145 of the Bankruptcy Code is not available or applicable to any New Securities issued hereunder, such New Securities shall be issued in reliance upon section 4(a)(2) of the Securities Act of 1933, Regulation D promulgated thereunder, or another available exemption from registration, and shall be subject to applicable resale restrictions under Rule 144 of the Securities Act of 1933 or as otherwise provided by law. Recipients of New Securities issued in reliance upon an exemption other than section 1145

of the Bankruptcy Code shall be deemed to have made all representations and warranties required under applicable securities laws to qualify for such exemption.

(d)      No fractional New Securities shall be issued or distributed under or pursuant to the Plan.

4.17      **Execution, Delivery, and Enforcement of Plan Documents Upon Restructuring Transaction**. On or before the Effective Date, the Debtors, the Reorganized Debtor, and the Plan Sponsor, as applicable, are authorized and directed to execute, deliver, file, and record such contracts, instruments, releases, agreements, and other documents, and to take such other actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and the issuance of the New Securities, including, but not limited the following documents, which for the avoidance of doubt the secretary or any assistant secretary of the Debtors or the Reorganized Debtor shall be authorized to certify or attest to:

(a)      any operating agreements, registration rights agreements, or other governance documents, if any;

(b)      any certificates, instruments, or agreements evidencing the New Securities; and

(c)      any documents reasonably necessary to consummate the transactions contemplated by the Plan.

4.18      **Intercompany Interests and Intercompany Claims**

On the Effective Date, all Intercompany Claims and Interests will be adjusted, reinstated, or cancelled as determined by the Reorganized Debtor and the Plan Sponsor. No value will be attributed or paid as part of the Plan to Intercompany Claims. For the avoidance of doubt, the Reorganized Debtor will not assume any intercompany claims or liabilities.

4.19      **Deemed Consolidation**

The Plan is a joint plan of reorganization of all Debtors. For purposes of voting, confirmation, allowance, treatment, and distributions under the Plan only, the Debtors' Estates are deemed consolidated. On the Effective Date, all guarantees of any Debtor of the obligations of any other Debtor, all joint and several liability of any Debtor with respect to any other Debtor, and all multiple Claims against the Debtors on account of the same underlying obligation shall be deemed one Claim against and obligation of the consolidated Debtors solely for purposes of receiving treatment and distributions under the Plan. Such deemed consolidation shall not (a) constitute substantive consolidation for purposes of U.S. Trustee Fees, post-Effective Date reporting, post-Effective Date operations, or the closing of any individual Chapter 11 Case, (b) affect the legal and corporate structures of the Reorganized Debtor, (c) cause any Entity to be liable for any Claim or Cause of Action for which it otherwise is not liable, (d) affect any Intercompany Claims or Interests except as otherwise provided in the Plan, or (e) require any of the Chapter 11 Cases to remain open after such case is fully administered.

### 4.20   **Corporate Action**

Each of the matters provided for under the Plan involving the corporate structure of the Debtors or any corporate action to be taken by or required of the Debtors, including the issuance of the New Securities as applicable, shall be deemed to have occurred and be effective as provided herein, and shall be authorized, approved, and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by partners, members, creditors, directors, or managers of the Debtors. On or (as applicable) before the Effective Date, the appropriate officers of the Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effectuate any transaction hereunder) in the name of and on behalf of the Debtors. The authorizations and approvals contemplated by Section 5.17 of the Plan shall be effective notwithstanding any requirements under nonbankruptcy law.

### 4.21   **Effectuating Documents; Further Transactions**

The directors, officers, managers or any other appropriate officer of the Debtors, or, after the Effective Date, the Plan Sponsor, or the Reorganized Debtor, as applicable, shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

### 4.22   **Release of Liens**

Except as otherwise specifically provided in the Plan or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions to be made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges or other security interests shall revert to the Reorganized Debtor and its successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or filing being required to be made by the Debtors, Plan Sponsor, or any Holder of a Secured Claim.

### 4.23   **Tax Obligations of Liquidating Debtors**

The Reorganized Debtor assumes all of the Liquidating Debtors' liabilities under any federal, state, and local tax, whether arising prior to, on, or after the Petition Date.

### 4.24   **Exemption from Certain Transfer Taxes and Recording Fees**

To the maximum extent provided by section 1146(a) of the Bankruptcy Code, any post-Confirmation sale by the Debtors or any transfer from any Entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to: (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors; or (b) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instruments of transfer

executed in connection with the Plan arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, in each case to the extent permitted by applicable bankruptcy law, and the appropriate state or local government officials or agents shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### 4.25    **Further Authorization**

The Debtors, or, after the Effective Date, Plan Sponsor or the Reorganized Debtor or Plan Administrator, as applicable, shall be entitled to seek such orders, judgments, injunctions, and rulings as they deem necessary to carry out the intentions and purposes, and to give full effect to the provisions of the Plan.

### 4.26    **Waiver and Release of Supporting Creditor Unsecured Claims**

Notwithstanding anything to the contrary in Section 3.3(e) of the Plan, and in consideration of the settlement embodied in the Restructuring Term Sheet, on the Effective Date each of the Waiving Supporting Creditors shall be deemed to have irrevocably waived, released, and forever discharged any and all right to receive any distribution from the GUC Distribution Pool or any other distribution under the Plan on account of its General Unsecured Claims in Class 5; provided, that each Waiving Supporting Creditor shall retain the right to vote its Class 5 Claim to accept or reject the Plan, and its Ballot shall be solicited and counted for all purposes under section 1126 of the Bankruptcy Code. The amounts that the Waiving Supporting Creditors would otherwise have been entitled to receive from the GUC Distribution Pool shall instead be available for Pro Rata distribution to the remaining Holders of Allowed General Unsecured Claims in Class 5. The waiver and release set forth in Section 5.29 of the Plan are in addition to, and not in limitation of, the releases provided by the Supporting Creditors as Releasing Parties under Section 10.5 of the Plan and are consistent with the Restructuring Term Sheet and the DIP Order.

### 4.27    **Replacement of Equipment Guaranties**

Subject to agreement with the relevant equipment finance counterparties, on or as of the Effective Date, with respect to the Debtors' equipment leases and financing arrangements with Huntington, Ascentium, Dext, and JB&B that are assumed or reinstated under the Plan, the Plan Sponsor shall use commercially reasonable good faith efforts to cause the applicable equipment finance counterparties to replace the existing guaranties of Dr. Mirza N. Baig associated with such equipment leases with a guaranty given by the Plan Sponsor, as the post-emergence corporate parent of the Reorganized Debtor, on terms reasonably acceptable to the Plan Sponsor and the applicable counterparty.

### 4.28    **Debtors' Releases**

**NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, PURSUANT TO BANKRUPTCY CODE SECTION 1123(B) AND TO THE**

**FULLEST EXTENT ALLOWED BY APPLICABLE LAW, FOR GOOD AND VALUABLE CONSIDERATION, ON AND AFTER THE EFFECTIVE DATE, EACH RELEASED PARTY IS DEEMED RELEASED AND DISCHARGED BY THE DEBTORS AND THEIR ESTATES FROM ANY AND ALL CLAIMS AND CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS OR THEIR ESTATES, THAT THE DEBTORS AND THEIR ESTATES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM AGAINST, OR INTEREST IN, A DEBTOR OR OTHER ENTITY, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS (INCLUDING THE MANAGEMENT, OWNERSHIP, OR OPERATION THEREOF), ANY SECURITIES ISSUED BY THE DEBTORS AND THE OWNERSHIP THEREOF, THE DEBTORS' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, ANY AVOIDANCE ACTIONS, ANY INTERCOMPANY TRANSACTION, THE CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, OR FILING, AS APPLICABLE, OF THE DISCLOSURE STATEMENT, THE DIP FACILITY, THE PLAN, THE PLAN SUPPLEMENT OR ANY RESTRUCTURING TRANSACTION CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE DISCLOSURE STATEMENT, THE DIP FACILITY, THE PLAN, THE PLAN SUPPLEMENT, THE CHAPTER 11 CASES, THE FILING OF THE CHAPTER 11 CASES INCLUDING ANY PREVIOUS PLANS OF REORGANIZATION AND RELATED DOCUMENTS, THE DIP DOCUMENTS, SOLICITATION OF VOTES ON THE PLAN, THE PURSUIT OF CONFIRMATION OF THE PLAN, THE PURSUIT OF CONSUMMATION OF THE PLAN, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF ANY SECURITIES PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, OR UPON ANY OTHER RELATED ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE.**

4.29   **Releases by Releasing Parties**

**NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, AS OF THE EFFECTIVE DATE, AND TO THE FULLEST EXTENT ALLOWED BY APPLICABLE LAW, EACH RELEASING PARTY IS DEEMED TO HAVE RELEASED AND DISCHARGED EACH RELEASED PARTY FROM ANY AND ALL CLAIMS AND CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED OR ASSERTABLE ON BEHALF OF ITSELF OR ANY DEBTOR OR ITS ESTATE, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS (INCLUDING THE MANAGEMENT, OWNERSHIP OR OPERATION THEREOF), ANY SECURITIES ISSUED BY THE DEBTORS AND THE OWNERSHIP THEREOF, THE DEBTORS' IN- OR OUT-OF-**

**COURT RESTRUCTURING EFFORTS, ANY AVOIDANCE ACTIONS, ANY INTERCOMPANY TRANSACTION, THE CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, OR FILING OF THE DISCLOSURE STATEMENT, THE DIP FACILITY, THE PLAN, THE PLAN SUPPLEMENT, PREVIOUS PLAN OF REORGANIZATION AND RELATED DOCUMENTS, OR ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE DISCLOSURE STATEMENT, THE DIP FACILITY, THE PLAN, THE PLAN SUPPLEMENT, THE CHAPTER 11 CASES, THE FILING OF THE CHAPTER 11 CASES, THE DIP DOCUMENTS, SOLICITATION OF VOTES ON THE PLAN, THE PURSUIT OF CONFIRMATION OF THE PLAN, THE PURSUIT OF CONSUMMATION OF THE PLAN, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OF ANY SECURITIES PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, OR UPON ANY OTHER RELATED ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE (A) ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, ANY RESTRUCTURING TRANSACTION, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT EXECUTED TO IMPLEMENT THE PLAN AND SHALL NOT RESULT IN A RELEASE, WAIVER, OR DISCHARGE OF ANY OF THE DEBTOR OR THE PLAN SPONSOR WITH RESPECT TO SUCH POST-EFFECTIVE DATE OBLIGATIONS, (B) OBLIGATIONS UNDER ANY OF THE DIP ORDERS THAT, BY THEIR EXPRESS TERMS, SURVIVE THE TERMINATION OF THE DIP ORDERS, INCLUDING THE RIGHTS OF THE APPLICABLE AGENTS TO EXPENSE REIMBURSEMENT, INDEMNIFICATION AND SIMILAR AMOUNTS OR (C) CLAIMS OR CAUSE OF ACTIONS RELATED TO ANY ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER BY A COURT OF COMPETENT JURISDICTION TO HAVE CONSTITUTED ACTUAL FRAUD, WILLFUL MISCONDUCT, OR GROSS NEGLIGENCE.**

4.30    **Consensual Releases; Reservation and Severability**

The releases by Releasing Parties set forth in Section 10.6(b) are consensual and are binding only upon those Releasing Parties that have consented to provide such releases, including Holders of Claims that vote to accept the Plan and any other Holders that are afforded, and do not timely exercise, an opportunity to opt out of such releases on their Ballots or in connection with the solicitation of the Plan. No Holder that abstains from voting on the Plan, or that votes to reject the Plan and timely opts out, shall be bound by the third-party releases set forth in Section 10.6(b). If any release, exculpation, or injunction provision of the Plan is determined by a court of competent jurisdiction to be invalid, unenforceable, or impermissible as to any Person or Entity, such determination shall not affect the validity or enforceability of any other provision of the Plan or of such releases as to any other Person or Entity, and shall not constitute grounds to deny confirmation of, or to delay or impair consummation of, the Plan

### 4.31  **Exculpation**

Effective as of the Effective Date, to the extent permitted under section 1125(e) of the Bankruptcy Code, the Exculpated Parties shall not have or incur liability for, and are exculpated from any Cause of Action related to any act or omission taking place between the Petition Date and the Effective Date, in connection with, relating to, or arising out of, these Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Plan and Disclosure Statement, the Plan Supplement, any previous plan of reorganization and applicable disclosure statement or any transaction under the Plan, contract, instrument, or document or transaction approved by the Bankruptcy Court in these Chapter 11 Cases, except for (a) any Cause of Action related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted fraud, willful misconduct, or gross negligence of such Person, and (b) any Cause of Action related to any liability of professionals to their clients pursuant to Texas Disciplinary Rules of Professional Conduct Rule 1.08(g); *provided, however*, that, for the avoidance of doubt, any such exculpation shall not act or be construed to exculpate, channel, release, enjoin, or otherwise affect any civil or criminal enforcement action by a Governmental Unit.

### 4.32  **Injunction**

Except as otherwise specifically provided in the Plan or the Confirmation Order, and subject to section 524(a) of the Bankruptcy Code, all Persons or Entities who have held, hold or may hold (a) Claims or Interests that arose prior to the Effective Date, (b) Causes of Action that are subject to exculpation pursuant to Section 10.4 of the Plan (but only to the extent of the exculpation provided in Section 10.4 of the Plan), or (c) Claims, Interests or Causes of Action that are otherwise discharged, satisfied, stayed or terminated pursuant to the terms of the Plan and all other parties-in-interest seeking to enforce such Claims, Interests or Causes of Action are permanently enjoined, from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim (including a Subordinated Claim) against or Interest in the Debtors or the Plan Sponsor, or property of any Debtor transferred to the Plan Sponsor, other than to enforce any right to a distribution pursuant to the Plan, (ii) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtors or the Plan Sponsor or property of the Debtors transferred to the Plan Sponsor with respect to any such Claim or Interest, other than to enforce any right to a distribution pursuant to the Plan, (iii) creating, perfecting or enforcing any Lien or encumbrance of any kind against the Debtors or Plan Sponsor, or against the property or interests in property of the Debtors transferred to the Plan Sponsor with respect to any such Claim or Interest, other than to enforce any right to a distribution pursuant to the Plan, or (iv) asserting any right of setoff, recoupment (except for setoffs or recoupment validly exercised prepetition), or subrogation of any kind against any obligation due from the Debtors or Plan Sponsor, or against the property or interests in property of the Debtors transferred to the Plan Sponsor, with respect to any such Claim or Interest unless such Persons or Entities have filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Persons or Entities assert, have, or intend to preserve any right of setoff pursuant to applicable law or otherwise. Such injunction shall extend to any

successors or assignees of the Debtors or Plan Sponsor and its respective properties and interests in properties.

### 4.33    Allowance of Claims

On and after the Effective Date, only the Plan Administrator on behalf of the Reorganized Debtor may object to the allowance of any Claim, including, but not limited to, any Administrative Claim. On and after the Effective Date, the Reorganized Debtor shall have and retain any and all rights and defenses the Debtors had with respect to any Claim, including, but not limited to, any Administrative Claim, immediately before the Effective Date. Except as expressly provided in the Plan or in any order entered in these Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in these Chapter 11 Cases allowing such Claim.

### 4.34    Objection to Claims

(a)    *Authority*. On and after the Effective Date, the Plan Administrator on behalf of the Reorganized Debtor shall have sole authority to settle, compromise, litigate to judgment, or file objections to any Claim, including, but not limited to any Administrative Claim, and to withdraw any objections to any Claim, including, but not limited to any Administrative Claim that are pending as of the Effective Date and/or that the Plan Administrator may file. Except as set forth above, on and after the Effective Date, the Plan Administrator also shall have the right to resolve any Disputed Claim outside the Bankruptcy Court under applicable governing law.

(b)    *Objection Deadline*. As soon as practicable, but no later than the Claims Objection Deadline, the Plan Administrator may file objections with the Bankruptcy Court and serve such objections on the Holders of the Claims to which such objections are made. Nothing contained herein, however, shall limit the right of the Plan Administrator to object to Claims, if any, filed or amended after the Claims Objection Deadline. The Claims Objection Deadline may be extended by the Bankruptcy Court upon motion by the Plan Administrator.

### 4.35    Estimation of Claims

The Plan Administrator or Reorganized Debtor may, at any time, request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtors or the Plan Administrator previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Plan Administrator on behalf of the Reorganized Debtor may pursue

supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation, and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

4.36    **No Distributions Pending Allowance**

If an objection to a Claim is filed as set forth in Section 7.2 of the Plan, no payment or distribution provided under the Plan shall be made on account of any disputed portion of such Claim prior to final resolution of the disputed portion of the Claim.

4.37    **Distributions Generally**

With the exception of the payments made by the Reorganized Debtor on account of the Secured Lender Claims pursuant to section 3.3(b)(ii) of the Plan, the Plan Administrator shall make all Plan distributions on behalf of the Debtors in accordance with this Article VI and other governing terms of the Plan. The designation or use of the Claims Administration Case shall not alter, limit, or transfer the Plan Administrator's obligation to fund and make distributions required under the Plan.

4.38    **No Postpetition or Default Interest on Claims**

Unless required by the Bankruptcy Code or otherwise specifically provided for in the Plan, the Confirmation Order, or another order of the Bankruptcy Court, and notwithstanding any documents that govern the Debtors' prepetition funded indebtedness to the contrary, postpetition and/or default interest shall not accrue or be paid on any Claims, and no Holder of a Claim shall be entitled to (a) interest accruing on such Claim on or after the Petition Date on any such Claim or (b) interest at the contract default rate, as applicable.

4.39    **Timing of Distributions** Unless otherwise provided in the Plan, any distributions and deliveries to be made under the Plan shall be made on the Effective Date or as soon thereafter as is practicable; provided that the Plan Sponsor or Plan Administrator as applicable may implement periodic distribution dates to the extent they determine them to be appropriate

(a)      The first distribution to Holders of Allowed General Unsecured Claims shall occur on the Disbursement Commencement Date. For the avoidance of doubt, if the Claims Reconciliation Date has not occurred by the date that is eighteen (18) months after the Effective Date, the first distribution shall be deferred until the Claims Reconciliation Date.

(b)      Each distribution shall be made to holders of Allowed General Unsecured Claims as of the applicable Distribution Date based on their respective Pro Rata Shares.

4.40    **Distribution Record Date**

As of the close of business on the Distribution Record Date, the various lists of Holders of Claims in each Class, as maintained by the Debtors, shall be deemed closed, and there shall be no further changes in the record Holders of any Claims after the Distribution Record Date. Neither

the Debtors nor the Reorganized Debtor shall have any obligation to recognize any transfer of a Claim occurring after the close of business on the Distribution Record Date.

### 4.41   **Distributions by Plan Administrator**

Except as otherwise provided herein, all distributions under the Plan shall be made by the Plan Administrator on or after the Effective Date. The Plan Administrator shall not be required to give any bond or surety or other security for the performance of its duties. The Debtors, Reorganized Debtor and Plan Sponsor, as applicable, shall use all commercially reasonable efforts to provide the Plan Administrator with the amounts of Claims and the identities and addresses of Holders of Claims, in each case, as set forth in the Debtors' books and records.

### 4.42   **Delivery of Distributions**

All distributions under the Plan to Holders of Allowed General Unsecured Claims shall be made by the Plan Administrator by wire transfer or by check mailed to the address set forth in the holder's Proof of Claim or, if no Proof of Claim has been filed, to the address set forth in the Debtors' Schedules, unless the Holder has provided written notice to the Debtors or Plan Administrator of a different address or has elected to receive distributions by wire transfer or other electronic means in accordance with procedures established by the Plan Administrator.

### 4.43   **Resolution of Claims**

Except as otherwise provided herein, or in any contract, instrument, release, or other agreement or document entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Plan Administrator on behalf of the Reorganized Debtor (or its successors or assignees), shall retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all Claims and Disputed Claims without further notice or approval of the Bankruptcy Court. A Claim that is resolved by a written settlement or compromise executed by the Plan Administrator on behalf of the Reorganized Debtor pursuant to Section 7.5 of the Plan shall be deemed Allowed (or Disallowed, as applicable) in the amount agreed upon in such settlement or compromise, effective upon execution of the written agreement, without the need for any further order of the Bankruptcy Court.

### 4.44   **Disallowed Claims**

All Claims held by Persons or Entities against whom or which the Debtors or the Plan Administrator has commenced a proceeding asserting a Cause of Action under sections 542, 543, 544, 545, 547, 548, 549, 550 and/or 724 of the Bankruptcy Code shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code and Holders of such Claims shall not be entitled to vote to accept or reject the Plan; provided, Claims that are deemed Disallowed pursuant to Section 7.6 of the Plan shall continue to be Disallowed for all purposes until such Claim has been settled or resolved by Final Order and any sums due to the Debtors or Plan Administrator from such Person or Entity have been turned over or paid to Plan Administrator.

### 4.45 **Undeliverable Distributions and Unclaimed Property**

Any distribution that is returned as undeliverable or that remains unclaimed for a period of ninety (90) days after the applicable Distribution Date shall be deemed unclaimed. The Holder of a Claim with respect to which a distribution is deemed unclaimed shall be deemed to have forfeited its right to such distribution, and such amounts shall be redistributed to the remaining holders of Allowed General Unsecured Claims on the next Distribution Date on a Pro Rata basis. If such unclaimed distribution arises on or after the final Distribution Date, such amounts shall revert to the Reorganized Debtor free and clear of any restrictions thereon.

### 4.46 **Minimum Distributions**

If any final distribution under the Plan to the Holder of an Allowed Claim would be less than US $50.00, the Plan Administrator may cancel such distribution which shall irrevocably revert to the Reorganized Debtor automatically and without need for a further order by the Bankruptcy Court notwithstanding any applicable federal, provincial or state escheat, abandoned, or unclaimed property laws to the contrary, and the Claim of any Holder to such property or interest in property shall be discharged and forever barred.

### 4.47 **Setoff and Recoupment**

The Plan Administrator on behalf of the Debtors and Reorganized Debtor may, but shall not be required to, set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Claim, any and all claims, rights, and Causes of Action that the Debtor or the Reorganized Debtor may hold against the Holder of such Allowed Claim. Neither the failure to effect a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release of any claims, rights, or Causes of Action that the Debtor or the Reorganized Debtor may possess against the holder of such Claim.

### 4.48 **No Distribution in Excess of Amount of Allowed Claims**

Notwithstanding anything to the contrary in the Plan, no Holder of an Allowed Claim shall receive, on account of such Allowed Claim, Plan distributions in excess of the Allowed amount of such Claim.

### 4.49 **Assumption or Rejection of Executory Contracts and Unexpired Leases**

(a)     Except as otherwise provided in the Plan, on the Effective Date, all Executory Contracts and Unexpired Leases of the Debtors shall be deemed rejected in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease (i) has previously been rejected, assumed, or assumed and assigned by order of the Bankruptcy Court in effect prior to the Effective Date (which order may be the Confirmation Order); (ii) is the subject of a motion to assume filed on or before the Effective Date; (iii) is identified on the Schedule of Assumed Executory Contracts and Unexpired Leases to be assumed by the Reorganized Debtor or assumed and assigned to the Reorganized Debtor; or (iv) has expired or terminated pursuant to its own terms. Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order approving the assumptions or rejections of such

Executory Contracts and Unexpired Leases as set forth in the Plan, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated, all assumptions, assumptions and assignments, and rejections of Executory Contracts and Unexpired Leases in the Plan will be effective as of the Effective Date. Each Executory Contract and Unexpired Lease assumed or assumed and assigned pursuant to the Plan, or by Bankruptcy Court order, will transfer to and be fully enforceable by the Reorganized Debtor or its assignee in accordance with its terms, except as such terms may have been modified by order of the Bankruptcy Court. Notwithstanding the foregoing paragraph or anything to the contrary herein, the Debtors reserve the right to supplement the Schedule of Assumed Executory Contracts and Unexpired Leases prior to the Effective Date.

(b)     With respect to the Assumed Contracts, any provision in any such agreement that:

(i)     prohibits, restricts, or conditions the assumption and/or assignment, or purports to prohibit, restrict, or condition the assumption and/or assignment (including any "change of control" provision) of such agreement or allows any party to such agreement to terminate, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon the assumption and/or assignment of such agreement constitutes an unenforceable anti-assignment and/or discrimination provision and is void and of no force and effect.

(ii)    provides for modification, breach, or termination, or deemed modification, breach, or termination on account of or related to any of the following: (A) the commencement or continuation of the Chapter 11 Cases, (B) the insolvency or financial condition of the Debtors at any time, (C) the Debtors' assumption and/or assignment of such agreement, (D) a change of control or similar occurrence, or (E) the consummation of the Plan, such provision is modified so as not to entitle the non-Debtor party thereto to prohibit, restrict, or condition assumption and/or assignment, to modify, terminate, or declare a breach or default under such agreement, or to exercise any other breach- or default-related rights or remedies with respect thereto, including any provision that purports to allow the non-Debtor party thereto to terminate or recapture such agreement, impose any penalty thereunder, condition any renewal or extension thereof, impose any rent acceleration or assignment fee, or increase or otherwise impose any other fees or other charges in connection therewith.

(c)     Upon an assignment of an Executory Contract or Unexpired Lease to the Reorganized Debtor or the Reorganized Debtor's assumption of an Executory Contract or Unexpired Lease, as of the Effective Date pursuant to the Plan, no default or other unperformed obligations of the Debtors arising on or prior to the Effective Date shall exist, and each non-Debtor party is forever barred, estopped, and permanently enjoined from (i) declaring a breach or default under such agreement for any act or omission occurring on or prior to the Effective Date, (ii) raising or asserting against the Debtors, the Estates or the Reorganized Debtor, or the assets or property of any of them, any fee, default, termination, breach, Cause of Action, or condition arising under or related to the agreement based upon a fact or circumstance that occurred on or prior to

Page 58

the Effective Date, or (iii) taking any other action as a result of the Debtors' financial condition, bankruptcy, or failure to perform any of its obligations under the agreement. Each non-Debtor party to such an agreement is also forever barred, estopped, and permanently enjoined from (x) asserting against the Debtors, the Estates or the Plan Sponsor, or the assets or property of any of them, any breach, default, or Cause of Action arising out of any indemnity or other obligation or warranties for acts, omissions, or occurrences arising or existing on or prior to the Effective Date, or, against the Plan Sponsor, any counterclaim, setoff, or any other Cause of Action that was or could have been asserted or assertable against the Debtors or the Estates and (y) imposing or charging against the Plan Sponsor or its Affiliates any rent accelerations, assignment fees, increases, or any other fees or charges as a result of assumption of the agreement.

(d)      Any Person or Entity that may have had the right to consent to the assumption and/or assignment of an Executory Contract or Unexpired Lease has consented to such assumption and/or assignment for purposes of section 365 of the Bankruptcy Code if such Person or Entity failed to object timely to the assumption of such agreement, and the Plan Sponsor has demonstrated adequate assurance of future performance with respect to such agreement pursuant to section 365 of the Bankruptcy Code.

### 4.50   **Assumption of the Hospital Lease**

The Hospital Lease shall be an Assumed Executory Contract and shall be cured through payment of the Hospital Lease Cure Payment by the Debtors and Reorganized Debtor in accordance with the terms of the Hospital Lease Cure Schedule; for the sake of clarity, Landlord's acceptance of the Hospital Lease Cure Payment shall not constitute a waiver, discharge, or release of any claims against any third-party co-obligors on the Hospital Lease, including but not limited to any guarantor(s), for any remaining deficiency due under the Hospital Lease after applying the Hospital Lease Cure Payment.

### 4.51   **Assumption or Rejection of Government Agreements**

The HHSC UC DY10 and UC DY12 Agreement shall be an Assumed Contract under the Plan. As to the other Government Agreements, the Debtors intend to negotiate modified terms with the counterparties to such Government Agreements. Any modified terms agreed to between the Debtors and counterparties to the Government Agreements shall be disclosed in the Plan Supplement. The Debtors' assumption of any Government Agreement listed in the Schedule of Assumed Executory Contracts or Unexpired Leases shall relate to such agreements as modified pursuant to the terms disclosed in the Plan Supplement.

### 4.52   **Cure of Defaults Under Assumed Contracts**

(a)      Any monetary defaults under each Assumed Contract shall be satisfied pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Amount (or, in the case of the Landlord, the Hospital Cure Payment) on the Effective Date, subject to the limitation described below, or on such other terms as the parties to such Assumed Contracts may otherwise agree. In the event of a dispute regarding (a) the amount of any payments to cure such a default, (b) the ability of the Plan Sponsor, Reorganized Debtor, or any assignee to provide "adequate assurance

of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (c) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption. Any objection by an Executory Contract or Unexpired Lease counterparty to a proposed assumption or related Cure Amount must be filed and served in accordance with the Solicitation Order. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or Cure Amount shall be deemed to have assented to such assumption or Cure Amount.

(b)     Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction or any Claims against the Debtors or pre-assumption defaults by the Debtors, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition of other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption; *provided, however*, that Landlord's acceptance of the Hospital Lease Cure Payment shall not constitute a waiver, discharge, or release of any claims against any third-party co-obligors on the Hospital Lease, including but not limited to any guarantor(s), for any remaining deficiency due under the Hospital Lease after applying the Hospital Lease Cure Payment. Any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned shall be deemed Disallowed and expunged without further notice to or action, order or approval of the Bankruptcy Court.

### 4.53    **Claims Based on Rejection of Executory Contracts and Unexpired Leases**

Unless otherwise provided by a Bankruptcy Court order, any Proofs of Claim asserting Claims arising from the rejection of the Debtors' Executory Contracts and Unexpired Leases pursuant to the Plan or otherwise must be filed no later than 5:00 p.m. (prevailing Central Time) on the date that is thirty (30) days after the Effective Date. Any Proofs of Claim arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases that are not timely filed shall be Disallowed automatically, forever barred from assertion, and shall not be enforceable against the Debtors without the need for any objection by the Debtors or further notice to or action, order, or approval of the Bankruptcy Court. All Allowed Claims arising from the rejection of the Debtors' Executory Contracts and Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with the particular provisions of the Plan for such Claims.

### 4.54    **Contracts and Leases Entered Into After the Petition Date**

Contracts and leases entered into after the Petition Date by the Debtors, including any Executory Contracts and Unexpired Leases assumed by the Debtors and Reorganized Debtor, shall be performed by the Debtors liable thereunder in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) shall survive and remain unaffected by entry of the Confirmation Order.

4.55    **Reservation of Rights**

Nothing contained in the Plan shall constitute an admission by the Debtors that any particular contract is in fact an Executory Contract or Unexpired Lease or that the Debtors have any liability thereunder.

**ARTICLE V**

**CONFIRMATION OF THE PLAN AND BINDING EFFECT**

5.1     **Conditions Precedent to the Effective Date**

The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived in accordance with the terms of the Plan:

(a)     The Bankruptcy Court shall have entered the Confirmation Order in form and substance reasonably acceptable to the Plan Sponsor and the Confirmation Order has become final and not subject to stay or pending appeal;

(b)     The First Plan shall have been withdrawn in accordance with the Restructuring Term Sheet;

(c)     The Definitive Documents and any necessary opinions shall have been negotiated, executed, and delivered in forms reasonably acceptable to the Plan Sponsor and the Debtors have complied with the terms of the Definitive Documents in all material respects;

(d)     The Plan Funding shall have been transferred to the Debtors in accordance with the instructions provided to the Plan Sponsor;

(e)     All required financing obligations and related transactions of the Debtors and Plan Sponsor contemplated by the Plan have been consummated;

(f)     All necessary governance, organizational and transaction procedures necessary to effect the Plan have been consummated;

(g)     The Confirmation Order shall authorize the Debtors or Reorganized Debtor to seek separate final decrees closing the Chapter 11 Case of White Rock Medical Center, LLC and any other Debtor whose Chapter 11 Case need not remain open, shall provide that the Claims Administration Case may remain open solely for the limited purposes set forth in the Plan, and shall provide that completion of all distributions under the Plan is not required for entry of a final decree closing any Chapter 11 Case that is otherwise fully administered;

(h)     All governmental and regulatory approvals, consents, authorizations, and filings necessary for the issuance of the New Securities shall have been obtained or made, as applicable, including any required filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and any applicable waiting periods shall have expired or been terminated; and

(i)      all actions, documents, certificates, and agreements necessary to implement the Plan shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable government units in accordance with applicable law, and all other actions required to be taken in connection with the Effective Date shall have occurred; *provided*, *that*, notwithstanding when a condition precedent to the Effective Date occurs, for purposes of the Plan, such condition precedent shall be deemed to have occurred simultaneously with the other conditions precedent to the Effective Date; *provided*, *further*, that to the extent a condition precedent (a "**Prerequisite Condition**") may be required to occur prior to another condition precedent (a "**Subsequent Condition**") then, for purposes of the Plan, the Prerequisite Condition shall be deemed to have occurred immediately prior to the Subsequent Condition regardless of when such Prerequisite Condition or Subsequent Condition shall have occurred.

5.2      **Waiver of Conditions Precedent**

Each of the conditions precedent in Section 9.1 of the Plan may be waived, in whole or in part, by the Plan Sponsor, without notice, leave or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

5.3      **Notice of Effective Date**

Following the satisfaction or waiver of all conditions precedent to the Effective Date, the Debtors shall file a notice of (a) the occurrence of the Effective Date, (b) the Administrative Claims Bar Date, (c) the Professional Fee Claims Bar Date, and (d) such other matters as appropriate or as may be ordered by the Bankruptcy Court.

5.4      **Discharge**

Pursuant to, and to the maximum extent provided by, section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan (including with respect to Claims reinstated by the Plan), the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of all Claims against, and Interests in, the Debtors, and Causes of Action of any nature whatsoever arising on or before the Effective Date, known or unknown, including, without limitation, any interest accrued or expenses incurred on such Claims from and after the Petition Date, against the Debtors, and liabilities of, Liens on, obligations of, and rights against, the Debtors or any of their assets or properties arising before the Effective Date, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims or Equity Interests, in each case whether or not: (a) a proof of Claim or Equity Interest based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Equity Interest based upon such debt or right is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the Holder of such a Claim or Equity Interest has accepted the Plan. Any default by the Debtors with respect to any Claim that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. Except as otherwise specifically provided in the Plan (including with respect to Claims reinstated by the Plan), all Entities shall be precluded from asserting against the Debtors, the Reorganized Debtors, or their respective properties or interests in property, any other Claims based on any act or omission, transaction, or

Page 62

other activity of any kind or nature that occurred prior to the Effective Date. Except with respect to Claims reinstated pursuant to the Plan, the Confirmation Order shall be a judicial determination of the discharge of all Claims arising before the Effective Date against the Debtors and all Interests in the Debtors, subject to the occurrence of the Effective Date.

5.5    **Binding Effect**

Following the Effective Date, the Plan, and any documents and agreements executed and delivered in connection with the transaction provided for herein, including any organizational documents of the Reorganized Debtor, shall be binding upon and inure to the benefit of the Debtors, the Estates, the Reorganized Debtor, all present and former Holders of Claims and Interests, whether or not such Holders voted in favor of the Plan, and their respective successors and assigns.

## ARTICLE VI

## JURISDICTION OF THE BANKRUPTCY COURT

6.1    **General Retention of Jurisdiction**

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction (unless otherwise indicated) over all matters arising in, arising out of, and/or related to, the Chapter 11 Cases and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

(a)    resolve any matters related to (i) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which any Debtor is a party or with respect to which any Debtor may be liable and to hear, determine, and, if necessary, liquidate any Claims arising therefrom, including Cure Amounts pursuant to section 365 of the Bankruptcy Code, (ii) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed or assumed and assigned, and (iii) any dispute regarding whether a contract or lease is or was executory or unexpired;

(b)    decide or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters and grant or deny any applications involving the Debtors that may be pending on the Effective Date (which jurisdiction shall be nonexclusive as to any such non-core matters);

(c)    Allow, Disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or Allowance of Claims or Interests;

(d)    enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan, and all contracts, instruments, releases, and other agreements or

documents created in connection with the Plan, the Disclosure Statement, the Plan Supplement, or the Confirmation Order;

(e)       resolve any cases, controversies, suits, or disputes that may arise in connection with the consummation, interpretation, or enforcement of the Plan or any contract, instrument, release, or other agreement or document that is executed or created pursuant to the Plan, or any entity's rights arising from or obligations incurred in connection with the Plan or such documents;

(f)       modify the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code or modify the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan;

(g)       hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Plan or under sections 330, 331, 503(b), and 1129(a)(4) of the Bankruptcy Code; *provided*, *however*, that from and after the Effective Date the payment of fees and expenses by the Plan Administrator, including professional fees, shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

(h)       issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with consummation, implementation, or enforcement of the Plan or the Confirmation Order;

(i)       adjudicate controversies arising out of the administration of the Estates or the implementation of the Plan;

(j)       resolve any cases, controversies, suits, or disputes that may arise in connection with Claims, including the Bar Date, related notice, claim objections, Allowance, Disallowance, estimation, and distribution;

(k)       adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

(l)       adjudicate, decide, or resolve any and all matters related to Causes of Action, that are pending as of the Effective Date or that may be commenced in the future, by, against, or on behalf of the Debtors, non-Debtor Affiliate, or Plan Sponsor;

(m)       enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked, or vacated, or distributions pursuant to the Plan are enjoined or stayed;

(n)       determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, the Plan Supplement, or any contract,

instrument, release, or other agreement or document created in connection with the Plan, the Plan Supplement, the Disclosure Statement, or the Confirmation Order;

(o)     enforce all orders, judgments, compromises, settlements, discharges, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases;

(p)     adjudicate controversies with respect to distributions to Holders of Allowed Claims;

(q)     determine requests for the payment of Claims and Interests entitled to priority under section 507 of the Bankruptcy Code;

(r)     hear and determine all matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including the expedited determination of taxes under section 505(b) of the Bankruptcy Code);

(s)     hear and determine all matters concerning exemptions from state and federal registration requirements in accordance with section 1145 of the Bankruptcy Code;

(t)     hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under the Bankruptcy Code;

(u)     hear and determine any issues related to any matter adjudicated in the Chapter 11 Cases;

(v)     enter one or more orders concluding or closing any Chapter 11 Case, including separate final decrees closing the Chapter 11 Case of White Rock Medical Center, LLC and any other Chapter 11 Case that is fully administered; and

(w)     hear and determine any other matter not inconsistent with the Bankruptcy Code.

## 6.2     **Jurisdiction for Certain Other Agreements**

The Plan shall not modify the jurisdictional provisions of the documents contained in the Plan Supplement. Notwithstanding anything herein to the contrary, on and after the Effective Date, the Bankruptcy Court's retention of jurisdiction pursuant to the Plan shall not govern the enforcement or adjudication of any rights or remedies with respect to or as provided in the documents in the Plan Supplement and the jurisdictional provisions of such documents shall control.

## 6.3     **Courts of Competent Jurisdiction**

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matters arising out of the Plan, such abstention, refusal, or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

# ARTICLE VII

# MISCELLANEOUS

### 7.1    Payment of Statutory Fees

All U.S. Trustee Fees payable after the Effective Date, if any, shall be paid by the Plan Administrator on behalf of the Debtors with respect to each Debtor until the closing of the Chapter 11 Case that remains open until such Chapter 11 Case is converted, dismisses, or closed by entry of a final decree pursuant to section 350(a) of the Bankruptcy Code. The Plan Administrator shall file and serve on the U.S. Trustee quarterly reports of the disbursements made in each Chapter 11 Case that remains open within fifteen (15) days after the conclusion of each such period, until such Chapter 11 Case is converted, dismissed, or closed by entry of a final decree. Any such reports shall be prepared consistent with (both in terms and format) of the applicable Bankruptcy Court and U.S. Trustee Guidelines for such matters. After entry of a final decree closing the Chapter 11 Case of White Rock Medical Center, LLC, the ordinary course operating receipts and disbursements of the Reorganized Debtor shall not be included in the calculation of U.S. Trustee Fees for the Claims Administration Case or any other Chapter 11 Case that remains open, except to the extent otherwise required by Final Order.

### 7.2    Substantial Consummation and Case Closing

On the Effective Date, the Plan shall be deemed substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code to the fullest extent permitted by applicable law. The Debtors or Reorganized Debtor may rely on such substantial consummation, together with the transfer or vesting of property, the assumption of management and operation of the Reorganized Debtor's business, the commencement or availability of Plan distributions, and the absence of unresolved matters requiring the Chapter 11 Case of White Rock Medical Center, LLC to remain open, as grounds to seek entry of a final decree closing the Chapter 11 Case of White Rock Medical Center, LLC. Entry of a final decree closing the Chapter 11 Case of White Rock Medical Center, LLC shall not be delayed solely because distributions or payments required by the Plan have not been completed.

### 7.3    Amendment or Modification of the Plan

Subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, the Debtors reserve the right to alter, amend, or modify the Plan at any time prior to or after the Confirmation Date but prior to the substantial consummation of the Plan. A Holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, or modified, if the proposed alteration, amendment, or modification does not materially and adversely change the treatment of the Claim of such Holder.

### 7.4    Successor and Assigns

The Plan shall be binding upon and inure to the benefit of the Debtors, and their respective successors and assigns. The rights, benefits, and obligations of any Entity named or referred to in

the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Entity

### 7.5 Revocation, Withdrawal, or Non-Consummation

The Debtors reserve the right to revoke or withdraw the Plan at any time prior to the Confirmation Date and to file other plans of reorganization. If the Plan is revoked or withdrawn, or if Confirmation or consummation of the Plan does not occur, then (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests, assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (c) nothing contained in the Plan, nor any action taken or not taken by the Debtors with respect to the Plan, the Disclosure Statement, or the Confirmation Order, shall (i) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Interests in, the Debtors or any other Person; (ii) prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors, or (iii) constitute or be deemed to constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Person.

### 7.6 Immediate Binding Effect

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and Plan Supplement shall be immediately effective and enforceable.

### 7.7 Entire Agreement

On the Effective Date, the Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

### 7.8 Notice

All notices, requests, and demands to or upon the Debtors, to be effective shall be in writing and, unless otherwise expressly provided in the Plan, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by electronic transmission, when received and telephonically confirmed, addressed as follows:

**REED SMITH LLP**

Omar J. Alaniz (SBN 24040402)
2850 N. Harwood Street, Suite 1500
Dallas, TX 75201

Telephone: (469) 680-4200
E-mail:  oalaniz@reedsmith.com

- And -

Scott M. Esterbrook (admitted *pro hac vice*)
Derek M. Osei-Bonsu (admitted *pro hac vice*)
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, PA 19103
Telephone: (215) 851-8100
E-mail: sesterbrook@reedsmith.com
          dosei-bonsu@reedsmith.com

### 7.9    Votes Solicited in Good Faith

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to Bankruptcy Code section 1125(e), the Debtors, their respective Affiliates, agents, representatives, members, principals, equity holders (regardless of whether such interests are held directly or indirectly), officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan, and, therefore, neither any of such parties or individuals or the Plan Sponsor will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the securities offered and sold under the Plan.

### 7.10    Closing of Chapter 11 Cases

As soon as reasonably practicable after the Effective Date and substantial consummation of the Plan, the Reorganized Debtor or Plan Administrator shall seek entry of a final decree closing the Chapter 11 Case of White Rock Medical Center, LLC as promptly as practicable. The Chapter 11 Case of North Houston Surgical Hospital or such other Debtor that is not expected to operate after the Effective Date shall remain open as the Claims Administration Case and shall serve as an administrative docket under which the Plan Administrator shall reconcile, object to, estimate, allow, disallow, settle, and pay Claims against any Debtor. Because the Claims against the Debtors are deemed consolidated under the Plan, objections to and the resolution of Claims against any Debtor may be prosecuted in the Claims Administration Case notwithstanding the closing of the Chapter 11 Case of White Rock Medical Center, LLC and the other Chapter 11 Cases. The Reorganized Debtor or Plan Administrator may also seek entry of one or more final decrees closing the Chapter 11 Case of any other Debtor whose Chapter 11 Case need not remain open for claims administration purposes, in each case without prejudice to the Bankruptcy Court's retained jurisdiction under the Plan and the Confirmation Order to the administration, objection, resolution, or payment of Claims against any Debtor through the Claims Administration Case. With respect to any Chapter 11 Case that remains open the Plan Administrator shall file with the Bankruptcy

Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close such Chapter 11 Case. The completion of distributions under the Plan shall not, by itself, be a condition to closing the Chapter 11 Case of White Rock Medical Center, LLC.

### 7.11   **Waiver or Estoppel**

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers filed with the Bankruptcy Court prior to the Confirmation Date.

## ARTICLE VIII

## CONFIRMATION AND ALTERNATIVES TO THE PLAN

### 8.1   **Requirements for Confirmation of the Plan**

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are: (i) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (ii) the Plan is feasible; and (iii) the Plan is in the "best interests" of holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that: (i) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (ii) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (iii) the Plan has been proposed in good faith.

### 8.2   **Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan not be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors (unless such liquidation or reorganization is proposed in the Plan). Because the Plan proposes a liquidation of all of the Liquidating Debtors assets or a sale of the membership interests of the Reorganized Debtor, for purposes of this test, the Debtors have analyzed their ability to meet the obligations under the Plan.  Based on the Debtors' analysis, the Debtors believe the conditions precedent to the Effective Date will be satisfied, and the Reorganized Debtor and Plan Administrator will have sufficient assets, and in the case of the Reorganized Debtor, cash flows from ongoing operations, to accomplish their tasks under the Plan and have made adequate provisions to ensure the consummation of the Plan. In particular, the Plan provides for the establishment of a Plan Administrator Reserve funded with up to $528,092 from the Plan Funding, with the Plan Sponsor obligated to make Supplemental PA Contributions to the extent the Plan Administrator determines in good faith that the Reserve is insufficient. Any excess funds in the Plan Administrator Reserve revert to the Plan Sponsor. These tasks include, among

other things, the distributions to be made to creditors, the winding-up of the Liquidating Debtors' estates, payment of post-Effective Date expenses and startup costs of the Plan Administrator as well as operational costs of the Reorganized Debtor. Therefore, the Debtors believe that the restructuring transactions contemplated in the Plan will meet the feasibility requirements of the Bankruptcy Code.

### 8.3    Best Interests Test/Liquidation Analysis

Even if a plan is accepted by the holders of each class of claims and interests, the Bankruptcy Code requires the Bankruptcy Court to determine that such plan is in the best interests of all holders of claims or interests that are impaired by that plan and that have not accepted the plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to holders of each impaired class of claims and interests if the debtor was liquidated under chapter 7, the Bankruptcy Court must first determine the aggregate dollar amount that would be generated from a debtor's assets if its chapter 11 cases were converted to cases under chapter 7 of the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of a liquidation of the debtor's unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses, and administrative claims associated with a chapter 7 liquidation, must be compared with the value offered to such impaired classes under the plan. If the hypothetical liquidation distribution to holders of claims or interests in any impaired class is greater than the distributions to be received by such parties under the plan, then such plan is not in the best interests of the holders of claims or interests in such impaired class.

The Debtors, with the assistance of the Debtors' advisors, are preparing an analysis that demonstrates that liquidation of the Debtors' business under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value provided to holders of Claims as compared to distributions contemplated under the Plan. The Debtors will provide this liquidation analysis in the Plan Supplement. The Debtors believe that Confirmation of the Plan will provide a substantially greater return to the holders of Claims than a liquidation under chapter 7 of the Bankruptcy Code.

### 8.4    Acceptance by Impaired Classes.

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required. Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have actually voted to accept or to reject the

plan. Thus, a class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have actually voted to accept or to reject the plan. Pursuant to the Plan, if a Class contains Claims eligible to vote and no holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the holders of such Claims in such Class shall be deemed to have accepted the Plan.

## 8.5     **Acceptance of the Plan without Acceptance from All Impaired Classes**

Section 1129(b) of the Bankruptcy Code allows the Bankruptcy Court to confirm a plan even if all impaired classes have not accepted it; provided that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving disparate treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (e.g., classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

The "fair and equitable" test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

If the Debtors must "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. With respect to the fair and equitable requirement, the

Bankruptcy Code requires that (i) creditors in a Class be paid in full or that no creditor of lesser priority receives any distribution under the Plan, and (ii) no Class under the Plan will receive more than one hundred percent of the amount of Allowed Claims in that Class.  The Debtors believe that the Plan and the treatment of all Classes of Claims under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan to the extent necessary.

## ARTICLE IX

## RISK FACTORS

**PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS THAT ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT**

**ALTHOUGH THESE RISK FACTORS ARE MANY, THESE FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESS OR THE PLAN AND ITS IMPLEMENTATION.**

9.1   **Bankruptcy Risks**

### *There may be Objections to the Classification of Claims*

Bankruptcy Code section 1122 provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created six (6) Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class.  However, a Holder of a Claim or Interest could challenge the Debtors' classifications.  In such an event, the cost of the Chapter 11 Cases and the time needed to confirm the Plan may increase, and there can be no assurance that the Bankruptcy Court will agree with the Debtors' classification.  If the Bankruptcy Court concludes that the classifications of Claims and Interests under the Plan do not comply with the requirements of the Bankruptcy Code, the Debtors may need to modify the Plan.  The Plan may not be confirmed if the Bankruptcy Court determines that the Debtors' classification of Claims and Interests is not appropriate.

### *The Debtors May Run out of Cash Collateral and Postpetition Financing*

The Debtors are able to operate in chapter 11 because of the use of Cash Collateral and the DIP Facility.  The Cash Collateral and DIP Facility are subject to budgets, and if Confirmation of the Plan becomes significantly contested or the Effective Date is delayed, the Debtors may exhaust their available resources.  If the Debtors run out of Cash Collateral or exhaust the DIP Facility there is no guarantee that the Debtors will be able to secure additional postpetition financing or access to Cash Collateral to address liquidity concerns and the reorganization of the Debtors may

be harmed as a result.

### *The Debtors May Not Get Enough Votes to Confirm the Plan*

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors may seek, as promptly as practicable thereafter, Confirmation.  If the Plan does not receive the required support from Classes 2, 4 and 5, the Debtors may elect to amend the Plan or proceed with liquidation.  There can be no assurance that the terms of any such alternative chapter 11 plan or chapter 7 liquidation would be similar or as favorable to the Holders of Allowed Claims as the contemplated Plan.

In the event that any impaired class of claims does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es).  The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit of nonconsensual Confirmation or consummation of the Plan may result in, among other things, an increase in the expenses on the Debtors' Estates.

### *Non-Confirmation of Plan*

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court in accordance with the Bankruptcy Code, the Debtors cannot assure you that the Plan will be confirmed by the Bankruptcy Court.  Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a plan, and requires, among other things, a finding by the Bankruptcy Court that the plan is "feasible," that all claims and interests have been classified in compliance with the provisions of Bankruptcy Code section 1122, and that, under the plan, each holder of a claim or interest within each impaired class either accepts the plan or receives or retains cash or property of a value, as of the date the plan becomes effective, that is not less than the value such Holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.  With respect to impaired classes of claims or interests that do not accept the plan, section 1129(b) requires that the plan be fair and equitable (including, without limitation the "absolute priority rule") and not discriminate unfairly with respect to such classes. There can be no assurance that the Bankruptcy Court will conclude that the feasibility test and other requirements of Bankruptcy Code section 1129 have been met with respect to the Plan.  If and when the Plan is filed, there can be no assurance that modifications to the Plan would not be required for Confirmation, or that such modifications would not require a re-solicitation of votes on the Plan.

The Bankruptcy Court could refuse to finally approve this Disclosure Statement and determine that the votes in favor of the Plan could be disregarded.  The Debtors would then be required to recommence the solicitation process, which could include re-filing a plan and

disclosure statement.

If the Plan is not confirmed, the Chapter 11 Cases may be converted into cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 of the Bankruptcy Code would result in, among other things, smaller distributions being made to creditors and interest Holders than those provided for in the Plan because of:

- the potential absence of a market for the Debtors' assets on a going concern basis;

- additional administrative expenses involved in the appointment of a chapter 7 trustee; and

- additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation and from the rejection of Unexpired Leases and other Executory Contracts in connection with a cessation of the Debtors' operations.

### *Parties in Interest May Object to the Plan's Amount or Classification of Claims or Interests*

Except as otherwise provided in the Plan, the Debtors and other parties in interest reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### *Non-Occurrence or Delayed Occurrence of the Effective Date*

Although the Debtors believe that the Effective Date will occur after the Confirmation Date following satisfaction of any applicable conditions precedent, there can be no assurance as to the timing of the Effective Date. If the conditions precedent to the Effective Date set forth in the Plan have not occurred or have not been waived, then the Confirmation Order may be vacated, in which event no distributions would be made under the Plan, the Debtors and all holders of Claims and Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtors' obligations with respect to Claims and Interests would remain unchanged.

### *The Releases, Injunction or Exculpation Provisions May Not be Approved*

The Plan provides for certain releases, injunctions, and exculpations, including a release of liens that may otherwise be asserted against the Debtors or Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

The releases provided to the Released Parties and the exculpation provided to the Exculpated Party are necessary to the success of the Debtors' reorganization because the Released Parties and Exculpated Parties have made contributions to the Debtors' reorganizational efforts that are important to the success of the Plan and have agreed to make further contributions. The Plan's release and exculpation provisions are an inextricable component of the Plan.

9.2   **Plan Risks**

*Variance from Financial Projections and Feasibility Analysis*

The Debtors have prepared financial projections based on certain assumptions. The projections and the feasibility analysis have not been compiled, audited, or examined by independent accountants and the Debtors make no representations or warranties regarding the accuracy of the projections or the feasibility analysis or the ability to achieve forecasted results. Many of the assumptions underlying the projections and the feasibility analysis are subject to significant uncertainties and are beyond the control of the Debtors, including, but not limited to, anticipated market and economic conditions and changing governmental policy and regulations. Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the ultimate financial results. Projections and feasibility analyses are inherently subject to substantial and numerous uncertainties and to a wide variety of significant business, economic and competitive risks, and the assumptions underlying the projections and the feasibility analysis may be inaccurate in any material respect.

Based on the Plan Sponsor's contributions and the calculations of Claims and Interests to be addressed pursuant to the Plan, including the fees and expenses of winding up the Liquidating Debtors' estates, the Debtors reasonably believe there will be sufficient consideration to consummate all transactions called for under the Plan. Nonetheless these projections may vary from the actual costs of the transactions called for under the Plan. Therefore, the actual results achieved may vary significantly from the forecasts, and the variations may be material.

*Allowed Administrative and Priority Claims May be Higher than Anticipated*

Allowed Administrative Claims and Allowed Priority Claims may be higher than anticipated. Accordingly, there is a risk that the Debtors will not be able to pay in full in cash all Administrative Claims and Priority Claims on the Effective Date as is required to confirm a chapter 11 plan.

*Reorganized Debtor Indemnification Obligations*

Pursuant to the Resignation Settlement Agreement and Section 5.5 of the Plan, the Reorganized Debtor is obligated to indemnify Dr. Baig and the other Resigning Employees against certain uninsured losses relating to the Debtors or the hospital, subject to an aggregate cap of $700,000 and a four-year claim period. The Reorganized Debtor is separately obligated to indemnify Dr. Baig for costs relating to the equipment lease guarantees identified in the Resignation Settlement Agreement without regard to the $700,000 cap. These obligations apply only to losses not covered by the D&O Policy and not resulting from gross negligence, willful misconduct, or fraud. To the extent such claims arise and are not covered by insurance, the

Reorganized Debtor may be required to expend up to $700,000 (plus uncapped amounts for equipment guarantees), reducing Cash available for operations, debt service, and distributions under the Plan. The Debtors are not aware of any pending or threatened claims against the Indemnified Parties as of the date hereof.

### *Deemed Consolidation*

The Plan provides for the deemed substantive consolidation of all seven Debtors' Estates for purposes of voting, confirmation, and distribution. This means that all Claims against any Debtor entity will be treated as Claims against a single consolidated estate and will share in a single pool of distributions, regardless of which specific Debtor entity is the obligor. As a result, creditors who contracted solely with one Debtor will share in the same GUC Distribution Pool as creditors of White Rock and other Debtors. Deemed consolidation may result in a creditor receiving a greater or lesser recovery than it would receive if distributions were made solely from the assets of the specific Debtor against which such creditor holds a Claim.

### *Loss of Government Payments*

An unexpected change in patient demographics or certain operational, quality and/or patient may result in the Reorganized Debtor no longer being eligible for some or all of the Government Payments.  The Government Payments for a subsequent year are typically determined by a hospital's performance for a calendar year previous to the current calendar year. For instance, the Debtors' applicability for certain Government Payments for the 2028 fiscal year may be predicated on results from the 2025 fiscal year, which have not been determined yet. Given the significant gap in testing periods and payments being made, there is a risk that the Government Payments for a future year may not be accessible to the Reorganized Debtor.  The Debtors' management do not believe there will be any significant variance in WRMC's operation or patient demographics that will result in a significant change to the Government Payments received by the Debtors and to be received by the Reorganized Debtor.  If the Debtors or Reorganized Debtor were no longer eligible for the Government Payments, this would most likely be the result of the Debtors providing a greater percentage of services to insured patients, which could have the overall effect of increasing the Debtors' or Reorganized Debtor's revenue.

## ARTICLE X

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following is a general summary of certain material U.S. federal income tax consequences of the Plan to the Debtor and to certain holders (which solely for purposes of this discussion means the beneficial owner for U.S. federal income tax purposes) of certain Claims. The following summary does not address the U.S. federal income tax consequences to holders of Claims or Interests not entitled to vote on the Plan or holders of Class 2 Claims.  This summary is based upon the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), the Treasury Department regulations promulgated thereunder ("**Treasury Regulations**"), judicial decisions and current administrative rulings and practice, all as in effect on the date hereof.  These authorities

are all subject to change at any time by legislative, judicial or administrative action, and such change may be applied retroactively in a manner.

Due to a lack of definitive judicial or administrative authority or interpretation, the complexity of the application of the Tax Code and Treasury Regulations to the implementation of the Plan, the possibility of changes in the law, the differences in the nature of various Claims and Interests, and the potential for disputes as to legal and factual matters, the tax consequences discussed below are subject to substantial uncertainties. No legal opinions have been requested or obtained from counsel with respect to any of the tax aspects of the Plan, and no rulings have been or will be requested from the IRS or any other taxing authority with respect to any of the issues discussed below. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

The summary does not cover all aspects of U.S. federal income taxation that may be relevant to the Debtor or to certain holders of Claims in light of their particular circumstances. For example, the description does not address issues of special concern to certain types of taxpayers, such as dealers in securities, life insurance companies, financial institutions, tax exempt organizations, S corporations, partnerships, or other pass-through entities for U.S. federal income tax purposes and their owners, and non-U.S. persons, nor, except as specifically provided herein, does it address tax consequences to holders of Interests. In addition, the description does not discuss any U.S. federal non-income (including estate or gift), state, local or non-U.S. tax, alternative minimum tax, or the Medicare tax on certain net investment income consequences of the Plan. Furthermore, this discussion assumes that a holder of a Claim holds such claim as a "capital asset" within the meaning of Section 1221 of the Tax Code (generally property held for investment).

The summary does not cover all aspects of U.S. federal income taxation that may be relevant to the Debtors or to certain holders of Claims in light of their particular circumstances. For example, the description does not address issues of special concern to certain types of taxpayers, such as dealers in securities, life insurance companies, financial institutions, tax exempt organizations, S corporations, partnerships, or other pass-through entities for U.S. federal income tax purposes and their owners, holders who utilize the installment method of reporting with respect to their Claims, and non-U.S. persons, nor, except as specifically provided herein, does it address tax consequences to holders of Interests. In addition, the description does not discuss any U.S. federal non-income (including estate or gift), state, local or non-U.S. tax, alternative minimum tax, or the Medicare tax on certain net investment income consequences of the Plan. Furthermore, this discussion assumes that a holder of a Claim holds such claim as a "capital asset" within the meaning of Section 1221 of the Tax Code (generally property held for investment).

THE TRANSACTIONS CONTEMPLATED BY PLAN MAY HAVE AN IMPACT ON THE TAX TREATMENT OF ANY HOLDER OF A CLAIM OR INTEREST. THAT IMPACT MAY BE ADVERSE TO SUCH HOLDER. NOTHING HEREIN IS INTENDED TO BE ADVICE OR OPINION AS TO THE TAX IMPACT OF THE PLAN ON ANY HOLDER OF A CLAIM OR INTEREST. EACH HOLDER OF A CLAIM OR INTEREST IS CAUTIONED TO OBTAIN INDEPENDENT AND COMPETENT TAX ADVICE PRIOR TO VOTING ON THE PLAN.

10.1    **Certain U.S. Federal Income Tax Consequences to the Debtor**The Debtors believe that each Debtor (other than NCP Management, LLC) is either properly classified as a partnership or a disregarded entity for U.S. federal income tax purposes.  As a result, such Debtors generally are not subject to U.S. federal income tax.  Instead, each holder of Interests of any such Debtors is required to report on its U.S. federal income tax return, and is subject to U.S. federal income tax in respect of, its allocable share of the income, gain, loss, and credit of any such Debtors.  Accordingly, the U.S. federal income tax consequences of the Plan generally will not be borne by such Debtors, but instead will generally be borne directly by the holders of Interests of such Debtors, including such holders of Interests being allocated their allocable share of any gain or loss recognized by the applicable Debtor on a sale of any of its assets for U.S. federal income tax purposes, which gain or loss on such a sale transaction should generally be equal to the difference between the purchase price paid for the assets and the applicable Debtor's adjusted tax basis in such assets.  However, because NCP Management, LLC is classified as a corporation for U.S. federal income tax purposes, NCP Management, LLC may realize COD Income (as defined below) as a result of the transactions arising under the Plan, but any such realized COD Income is generally expected to be excluded under the Bankruptcy Exception (as defined below).

In general, absent an exception, a taxpayer will realize and recognize cancellation of indebtedness income ("**COD Income**") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD Income, in general, is the excess of (i) the adjusted issue price of the indebtedness satisfied, over (ii) the amount of cash paid and the fair market value of any other consideration given in satisfaction of such indebtedness at the time of the exchange.

Under Section 108 of the Tax Code, a taxpayer is not required to include COD Income in gross income if the taxpayer is under the jurisdiction of a court in a case under the Bankruptcy Code and the discharge of debt occurs pursuant to that case (the "**Bankruptcy Exception**") or to the extent that the taxpayer is insolvent immediately before the discharge (the "**Insolvency Exception**").  Instead, as a consequence of such exclusion, a taxpayer must reduce its tax attributes by the amount of COD Income that it excluded from gross income.

Under Section 108(d)(6) of the Tax Code, when an entity that is taxed as a partnership realizes COD Income, its partners are treated as receiving their allocable share of such COD Income and the Bankruptcy Exception or Insolvency Exception (and related attribute reduction) is applied at the partner level, rather than at the entity level, and, thus, depend on whether the partner is itself insolvent or in bankruptcy.  Accordingly, the holders of Interests in any Debtor that is classified as a partnership for U.S. federal income tax purposes will be treated as receiving their allocable share of any COD Income realized by any such Debtor, and the Bankruptcy Exception and the Insolvency Exception will be applied at the partner level.  The fact that any such Debtor is insolvent or in bankruptcy is not relevant for the determination.

Each holder of Interests is urged to consult with its own tax advisors as to the tax implications to it of the Plan.

10.2 **Certain U.S. Federal Income Tax Consequences for Holders of Class 2, Class 4, or Class 5 Claims**

(a) **General Tax Consequences**

For U.S. federal income tax purposes, an actual exchange of a new debt instrument for an existing debt instrument, or the modification of the terms of an existing debt instrument, generally will be treated as an exchange of the existing debt instrument for a new debt instrument, which (among other things) would generally result in the realization of gain or loss for U.S. federal income tax purposes (as discussed in more detail below), if the terms of the new debt instrument or the modified terms, as applicable, compared to the existing debt instrument constitute a "significant modification." The applicable Treasury Regulations concerning modification of debt instruments generally provide that a significant modification occurs if, based on all the facts and circumstances and taking into account all changes in the terms of the debt instrument collectively (other than certain specified changes which are tested separately), the legal rights or obligations that are altered, and the degree to which they are altered, are economically significant. Because this is a facts and circumstances analysis that is based on the facts and terms of each specific Claim, each holder of a Class 2, Class 4, or Class 5 Claim is urged to consult its own tax advisors to determine whether the receipt of the right to receive a percentage of the gross revenues of the Reorganized Debtor, the Restructured Equipment Note Terms, the Equipment Lender Cramdown Note, or its Pro Rata Share of the GUC Distribution Pool will result in a significant modification, and therefore, an exchange by such holder of its existing debt instrument for a new debt instrument for U.S. federal income tax purposes. The remainder of this discussion assumes that the issuance of the right to receive the percentage of gross revenues of the Reorganized Debtor, the Restructured Equipment Note Terms, the Equipment Lender Cramdown Note, and its Pro Rata Share of the GUC Distribution Pool (to the extent that such obligation is treated as a debt instrument for U.S. federal income tax purposes) pursuant to the Plan will result in a significant modification a holder of a Class 2, Class 4, or Class 5 Claim in respect of its Claim.

Generally, a holder of a Class 2, Class 4, or Class 5 Claim should recognize gain or loss equal to the difference between (i) the sum of (a) the amount of any Cash received, (b) if applicable, the "issue price" (or in certain limited circumstances, the stated principal amount reduced by any unstated interest (as determined under the applicable rules)) of any non-contingent note or other obligation that is considered to be a debt instrument for U.S. federal income tax purposes that is received, and (c) if applicable, the fair market value of any contingent note or other obligation that is considered to be a debt instrument for U.S. federal income tax purposes, any obligation that is not considered to be a debt instrument for U.S. federal income tax purposes, or any other assets that are received by such holder in respect of such Claim (other than any such consideration received in respect of accrued and unpaid interest, which will be taxed as set forth in the next paragraph below), and (ii) such holder's adjusted tax basis in such Claim. The character of any such gain or loss will depend on a number of factors, including the tax status of the holder, the nature of the Claim in the holder's hands, whether the Claim was purchased at a discount, whether the Claim constitutes a capital asset in the hands of the holder, the holder's holding period of the Claim, and the extent to which the holder previously claimed a bad debt deduction or deduction for the worthlessness of all or a portion of the Claim. Subject to the market discount rules discussed below, if the Claim is a capital asset in the holder's hands, any gain or loss realized will

generally be characterized as capital gain or loss and will constitute long-term capital gain or loss if the holder has held such Claim for more than one year.  Under current U.S. federal income tax law, non-corporate holders may be eligible for reduced rates of taxation on long-term capital gains. The deductibility of capital losses is subject to limitations.

The "issue price" of a note or other obligation that is considered to be a debt instrument for U.S. federal income tax purposes that is not considered to be publicly traded and that is issued in exchange for another debt instrument that is not considered to be publicly traded generally will (i) if such note or other obligation provides for "adequate stated interest," be the stated principal amount of the such note or other obligation, and (ii) if such note or other obligation does not provide for adequate stated interest, be its "imputed principal amount." In general, the "imputed principal amount" of any such note or other obligation will be the sum of the present values of all payments due under such note or other obligation using a discount rate equal to the "test rate of interest;" any such note or other obligation will be considered to have adequate stated interest if its stated principal amount is less than or equal to its imputed principal amount; and the "test rate of interest" generally should be the lowest applicable federal rate in effect during the three month period ending with the month in which the Effective Date occurs.

(b)    **Accrued Interest**

To the extent any amount of consideration received by a holder of a Class 2, Class 4, or Class 5 Claim is attributable to accrued but unpaid interest in respect of such Claim, the receipt of such Cash will be taxable to such holder as ordinary income to the extent not previously included in income by such holder.  Conversely, a holder who previously included in its income accrued but unpaid interest attributable to its Class 2, Class 4, or Class 5 Claim may be able to recognize a deductible loss to the extent that such accrued but unpaid interest is not paid in full.

(c)    **Market Discount**

Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a holder in respect of its Class 2, Class 4, or Class 5 Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim.  Any gain recognized by a holder on the taxable disposition of a Claim that was acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Claim was considered to be held by the holder (unless the holder elected to include market discount in income as it accrued).

(d)    **Receipt of Percentage of Gross Revenues of the Reorganized Debtor**

There is not any authority directly addressing the U.S. federal income tax treatment of the receipt of the right to a percentage of gross revenues of the Reorganized Debtor pursuant to the Plan.  Therefore, the tax treatment of the receipt of the right to a percentage of gross revenues of the Reorganized Debtor by a holder of a Class 2 Claim pursuant to the Plan is subject to uncertainty (including with respect to the amount, timing, and character of any gain, income, or loss), and such receipt of such right to a percentage of gross revenues of the Reorganized Debtor pursuant to the Plan could result in tax consequences to a holder of a Class 2 Claim that differs materially from

those summarized below.  Accordingly, each holder of a Class 2 Claim is urged to consult its own tax advisors regarding the tax consequences arising from the receipt of right to a percentage of gross revenues of the Reorganized Debtor pursuant to the Plan.

Based on the U.S. federal income tax rules applicable to arrangements or obligations analogous to the right to receive a percentage of gross revenues of the Reorganized Debtor, it appears to be reasonable to treat the right to receive such percentage of gross revenues as either a contingent payment debt instrument or as a deferred contingent contractual payment obligation that is not a debt instrument.  In either case, for purposes of determining the amount of gain or loss that a holder would recognize in respect of its Claim, the holder should generally be required to take into account the fair market value (determined as of the Effective Date) of such right to receive such percentage of gross revenues.  The holder would have an initial tax basis in such right to receive such percentage of gross revenues equal to such fair market value amount.  Any such gross revenue payments received by the holder from the Reorganized Debtor (except to the extent of any portion of such payment that is otherwise required to be treated as imputed interest for U.S. federal income tax purposes) should likely be treated first as a return of the holder's tax basis in its right to receive such percentage of gross revenues (but not below zero), with any remaining excess then treated as gain.  The character of any such gain generally is unclear, but if such gain is treated as capital gain, such capital gain should generally be long-term capital gain if the holder's right to receive such percentage of gross revenues has been held for more than one year at the time of any such payment that is in excess of the tax basis.  Under current U.S. federal income tax law, non-corporate holders may be eligible for reduced rates of taxation on long-term capital gain.  A holder should generally recognize a loss (which might be considered a capital loss) to the extent of any remaining tax basis in its right to such percentage of gross revenues after the expiration of any right to receive such percentage of gross revenues.  The deductibility of capital losses is subject to limitations.  Additionally, the imputed interest provisions under U.S. federal income tax law should also generally apply to potentially cause a portion of any such gross revenue payment to be treated as interest, which would be taxable to the holder as ordinary income.

(e)     **Restructured Equipment Note Terms and Equipment Lender Cramdown Note**

Because neither the Class 4 Claim, the Restructured Equipment Note Terms, nor the Equipment Lender Cramdown Note should be considered to be publicly traded, the issue price of the Restructured Equipment Note Terms or the Equipment Lender Cramdown Note, as applicable, generally will be determined based on whether the Restructured Equipment Note Terms or the Equipment Lender Cramdown Note, as applicable, has "adequate stated interest" (as described above under the heading "**General Consequences**").  Because this is a facts and circumstances analysis that is based on the facts and terms applicable to each specific holder of a Class 4 Claim, each holder of a Class 4 Claim is urged to consult its own tax advisors to determine the issue price of its Restructured Equipment Note Terms or the Equipment Lender Cramdown Note, as applicable.

If the Restructured Equipment Note Terms or the Equipment Lender Cramdown Note, as applicable, is determined to have adequate stated interest and its issue price is its stated principal amount, then stated interest on the Restructured Equipment Note Terms or the Equipment Lender

Cramdown Note, as applicable, generally will be taxable to a holder of a Class 4 Claim as ordinary income at the time such interest is received or accrued in accordance with the holder's regular method of accounting for U.S. federal income tax purposes.

If the Restructured Equipment Note Terms or the Equipment Lender Cramdown Note, as applicable, is determined not to have adequate stated interest and its issue price is its imputed principal amount, then payments of "qualified stated interest" on the Restructured Equipment Note Terms or the Equipment Lender Cramdown Note, as applicable, generally would be taxable to a holder of a Class 4 Claim as ordinary income at the time such interest is received or accrued in accordance with the holder's regular method of accounting for U.S. federal income tax purposes. "Qualified stated interest" generally means stated interest that is unconditionally payable in cash or in property (other than debt instruments of the issuer) at least annually at a single fixed rate or a single qualified floating rate. Additionally, the Restructured Equipment Note Terms or the Equipment Lender Cramdown Note, as applicable, generally would be treated as issued with "original issue discount" (or "**OID**") for U.S. federal income tax purposes if the sum of all payments (other than qualified stated interest) with respect to the Restructured Equipment Note Terms or the Equipment Lender Cramdown Note, as applicable, exceeds its issue price by more than a statutorily defined de minimis amount.

If the Restructured Equipment Note Terms or the Equipment Lender Cramdown Note, as applicable, is treated as issued with OID, a holder of a Class 4 Claim, regardless of its method of accounting for U.S. federal income tax purposes, generally must include the OID in gross income as it accrues (on a constant yield to maturity basis), regardless of whether cash attributable to such OID is received at such time. The amount of OID includable in gross income by the holder in any taxable year generally is the sum of the daily portions of OID with respect to the Restructured Equipment Note Terms or the Equipment Lender Cramdown Note, as applicable, for each day during such taxable year on which the holder holds the Restructured Equipment Note Terms or the Equipment Lender Cramdown Note, as applicable. The daily portion is determined by allocating to each day in any accrual period a pro rata portion of the OID allocable to that accrual period. The accrual period may be of any length and may vary in length over the term, provided that each accrual period is no longer than one year and each scheduled payment of principal or interest occurs on the first day or the final day of an accrual period. The amount of OID allocable to any accrual period is an amount equal to the excess, if any, of (i) the product of the "adjusted issue price" at the beginning of such accrual period and its yield to maturity (determined on the basis of a compounding assumption that reflects the length of the accrual period) over (ii) the sum of the qualified stated interest payments allocable to the accrual period. The "adjusted issue price" at the beginning of any accrual period generally equals the issue price, increased by the amount of all previously accrued OID and decreased by any cash payments previously made on the note other than payments of qualified stated interest, and the "yield to maturity" is the discount rate that, when used in computing the present value of all principal and interest payments to be made on the debt instrument, produces an amount equal to the issue price. The rules regarding OID are complex. Each holder of a Class 4 Claim is urged to consult its own tax advisors regarding the potential for OID and the consequences of OID.

Upon the sale, exchange, redemption, retirement, or other taxable disposition of the Restructured Equipment Note Terms or the Equipment Lender Cramdown Note, as applicable, the

holder will generally recognize gain or loss equal to the difference, if any, the amount realized (less any accrued but unpaid stated interest, which will be taxable as such to the extent not already included in income) and the holder's adjusted tax basis in the Restructured Equipment Note Terms or the Equipment Lender Cramdown Note, as applicable. The holder's adjusted tax basis in the Restructured Equipment Note Terms or the Equipment Lender Cramdown Note, as applicable, will generally be equal to the issue price of the Restructured Equipment Note Terms or the Equipment Lender Cramdown Note, as applicable, increased by any accrued OID previously included in the holder's gross income and reduced by any prior payments (other than qualified stated interest) on the Restructured Equipment Note Terms or the Equipment Lender Cramdown Note, as applicable. In general, such gain or loss will be capital gain or loss and will be long-term capital gain or loss if the Restructured Equipment Note Terms or the Equipment Lender Cramdown Note, as applicable, has been held for more than one year. Under current U.S. federal income tax law, non-corporate holders may be eligible for reduced rates of taxation on long-term capital gain. The deductibility of capital losses is subject to limitations.

10.3    **Information Reporting and Withholding**In connection with the Plan, the Debtors and the Reorganized Debtor will comply with all applicable withholding and information reporting requirements imposed by U.S. federal, state, local, and foreign taxing authorities, and all distributions or payments under the Plan (including payments arising under the right to receive the percentage of the gross revenues of the Reorganized Debtor, the Restructured Equipment Note Terms, the Equipment Lender Cramdown Note, and its Pro Rata Share of the GUC Distribution Pool) will be subject to those withholding and information reporting requirements. Holders of Claims may be required to provide certain tax information as a condition to receiving distributions or payments pursuant to the Plan (including payments arising under the right to receive the percentage of the gross revenues of the Reorganized Debtor, the Restructured Equipment Note Terms, the Equipment Lender Cramdown Note, and the GUC Distribution Pool).

In general, information reporting requirements may apply to distributions or payments pursuant to the Plan (including payments arising under the right to receive the percentage of the gross revenues of the Reorganized Debtor, the Restructured Equipment Note Terms, the Equipment Lender Cramdown Note, and the GUC Distribution Pool). Additionally, under the backup withholding rules, a holder of a Claim may be subject to backup withholding (currently at a rate of 24%) with respect to distributions or payments made pursuant to the Plan (including payments arising under the right to receive the percentage of the gross revenues of the Reorganized Debtor, the Restructured Equipment Note Terms, the Equipment Lender Cramdown Note, and the GUC Distribution Pool), unless a holder of a Claim provides the applicable withholding agent with a taxpayer identification number, certified under penalties of perjury, as well as certain other information, or otherwise establishes an exemption from backup withholding. Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules will be allowed as a credit against a holder's U.S. federal income tax liability, if any, and may entitle a holder to a refund, provided the required information is timely furnished to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.

Holders of Claims or Interests are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holder's tax returns.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM OR INTEREST IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES.  EACH HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT WITH SUCH HOLDER'S TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, LOCAL, FOREIGN, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

Dated:  July 24, 2026

**White Rock Medical Center, et al.**

By: Erik White

   */s/Erik White*
By: Erik White
Its: Chief Restructuring Officer


**REED SMITH LLP**

Omar J. Alaniz (SBN 24040402)
2850 N. Harwood Street, Suite 1500
Dallas, TX 75201
Telephone: (469) 680-4200
Facsimile: (469) 680-4299
E-mail:  oalaniz@reedsmith.com

-   and -

Scott M. Esterbrook (admitted *pro hac vice*)
Derek M. Osei-Bonsu (admitted *pro hac vice*)
Three Logan Square 1717 Arch Street, Suite 3100
Philadelphia, PA 19103
Telephone: (215) 241-1087
Facsimile: (215) 241-1000
E-mail: sesterbrook@reedsmith.com
     dosei-bonsu@reedsmith.com

*Counsel for the Debtors*
*and Debtors in Possession*

*Signature Page to Disclosure Statement*

**EXHIBIT A**

**Plan of Reorganization**

**EXHIBIT B**

**Disclosure Statement Order**